# APPENDIX A

LEXSEE 2002 DEL. SUPER. LEXIS 180

MARK W. CARELLO and KAREN CARELLO NOCKET, Plaintiffs, v.
PRICEWATERHOUSECOOPERS LLP, Defendant.

C.A. No. 01C–10–219 RRC

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2002 Del. Super. LEXIS 180*

May 23, 2002, Submitted
July 3, 2002, Decided

**SUBSEQUENT HISTORY:** Related proceeding at *Coleman v. PricewaterhouseCoopers LLC, 2005 Del. Super. LEXIS 41* (Del. Super. Ct., Feb. 8, 2005)

**DISPOSITION:** [*1] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DENIED.

**COUNSEL:** Kevin William Gibson, Esquire, Gibson & Perkins, P.C., Media, Pennsylvania, Attorney for Plaintiffs.

Gregory V. Varallo, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, and Martin L. Perschetz, Esquire, Schulte Roth & Zabel LLP, New York, New York (pro hac vice), Attorneys for Defendant.

**JUDGES:** Richard R. Cooch.

**OPINIONBY:** Richard R. Cooch

**OPINION:**

MEMORANDUM OPINION

COOCH, J.

INTRODUCTION

Before the Court is a motion for summary judgment ("the Motion") filed by defendant PricewaterhouseCoopers LLP ("PwC") n1 against plaintiffs Mark W. Carello and Karen Carello Nocket ("Plaintiffs"). Plaintiffs' action sounds in tort for negligent misrepresentation, specifically the alleged negligence of a public accountant to a third party with whom there was no privity of contract and where the only harm suffered was economic in nature. The issue here is whether PwC owed Plaintiffs a duty, such duty potentially arising either through 1) Plaintiffs' inclusion in a class of similarly-situated business owners who

relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason, [*2] Inc. ("Lason") and which were prepared by PwC, or 2) a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, in order for a duty to arise, PwC would have had to have known (or have had reason to have known) that Lason would share its financial statements with the class or with Plaintiffs as part of a potential business transaction.

> n1 PwC originally filed a motion to dismiss the complaint but both parties attached affidavits to their subsequent submissions in connection with that motion; the Court, with the agreement of the parties, will therefore treat the motion as one for summary judgment. See Super. Ct. Civ. R. 12(b) (providing that a motion to dismiss shall be treated as one for summary judgment if "matters outside the pleadings are presented to and not excluded by the Court").

In their proposed First Amended Complaint, n2 Plaintiffs allege that PwC negligently audited the [*3] financial statements of its client, Lason; Plaintiffs aver that they relied upon those statements in subsequently deciding to sell their business, Delaware Processing Services, Inc. ("DPS") to Lason. PwC advances two grounds for summary judgment in its Motion: 1) that under Superior Court Civil Rule 12(b)(6), Plaintiffs have failed to state a claim upon which relief can be granted; n3 and 2) that under Superior Court Civil Rule 9(b), Plaintiffs have failed to plead negligence with particularity.

> n2 Plaintiffs originally filed a Complaint alleging negligence and fraud, and they sought an award of punitive damages. At oral argument on PwC's Motion, the Court granted Plaintiffs leave to sub-

mit a proposed amended complaint (as well as af-fidavits) in connection with Court-ordered supple-mental memoranda. The proposed First Amended Complaint does not include a fraud count but avers only negligence.

n3 Although originally filed as a motion to dismiss, PwC's submissions on the motion subse-quent to the original motion's conversion did not re-characterize PwC's argument; PwC has main-tained throughout this litigation that it is entitled to judgment as a matter of law because it did not owe Plaintiffs any duty at the time Plaintiffs decided to sell their business because they decided to sell after Lason made an SEC filing on March 31, 1999.

[*4]

Because there are material facts in dispute and PwC is not entitled to judgment as a matter of law when those facts are viewed in a light most favorable to Plaintiffs, PwC's motion for summary judgment is DENIED.

## FACTS

Plaintiffs were the sole shareholders of DPS, a com-pany whose purpose was to service "financial institutions and similarly situated institutions in capturing and pro-cessing data"; n4 each plaintiff owned 50% of DPS's is-sued and outstanding stock prior to selling DPS to Lason. n5 Plaintiffs sold DPS to Lason through a transaction that closed on November 19, 1999 and which involved a complicated deferred "earn out" formula that appar-ently engineered to partly compensate Plaintiffs *in futuro*. Plaintiffs allege that in deciding to sell their business to Lason, they in part relied "on [a] review...of...statements [relating to Lason's financial health] and [PwC's] assess-ment of the financial condition of Lason as represented by such audited financial statements...." n6 PwC had "audited Lason's annual financial statements." n7

n4 First Am. Compl. P6.

n5 First Am. Compl. P5.

[*5]

n6 First Am. Compl. P68.

n7 Def.'s Mot. P1.

A further chronology drawn from the First Amended Complaint follows: "In April, 1998, the Plaintiffs...were contacted by...representatives of Lason, soliciting DPS's data entry business for a Lason subsidiary..."; n8 "In the third quarter of 1998...DPS began doing business with

Lason through its subsidiary"; n9 "During the period 1996 through 1999, Lason completed the acquisition of 76 companies (55 of which were completed during the two year period 1998-1999)"; n10 "The Plaintiffs, as part of their investigation to enter into the sale...reviewed and relied on Lason's Annual Report, 10-K and the au-dited financial statements accompanying such reports for the periods ending December 31, 1997, and December 31, 1998...together with Lason's...10-Q, and the unau-dited financial statements accompanying such report, for the periods ending December 31, 1998, March 31, 1999, and June 30, 1999..."; n11 "The Plaintiffs subsequently learned [after DPS was acquired by Lason] that Lason's re-ported revenues on its audited financial statements, and its 10Ks, and [*6] 10Qs, for the reporting fiscal years 1997, 1998, and 1999, which were prepared by...[PwC], were not based upon an accounting method which was in con-formity with Generally Accepted Accounting Principles ('GAAP')." n12

n8 First Am. Compl. P11.

n9 First Am. Compl. P12.

n10 First Am. Compl. P13.

n11 First Am. Compl. P54.

n12 First Am. Compl. P93.

On December 5, 2001, Lason filed a voluntary peti-tion under Chapter 11 of the United States Bankruptcy Code. n13 As a result of the accounting irregularities that Plaintiffs allege existed in Lason's audited financial statements and (presumably) because of Lason's subse-quent filing for bankruptcy protection, Plaintiffs aver that Lason "cannot and will not be able to" pay the "earn out" Plaintiffs argue is now due them as part of the DPS acqui-sition. Plaintiffs assert that PwC is liable to them "in that had [PwC] not misstated the income of Lason contrary to [Generally Accepted Accounting Principles], Plaintiffs never would have agreed to sell DPS [*7] to Lason." n14

n13 First Am. Compl. P106.

n14 First Am. Compl. P120.

Additionally, Plaintiffs claim that they relied on the alleged oral representations of Timothy Molnar, a PwC employee whom Plaintiffs apparently believed was a cer-tified public accountant and who Plaintiffs state "specifi-cally advised the Plaintiffs that the structure of the Lason [acquisition] was a 'fair one' and represented a 'good deal' for the Plaintiffs...." n15 The oral representations Plaintiffs purportedly relied upon included an alleged

2002 Del. Super. LEXIS 180, *7

statement by Molnar to the effect that "if there was any-thing else the Plaintiffs should look at or needed to know about the financial condition of Lason [in consideration of whether to sell their business to Lason][,]...what...[PwC] reported to the SEC...should be alright [sic]." In affidavits they have submitted in connection with this litigation, Plaintiffs state that after "meeting with Mr. Molnar...and after reviewing Lason's audited financial statements to-gether with the 10Ks and [*8] the 10Qs prepared by...[PwC]...[we] decided to accept Lason's terms and proceed with the sale of our DPS stock to Lason." n16

n15 First Am. Compl. P65.

n16 Carello Aff. P5 (Ex. A to Pls.' Sur Reply); Carello Nocket Aff. P5 (Ex. B to Pls.' Sur Reply)

PwC has attached two affidavits to its submissions opposing Plaintiffs' asserted cause of action. The first affidavit is from Timothy Molnar, the PwC employee whom Plaintiffs allege was the CPA who made certain representations concerning the financial health of Lason to Plaintiffs when they were contemplating the sale of their business; in his affidavit, Molnar denies he partici-pated in PwC's audit of Lason's financial records, states that he was unfamiliar with Lason's financial condition (and denies that he made any representations to the con-trary), and refutes that he ever represented to Plaintiffs that he was a CPA. n17 The second of PwC's attached affidavits is from Cheryl L. Dunn, the "engagement part-ner" for PwC's audits of the financial statements [*9] of Lason, Inc. Dunn's affidavit states "I am confident that, at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements, I did not know about a potential acquisition by Lason of DPS." n18

n17 See Molnar Aff. PP3, 4, 5 (Ex. A to Def.'s Supplemental Reply Mem.).

n18 Dunn Aff. P4 (Ex. B to Def.'s Supplemental Reply Mem.).

## CONTENTIONS OF THE PARTIES

Plaintiffs concede (and PwC argues) that in Delaware the applicable standard of the tort of negligent misrepre-sentation lies in *section 552 of the Restatement (Second) of Torts*. That section, in pertinent part, provides that:

(1) One who, in the course of business, pro-fession or employment, or in any other trans-action in which he has a pecuniary interest, supplies false information for the guidance of others...is subject to liability for pecuniary

loss caused to [those others] by their justifi-able reliance...

(2)...the liability is limited to loss suffered (a) by the person or one of a limited group of per-sons [*10] for whose benefit and guidance [the information supplier]...knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [the information supplier] knows that the recipi-ent...intends [the information to influence]... n19

n19 *Restatement (Second) of Torts § 552* (1977).

The pertinent factual allegations Plaintiffs make in support of their argument that PwC should now be found liable under the Restatement formulation follow: "Upon information and belief, DPS, was targeted for acquisi-tion by Lason as early as the third financial quarter of 1998, and no later than January of 1999, during or prior to the period...[PwC] was performing [its] 1999 audit of Lason's financial statements"; n20 "Upon information and belief, the Defendant as an integral part of Lason's acqui-sition team had actual knowledge that the Plaintiffs were targeted for acquisition by Lason during or prior to the period the Defendant was performing its 1999 audit of Lason's financial statements"; [*11] n21 "It is believed and therefore averred, that...[PwC] as an integral mem-ber of the Lason acquisition team was or should have been aware that companies considering an acquisition by Lason, such as DPS, would rely on the audited financial statements of Lason, and its 10Ks and 10Qs filed with the SEC, to determine if they should accept Lason's offer of purchase"; n22 that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies"; n23 and "As a re-sult and direct proximate cause of...[PwC's] negligence, the Plaintiffs have been and will be damaged, in that had...[PwC] not misstated the income of Lason contrary to GAAP, Plaintiffs never would have agreed to sell DPS to Lason." n24

n20 First Am. Compl. P20.

n21 First Am. Compl. P21.

n22 First Am. Compl. P64.

n23 Pls.' Answer to Def.'s Mot. at 4 n. 4.

n24 First Am. Compl. P120.

Despite the attached Cheryl L. Dunn affidavit (the "engagement partner" for PwC's audits of the [*12] fi-

2002 Del. Super. LEXIS 180, *12

nancial statements of Lason, Inc) to the effect that "at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements" PwC did not know about a potential acquisition of DPS by Lason, Plaintiffs state that they "would suspect that...[PwC] has hundreds of employees that may have a different recollection" and that they "have the absolute right to take discovery on this potential issue." n25

n25 Pls.' Sur Reply at 2.

In response, PwC argues that under *section 552 of the Restatement (Second) of Torts*, Plaintiffs have failed to allege the requisite duty PwC would have had to have owed them for PwC now to be potentially liable to Plaintiffs. Specifically, PwC argues that Plaintiffs have failed to allege a "pecuniary loss caused by justifiable reliance upon...false information" n26 because "the last audited financial statements issued before the sale of DPS was even contemplated were for the year ending December 31, 1998 [and]...thus Plaintiffs allege that Lason's failure to make a [*13] payment due after October 31, 2000 was caused by PwC's audit report on financial statements for a period that ended almost *two years earlier*." n27 PwC argues that Plaintiff's factual averments "contain[] no cognizable allegation that PwC's audit reports—rather than Lason's subsequent financial problems—caused Plaintiffs' losses." n28 In support of its argument that PwC did not owe Plaintiffs a duty as alleged, PwC states that the pleadings "make[] clear that PwC could not possibly have known about a proposed sale of DPS to Lason, or [have] intended that its audit reports be used in connection with such a sale, since Plaintiffs claim not even to have been approached about the sale until July 1, 1999" and "the audited financial statements on which Plaintiffs claim to have relied...were filed with the S.E.C. on March 31, 1998 and March 31, 1999, respectively." n29 PwC argues "to be liable for negligent misrepresentation under Restatement Section 552, a defendant must have owed to the plaintiff the requisite duty *at the time the alleged misrepresentations were made*." n30 Citing Outdoor Techs., Inc. v. Allfirst Fin., Inc., n31 PwC further argues that Plaintiffs' averments, [*14] particularly those relative to their encounter with Timothy Molnar, the PwC employee whom Plaintiffs allege was the PwC CPA who made certain representations to them, fail to establish a business relationship with PwC such that PwC can now be held liable to Plaintiffs.

n26 Def.'s Mot. P2.

n27 Id. (emphasis in original).

n28 Id.

n29 Def.'s Mot. P3.

n30 Def.'s Supplemental Reply Mem. at 1 (emphasis in original); Def.'s Reply Mem. at 3.

n31 *2001 WL 541472* (Del. Super.) (granting defendant–banks' motion for summary judgment because those banks and their counsel did not owe a duty to non-customer attempting to cash a check drawn on them).

Additionally, PwC argues that "a complaint alleging negligent misrepresentation...must allege 'the specific manner in which the [statement] is misleading' (citation omitted)," and that although the pleadings "purport[] to set forth numerous Generally Accepted Accounting Principles, [they] fail to allege how any of these principles [*15] allegedly [were] violated." n32 Accordingly, PwC argues that it is entitled to judgment as a matter of law because Plaintiffs have failed to plead negligence with particularity as required by Superior Court Civil Rule 9(b).

n32 Def.'s Mot. P5.

STANDARD OF REVIEW

Summary judgment is granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. n33 The court must view the facts in a light most favorable to the non-moving party. n34 A court "reviews the summary judgment motion and response papers and seeks to determine whether the record reveals a disputed factual issue material enough to require a trial and factfinder determination...." n35 A "nontrivial factual dispute created by the nonmovant [such as by the attachment of an affidavit disputing the other side's allegations] will usually bar summary judgment so long as the contested facts are material even if the nonmovant's support is considered weak by the court." n36

n33 Super. Ct. Civ. R. 56(c); *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991).

[*16]

n34 *Merrill v. Crothall–American, Inc.*, 606 A.2d 96, 99–100 (Del. 1992).

n35 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.11[5][a], at 56–108 (3d ed. 2002).

n36 Id., § 56.11[7][b], at 56–124.

## DISCUSSION

In order for PwC to be potentially held liable to Plaintiffs, Plaintiffs must show that PwC owed Plaintiffs a duty, either through Plaintiffs' inclusion in a class of similarly-situated business owners who relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason and which were prepared by PwC, or through a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, PwC would have had to have known (or have had reason to have known) that Lason would share those statements with the class or with Plaintiffs as part of a potential business transaction.

As noted by this Court in its 1990 decision in Guardian Construction Co. v. Tetra Tech Richardson, Inc., n37 [*17] "Delaware case law is divided on the issue of whether privity of contract is a prerequisite for the imposition of liability on a negligence theory where the damages sought to be recovered are purely economic." n38 Finding, however, that a lack of contractual privity between the design engineer and the general contractor involved there was "not fatal," the Guardian Construction court held that section 552 of the Restatement (imposing liability on suppliers of information to third parties who are intended recipients of the information when that information contains negligent misrepresentations) was the proper standard for claims of negligent misrepresentation brought in the Delaware courts, and the Court then "specifically adopted" the Restatement's standard. n39

n37 583 A.2d 1378 (Del. Super. Ct. 1990) (holding in part that claim of general contractor and subcontractor against design engineer for negligent misrepresentation as to tidal heights and project benchmarks in seaside construction project was cognizable despite lack of contractual privity between the parties).

n38 Guardian Construction, 583 A.2d at 1384.

[*18]

n39 583 A.2d at 1386.

It has been said that "the Restatement rule...appears to be a sensible and moderate approach to the potential consequences of imposing unlimited negligence liability...[on third parties with whom there is no privity of contract and where the only harm alleged is economic in nature]." n40 This Court, in Danforth v. Acorn Structures, Inc. n41

stated that the Restatement view represented "the definite weight of authority." n42 Some courts have taken different approaches than that suggested by the Restatement, however, either on the one hand "by denying recovery to third parties for auditor negligence in the absence of a third party relationship to the auditor that is 'akin to privity[]'," or on the other hand by allowing recovery "based on auditor negligence to third parties whose reliance on the audit report was 'foreseeable[]'." n43 But "most jurisdictions, supported by the weight of commentary and the modern English common law...have steered [the] middle course...of § 552." n44

n40 Bily v. Arthur Young & Co., 3 Cal. 4th 370, 834 P.2d 745, 769, 11 Cal. Rptr. 2d 51 (Cal. 1992) (adopting the Restatement rule and rejecting the "foreseeability" approach that California courts had until that time followed in a case where investors in corporation brought a professional malpractice action against an independent auditor that had examined a corporation's books prior to the corporation's initial public offering).

[*19]

n41 1991 WL 269956 (Del. Super.), aff'd on other grounds, 608 A.2d 1194 (Del. 1992).

n42 Id. at *2.

n43 Bily, 834 P.2d at 752.

n44 Id.

While "most jurisdictions" have analyzed negligent misrepresentation liability of accountants to third parties under the Restatement approach, interpretations of section 552 "vary...[and] the more expansive cases [i.e., those jurisdictions purporting to use section 552 in their analyses but not concentrating on limiting recovery to a person or group of persons that the accountant actually knew would rely on an audit report] have been criticized as effectively eliminating all of the restrictions the Restatement sought to impose." n45 One court has stated that the "better reasoned decisions interpret § 552 as limiting...potential liability...to actual knowledge of the limited although unnamed group...as well as actual knowledge of the particular financial transaction that such information is designed to influence...measured at the moment the audit report is published...." n46 Such an interpretation is supported [*20] by comment h to section 552 itself, which provides:

...it is not required that the person who is to

2002 Del. Super. LEXIS 180, *20

become the plaintiff be identified or known to the defendant as an individual when the information is supplied...it is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it...it is enough...that the maker...knows that his recipient intends to transmit the information to a similar person, persons or group. n47

Thus a plaintiff invoking a cause of action under negligent misrepresentation involving section 552 must show that the defendant supplied the information to a party for use in that party's business transactions with the plaintiff or a class of which the plaintiff was a member. n48

n45 Elizabeth Williams, Cause of Action Against Accountant for Negligent Performance of Professional Services, 15 COA2d 395 (2000); cf. *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc.*, 2002 WL 1335360 (Del. Super.) (finding that company whose primary business purpose was the transportation of fuel oil was not "in the business of supplying information" as required by section 552, and recognizing that those courts that have taken a more "expansive view" of that section may hold otherwise).

[*21]

n46 *Nycal Corp. v. KPMG Peat Marwick LLP*, 426 Mass. 491, 688 N.E.2d 1368, 1372 (Mass. 1998) (applying the Restatement standard to an action brought by a buyer of the controlling interest in a corporation against the accountants who had audited the financial statements accompanying the company's annual report and holding that accountants were not liable to purchaser because they had no knowledge that the controlling interest was to be sold).

n47 *Restatement (Second) of Torts § 552* cmt. h (1977).

n48 But cf. *Danforth v. Acorn Structures*, 1991 WL 269956, at *2 (Del. Super.) (stating that under section 552 "the plaintiff must show that the defendant supplied the information to *the plaintiff* for use in business transactions with third parties") (empha-

sis added); *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc.*, 2002 WL 1335360, at *6 (Del. Super.) (quoting Acorn Structures).

The reasoning behind limiting the liability of an information-providing party (including accountants who audit financial statements) rests [*22] on the theory that "[the misinformer actually knows [that the relying party] will receive inaccurate information...because the misinformer knows that [its] client will channel the work product to that restricted group." n49 An illustration of these liability-limiting concepts can be found in an illustration to comment h to section 552 of the Restatement:

A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used on a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements...to obtain a loan from X Bank...[and] through reliance upon [the negligently prepared financial statements]...X Bank suffers pecuniary loss. A is not liable to X Bank. n50

Thus, under the Restatement, [*23] an information supplier retained to furnish information for no particular purpose does not undertake a duty to third parties when the information supplier neither knows nor has reason to know of the intended use to which that information will be put by the information supplier's client.

n49 *First Nat'l Bank of Commerce v. Monco Agency Inc.*, 911 F.2d 1053, 1060 (5th Cir. 1990) (holding that under Louisiana law circumstantial evidence offered by a bank of an accounting firm's knowledge that statements it had audited for its client would be relied on by the bank in making loans to the firm's client did not raise genuine issue of material fact so as to prevent summary judgment in favor of the accounting firm).

n50 *Restatement (Second) of Torts § 552* cmt. h, illus. 10 (1977).

2002 Del. Super. LEXIS 180, *23

* * *

In this case, Plaintiffs have alleged their reliance on certain financial statements of Lason that were audited by PwC at a time when a class of persons similar to and including Plaintiffs were allegedly contemplating [*24] the sale of their businesses to Lason; Plaintiffs also allege that they would not have sold their business to Lason had the statements PwC audited not been "misstated" and "contrary to Generally Accepted Accounting Principles." Plaintiffs apparently have not been able to collect that part of the purchase price that was to accumulate after the close of the sale of DPS to Lason, given that Lason subsequently filed for bankruptcy. Plaintiffs have therefore potentially shown the cause and effect of their claimed loss, contrary to PwC's assertion that Plaintiffs have failed to show "that PwC's audit reports—rather than Lason's subsequent financial problems—caused Plaintiffs' losses." n51

n51 Def.'s Mot. P2.

Plaintiffs may also possibly be able to show that they were within a "limited group of persons" for whose benefit and guidance PwC knew Lason intended to supply their audited statements and to whom PwC knew that Lason intended to influence with those same statements. n52 Plaintiffs attempt to provide this crucial [*25] link when they allege that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies." n53 Given that Plaintiffs allege that from 1996 through 1999 Lason "completed the acquisition of 76 companies," n54 and that PwC presumably was the accounting firm that Lason retained during this time period, Plaintiffs' assertion that PwC played some part in Lason's competitive acquisitioning might be established.

n52 See Restatement (Second) of Torts § 552 (1977).

n53 Pls.' Answer to Def.'s Mot. at 4 n. 4.

n54 First Am. Compl. P13.

If in fact Lason was "actively gobbling up companies," and PwC was in fact Lason's accounting firm during this time period, it is possible that PwC knew or should have known that third parties might be relying on the PwC work product Plaintiffs claim was negligently prepared, because "in many cases, the accountant preparing a financial statement for his client, although he does not know the identity of the particular [*26] party or parties to whom his client intends to exhibit his report, is aware of the use to which his client intends to put the report, and thus is aware of the class of parties to whom the report will be exhibited." n55 Under the facts as Plaintiffs present them (that Lason completed the acquisition of 76 companies during the period 1996 through 1999, all the while using PwC's services), such a class could possibly consist of those entities or persons who utilized the PwC reports as part of their pre-sale considerations in those years Lason was actively acquiring other businesses, i.e., those parties who would reasonably rely on the statement PwC audited for Lason with knowledge that Lason would then show the statements to third parties with an interest similar to that of Plaintiffs. Such a class, if so determined, would comport with the Restatement's contemplated limitation on liability, and in so doing, should allay the concerns of an accountant's liability to an unknown class for unknown amounts in an unknowable time frame. Thus, PwC's argument that it is not liable for Lason's failure to make "earn out" payments to Plaintiffs in late 2000 based on the fact that PwC's alleged [*27] negligently-prepared work product covered a period ending at least two years prior is not persuasive at this summary judgment stage; to the extent that Lason's last public filing prior to the sale of Plaintiffs' business occurred in March 1999, given that Plaintiffs may have been members of a class of companies Lason "gobbled up" between 1996 and 1999, and to whom PwC potentially knew its work product was to be distributed, the March 1999 date is not critical. Additionally, should Plaintiffs eventually be able to show that they were in fact a member of such a class, PwC's argument that Plaintiffs cannot show "something more than a casual business encounter" n56 with PwC would be meritless, as a business relationship between the class members and PwC via Lason and its utilization of PwC's auditing services for the purpose of acquiring members of the class might well implicitly establish the requisite business relationship.

n55 Jack W. Shaw, Jr., Annotation, Liability of Public Accountant to Third Parties, 46 A.L.R.3d 979, 1003 (1972).

n56 Outdoor Technologies, 2001 WL 541472, at *5.

[*28]

PwC's claim that liability may be improperly imposed on a party such as PwC (as enunciated by illustration to comment 10 of the Restatement) is unfounded. That illustration applies only to audited statements where the auditor neither knows nor has reason to know of the intended use to which the audited statements will be put. In the illustration, the financial statements were audited by an accountant primarily to benefit its own client and only collaterally or incidentally audited to benefit a potential

2002 Del. Super. LEXIS 180, *28

lender. The facts of this case, if developed as Plaintiffs allege, tend to show otherwise. This Court cannot be sure from the present state of the record what knowledge PwC had at the time it audited the relevant Lason statements, and for whose benefit the services were performed. Where "reasonable minds could conclude from the allegations [in the pleadings] that...annual audits...were prepared for another purpose [other than being prepared solely to file with the SEC], that being the influencing of the transactions in question," a motion to dismiss can be denied under § 552. n57 In the context (as here) of a motion for summary judgment and at the outset of litigation, "the record [*29] is necessarily thin...[and] as litigation continues with ensuing disclosure and discovery, the record becomes far richer factually." n58

> n57 *In re Smartalk Teleservices, Inc. Securities Litigation, 124 F. Supp. 2d 505, 525 (S.D. Ohio 2000)* (denying motion to dismiss and holding that auditors owed a third party a duty of care where there were aware during preparation of documents that their client was interested in acquiring another company, which company was one of only four on national participants in the market).

> n58 *Moore's, supra note 35, § 56.11*[3], at 56-98.

Having found that on the present record PwC is not entitled to judgment as a matter of law, the Court could deny PwC's motion for summary judgment on that prong alone. However, the competing affidavits submitted by the parties additionally show that there are some material facts in dispute—namely, what PwC knew about Lason's potential use for the statements PwC was auditing, and when PwC knew it. Summary judgment is not [*30] warranted on that prong either. As an oft-cited treatise states, in the context of a summary judgment motion, a court is constrained to deny the motion even if the "nonmovant's support is considered weak by the court." n59 Summary judgment will further not be granted if "upon examination of all the facts, it seems desirable to inquire [more] thoroughly into them in order to clarify the application of the law to the circumstances." n60 Here, the Court cannot presently know what facts Plaintiffs may ultimately be able to establish, but at this juncture the Court will allow further discovery based on Plaintiffs' somewhat meager but legally sufficient showing of material facts in dispute.

> n59 *Moore's, supra note 36.*

> n60 *Ebersole v. Lowengrub, 54 Del. 463, 180 A.2d 467, 470, 4 Storey 463 (Del. 1962)* (reversing grant of summary judgment where the record

failed to explain why a driver of a motor vehicle suddenly stopped his vehicle thereby causing a multiple-vehicle collision).

* * *

PwC's second argument [*31] that the pleadings fail to plead negligence with particularity is also not persuasive. In *Snyder v. Butcher & Co.,* n61 the defendants filed a motion to dismiss predicated on plaintiffs' alleged failure to plead fraud and negligence with particularity, even though the plaintiffs had identified the promotional materials they relied upon in deciding to invest in privately-owned radio stations, had identified the alleged misrepresentations contained in those promotional materials, and had identified the parties who prepared and distributed the promotional materials. This Court there permitted the fraud and negligence claims to withstand the motion to dismiss as "Defendants were informed of the act Plaintiff complained of and... [could] adequately prepare for response and defense[;] the Amended Complaint did not seem to be a pretext for a fishing expedition, but contained allegations of a substantial suit[;]...[and] Defendants were being exposed to a suit which, while it may not [have] ultimately been successful...[could not] correctly be characterized as unfounded." n62 Additionally, the rule requiring particularity in the pleading of negligence "must be applied in light [*32] of the particular situation presented in any case," n63 and less particularity is required "when the facts lie more in the knowledge of the opposite party, than of the party pleading." n64 The Court finds those statements and the holding of Snyder applicable to this case, requiring denial of PwC's motion for summary judgment on this ground.

> n61 *1992 WL 240344 (Del. Super.)* (denying motion to dismiss and holding in part that claims of fraud and negligence were sufficiently pleaded to satisfy Superior Court Civil Rule 9(b)).

> n62 *Snyder, 1992 WL 240344,* at *10.

> n63 *Phillips v. Delaware Power & Light Co., 56 Del. 533, 194 A.2d 690, 697, 6 Storey 533 (Del. Super. Ct. 1963)*

> n64 Id.

## CONCLUSION

For the reasons stated above, PwC's motion for summary judgment is DENIED. The Court will deem the Plaintiffs' First Amended Complaint filed today; PwC shall file an answer to that amended complaint by July 15, 2002.

2002 Del. Super. LEXIS 180, *32

IT IS SO ORDERED [*33] .

Richard R. Cooch

*Westlaw.*

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

**H**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware.
CHRISTIANA MARINE SERVICE CORPORATION,
Plaintiff,
v.
TEXACO FUEL AND MARINE MARKETING INC. and
Texaco Inc., Defendants.
No. Civ.A. 98C-02-217WCC.

Submitted Jan. 2, 2002.
Decided June 13, 2002.

On Defendant Texaco Fuel and Marine Marketing Inc., and
Texaco Inc.'s Motion for Summary Judgment. Granted in
part; denied in part.

John D. Balaguer, White & Williams LLP, Wilmington,
Delaware, for Plaintiff, Christiana Marine.
James J. Maron & John P. Daniello, Maron & Marvel, P.A.,
Wilmington, Delaware, for Defendants, Texaco Inc.
Peter R. Kahana & Daniel M. Cohen, Berger & Montague,
P.C., Philadelphia, PA, for Defendant, Texaco Fuel and
Marine Marketing, Inc. and Texaco, Inc.

MEMORANDUM OPINION

CARPENTER, J.

*1 Defendants have filed a motion for summary judgment
pursuant to Superior Court Civil Rule 12(b)(6) for failure to
state a claim upon which relief could be granted. The core
of this controversy centers upon an alleged oral long term
requirement contract between Texaco Fuel and Marine
Marketing, Inc. (hereinafter "Texaco"), and Christiana
Marine Service Corporation (hereinafter "Christiana") a
bunker fuel provider. [FN1] Christiana seeks compensatory
damages without limitation to its lost profits; and
consequential damages, consisting of Christiana's economic
losses. The Court has heard oral argument on the motion
and for the reasons set forth below, Texaco's motion for
summary judgment is denied in part, and granted in part.

> FN1. Christiana has sued Texaco's parent
> company, Texaco Incorporated, in addition to

Texaco, pursuant to vicarious liability.

*FACTS*

Christiana Marine was incorporated in 1986, after its
successor corporation, Compass Marine Corporation, ceased
doing business. Christiana was a barge contractor that
transported marine bunker fuel, a low grade black oil, in the
Delaware River. Usually, when ships are at sea and need
fuel, they will notify the oil providers in a particular port,
such as Texaco or its competitors. The oil provider, is
informed of the ship's arrival date, and the amount of bunker
fuel needed to which the oil companies reply with their bids.
Once awarded a contract, the oil company hires a barge
contractor to transport the oil to the ships who requested the
fuel. [FN2]

> FN2. Christiana had two business locations: one in
> Chester, Pennsylvania, where delivery vessels were
> berthed during non-use and repair, and one in
> Wilmington, Delaware, where orders were
> received, invoices were sent, and where payments
> were received from Texaco.

In 1988 Texaco purchased a new supply facility, the
Delaware Terminal Corporation ("DTC") in Wilmington,
Delaware to increase Texaco's market share in the Delaware
River area. Because DTC was in Wilmington, and not in, or
as near to Philadelphia, it was slightly alienated from (1) the
highest business activity where most other supply facilities
were located; and (2) where most of the ships that had to be
serviced were located. [FN3] Bunker fuel deliveries from a
more distant area, such as Wilmington, were assessed higher
rates to transport bunker fuel, as compared to the established
rates in the Delaware River zone. In addition, DTC was not
equipped to handle bunkers, and had experienced substantial
congestion problems because of this. [FN4] To solve these
problems, Texaco needed a barge carrier who would agree
to provide below market prices for fuel deliveries from
DTC, and who would also agree to exclude demurrage for
loading delays at Texaco's congested terminal. [FN5] It was
in this environment that the business relationship between
Texaco and Christiana began.

> FN3. Most supply facilities are located in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

Philadelphia, Pennsylvania.

FN4. Bruce Bond Dep. at 51. Barge contractors like Christiana, pick up the bunker fuel at the oil company's terminal and deliver the fuel to the ship at sea. Thus in this situation, Texaco would pay Christiana, Christiana's barges would go to DTC to pick up the bunker fuel, and then with the aid of its own tugboats, take the barges full of bunker fuel out to the ships who paid Texaco for the fuel.

FN5. Plaintiff's Response Brief at 2.

Before the alleged contract with Texaco, Christiana had a virtual monopoly on small to medium size bunker jobs in the Delaware River area, FN6 and had sufficient equipment to conduct its usual business successfully. According to Christiana, Texaco proposed a long term agreement, which provided that Texaco would employ Christiana as its exclusive bunker barge contractor for all of its marine bunker fuel requirements, in exchange for Christiana's commitment to have ample equipment on hand to deliver Texaco's requirements upon demand. FN7 In addition to these terms, Christiana and Texaco allegedly agreed that Texaco would receive discounted delivery charges, at below market rates, along with no additional penalties for loading delays at DTC. FN8 In 1990, the parties apparently orally modified their business relationship and agreed that Christiana would "load and hold," would pay ship demurrage, and would pay extra unusual costs, which Texaco may have encountered, in return for Texaco's commitment to put through an average 200,000 bbls. of oil per month. FN9 Christiana considered the 200,000 quote a minimum average, with Texaco anticipating a 225,000 or 250,000 bbls a month throughput. In other words, Christiana presumed the 200,000 barrels was a floor, not a ceiling. Regardless, Texaco did not meet this alleged "guaranteed" minimum monthly average, as it only put through 200,000 barrels as promised in eight months out of the forty-eight months Christiana and Texaco had a business relationship. Neither the initial agreement nor the subsequent modifications were in writing and the relationship was strictly based on the parties' oral understandings.

FN6. York's Report at 6 (citing the October 28,

1999 Bruce R. Bond deposition p. 238).

FN7. Texaco even published a pamphlet, which stated "[Christiana], our bunker barge contractor, and local operating agent is based in Wilmington, DE in close proximity to our loading facility. [Christiana] operates several barge units ranging in capacity from 1700-3000 metric tons. DTC and [Christiana] offer Texaco flexibility second to none any supplier on the river."

FN8. Because barge carriage is generally a small margin, fixed cost business, Christiana would have a unique opportunity to secure a steady, expanding stream of business, provided by Texaco, if it entered into this "agreement."

FN9. Bates Dep. at 86:

*2 Based upon Texaco's alleged representations that it planned to put through 200,000 bbls. of oil per month, Christiana went to the First National Bank of Maryland ("FNBM") and secured loans to purchase additional barges, tugboats, and equipment, that would be required for the work Texaco and Christiana anticipated. George Wood, the loan officer at FNBM was responsible for handling and securing approval for the loans and testified that he sensed there were "understandings" between the two parties as to future business. However, he did not know what the terms of that agreement were, nor did he investigate or require the production of agreements to approve the loans. Loan documents evidence that FNBM received a "favorable reference from Mr. Bruce Bond of Texaco," that Texaco referred to Mr. Bates as a "no-nonsense businessman who always gets the job done," that on a "monthly basis, Christiana moves roughly 150,000 barrels of bunkers, and [Texaco] wants to increase this to 200,000," and that "Texaco is looking for a long term relationship with Christiana." FN10

FN10. June 20, 1989 loan document.

The alleged oral contract between Christiana and Texaco ensued until Christiana wrote Texaco a letter in August of 1995, informing them that Christiana could not continue to

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

provide bunker transportation because of the lack of Texaco's business and the cost of providing the service. FN11

> FN11. "It is with regret that [Christiana] had to inform Texaco last week that we could no longer provide bunker transportation in Philadelphia. The volume had gotten so small and the costs so high....," August 16, 1995 letter from William Bates to C. Michael Bandy of Texaco.

### PROCEDURAL POSTURE

On February 20, 1998, Christiana filed a complaint against Texaco and alleged six separate counts: (1) breach of contract-volume of business; (2) breach of contract-duration; (3) breach of contract-notice of termination; (4) breach of contract-duty of good faith and fair dealing; (5) promissory estoppel pursuant to Super. Ct. Civ. R. 8(e)(2); and (6) negligent misrepresentation. Texaco has filed a summary judgment motion requesting the dismissal of all claims.

### STANDARD OF REVIEW

A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FN12 If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate. FN13 Moreover, if it appears to the Court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied. FN14 The Court is required to examine all pleadings, affidavits and discovery material provided to the Court, FN15 accept all non-disputed facts as true, and must accept the non-movant's version of any disputed facts. FN16

> FN12. See Schueler v. Martin, 674 A.2d 883, 885 (Del.Super.1996); Pierce v. International Ins. Co. of Ill., 671 A.2d 1361, 1363 (Del.1996); Moore v. Sizemore, 405 A.2d 679, 680 (Del.1979).

> FN13. Kysor Industrial Corp. v. Margaux, 674 A.2d 889, 894 (Del.Super.1996).

> FN14. Vanaman v. Milford Memorial Hospital, Inc., 272 A.2d 718, 720 (Del.1970).

> FN15. Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc., 312 A.2d 322 (Del.Super.1973).

> FN16. Merrill v. Crothall-American, Inc., 606 A.2d 96 (Del.1992).

### DISCUSSION

#### A. Doctrine of Laches / Statute of Limitations

Texaco asserts that Christiana's breach of contract, promissory estoppel, and negligent misrepresentation claims are all barred pursuant to the doctrine of laches because Christiana's time to bring suit started in July 1993, when it became clear the terms of the contract as alleged by Christiana were not being met. FN17 Additionally, Texaco claims that Christiana consulted counsel in 1995, when it went out of business, to consider bringing a claim against Texaco; that Christiana intentionally misled Texaco "by writing Texaco a soothing, non-accusatory" 1995 letter saying nothing about a claim; that Christiana and its former attorney deliberately chose not tell Texaco about the alleged claim to inhibit Texaco from taking steps to defend itself. Texaco alleges that it was prejudiced (thus satisfying the element of laches that demands significant prejudice be shown) by Christiana's delay because: (1) out of the 48 months Christiana transported Texaco's bunker oil, Texaco only reached the alleged 200,000 barrels a month for 8 months, so if Christiana considered this "lower throughput" a breach of contract, they had an obligation to notify Texaco so it could have limited its damages by terminating the alleged contract at that point in time, and (2) Texaco is now unable to affectively defend itself as many documents and files regarding this relationship have been destroyed. Texaco stated that its computer files only date back until 1994, which makes locating precise and complete data for the relevant time period impossible.

> FN17. Texaco's Brief at 20.

*3 Christiana contends that the alleged contract was a continuous one, and as such, the statute of limitations was not triggered until the entire contract had been terminated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

Christiana claims the breach of contract occurred in August, 1995, which was the date of Mr. Bates' letter to Texaco notifying it that Christiana would be unable to participate in further business. Christiana also asserts that a laches agreement is unavailable to Texaco because Texaco "effectively" caused the termination of the agreement in its continuously low throughput, which caused Christiana to be prejudiced and to go out of business. And lastly, Christiana claims that Texaco is responsible for the lost computer files and documents, as Texaco took their mainframe computer out of service at the end of 1993. Christiana also points out that Texaco has been on notice of this lawsuit since May 1, 1996, and thus, could've kept records and documents for its defense as of that date. FN18

> FN18. Plaintiff's Brief in Opposition to Defendant's Motion at 20.

"The test of laches is both unreasonable delay and consequent significant prejudice." FN19 In an attempt to determine what constitutes unreasonable delay, the Court should first consider the time limitation fixed by the statute of limitations. FN20 Delaware's statute of limitations for contract and negligence actions is found in 10 Del. C. § 8106. The 3 year limitation on cause of actions for an alleged breach of contract accrues at the time of the breach, FN21 whereas a tort claim accrues at the time of the injury. FN22

> FN19. Wilkes v. H.M. Wrangell & Co., 293 F.Supp. 522, 524 (D.Del.1968)(citing Gutierrez v. Waterman S.A. Corp., 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Claussen v. Mene Grande Oil Co., 275 F.2d 108, 113 (3d Cir.1960)).

> FN20. Wilkes, 293 F.Supp. at 524.

> FN21. Fineberg v. Credit Int'l Bancshares, Ltd., 857 F.Supp. 338 (D.Del.1994); Nardo v. Guido DeAscanis & Sons, 254 A.2d 254 (Del.Super.1969).

> FN22. Howmet Corp. v. City of Wilmington, 285 A.2d 423 (Del.Super.1971).

The Court finds that the statute of limitations, 10 Del. C. § 8106, did not begin to run until there was an affirmative termination by one of the parties. Christiana wrote the August 1995 letter to Texaco, which terminated the arrangement between these two parties. Until then, the two parties continuously conducted business with one another and Christiana operated as Texaco's bunker fuel contractor. As such, under the statute of limitations applicable to contracts, Christiana had until August, 1998 to file its claims against Texaco. FN23 Since Christiana filed the instant action on February 20, 1998, it appears that Christiana successfully brought its claims within its window of opportunity. The Court finds that Christiana's claims have not been unreasonably delayed.

> FN23. An issue not addressed by the parties is whether the statute of limitations would prevent the tort action from proceeding forward since the "time of the injury" may have occurred before the termination of the contract. Since that count is being dismissed on other grounds the issue will not be addressed.

Additionally, the Court is not convinced that Texaco has been unduly prejudiced by the delay in bringing this lawsuit. The basic foundation underlying this litigation is the lack of documentation evidencing this business relationship. Thus to argue the passing of time has limited Texaco's access to documentation is absurd. Whatever documents, if any, were ever created would appear to have minimal relevance to the issues being litigated and the individuals involved are still available to testify about the events.

Further, while it is undisputed that Texaco, during its business relationship with Christiana, failed most months to meet the alleged 200,000 bbls. throughput, this does not equate to an obligation by Christiana to terminate the relationship so Texaco could minimize its damages. While this fact may be relevant to the jury's determination of whether a contract existed and if so, the terms of that contract, it does not rise to the level of prejudice required to prevent a subsequent lawsuit. Texaco is an international corporation with significant resources but in this business relationship, it appears to have acted like a mom and pop grocery store relying upon a handshake and ones goodwill to perform an important business function. To argue that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Christiana has tricked or mislead Texaco is simply an assertive legal effort to mine all possible avenues to prevent recovery. The argument is simply without merit. The Court finds neither unreasonable delay or prejudice and thus the claims are not barred by the doctrine of laches.

### B. Breach of Contract Claims

*4 While it is the Court's province to define a contract, it is the jury's function to decide whether a contract exists.[FN24] In *Universal Products Co. v. Emerson,*[FN25] the Supreme Court of Delaware followed numerous other court's holdings that it is the Court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged.[FN26] The *Emerson* court noted however, that the above rule does not apply "where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of [documents] considered in connection with other pertinent facts and circumstances proved."[FN27] Stated differently, when other facts and circumstances germane to the issue are to be considered in addition to any documentary evidence, a jury is to decide whether or not a contract was formed, not the Court.

> FN24. *Corletto v. Morgan,* 89 A. 738 (Del.Super.1914).

> FN25. *Universal Products Co. v. Emerson,* 179 A. 387 (Del.1935).

> FN26. *Id.* at 393.

> FN27. *Id.* at 394.

Texaco contends that there is simply no evidence, aside from the deposition testimony of Mr. Bates, to indicate that a contract, or long term agreement or "relationship" was ever contemplated by either of the parties. Indeed, Texaco's expert, Patrick J. Studdert, stated in his report that [i]n all my years in the bunker transportation business, I have never had an oral agreement of the kind Mr. Bates said he had between Christiana and Texaco and I have never heard of one in any port. It is not the custom or practice in the bunker fuel transportation industry.[FN28]

> FN28. Studdert's Report at 3.

Texaco asserts that "it is undisputed in the bunker fuel barge delivery industry-that deliveries are made by barge carriers for oil companies on an "as available basis."[FN29] Texaco further mentions that both parties' experts agree that barge carriers do not customarily have contracts like the one alleged by Christiana-long term oral contracts with minimum guaranteed monthly delivery quotas. Texaco then asserts that because Christiana did not exclusively work for Texaco, and it continued to conduct business with other oil companies, it cannot now claim that it purchased the additional barges, tugboats, and equipment from FNBM for the sole purpose of Texaco's alleged "long term agreement" to put through the amount of oil it allegedly promised.

> FN29. Texaco's motion at 3.

Christiana contends that the record thus far is replete with evidence indicative of a contract, or that a contractual relationship was contemplated by these parties. Christiana points to (1) Mr. Bates' deposition testimony; (2) George Wood's deposition testimony (the First National Bank of Maryland ("FNBM")'s representative); and the mere evidence of Mr. Bates' extensive loans, taken to purchase more equipment, barges, and tugboats in 1991 and 1992. Christiana's expert, Robert B. York contends that Christiana and Texaco's relationship was contractual, and more specifically stated in his report that
"[a] contract existed between [Christiana] and [Texaco] which went far beyond the normal terms of and is in consistent with an "as available" bunker agreement per posted rates and which, based on testimony, is consistent with a Requirements Contract.[FN30]

> FN30. York's Report at 20.

*5 The Court first finds that whether an oral contract, or a contract created by conduct was established between Christiana and Texaco, is not an issue that can be decided upon a motion for summary judgment. A reasonable jury may conclude that regardless of the fact a written contract was not prepared and signed, Texaco and Christiana had mutual, beneficial interests at stake in this business venture,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

and as such, an enforceable contract was created. The Restatement Second of Torts § 19 provides that "[t]he manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." [FN31] Subsection (3) further states that "[t]he conduct of a party may manifest assent even though he does not in fact assent." [FN32] The jury may find that Texaco's conduct manifested an assent to be bound, based upon Mr. Bates' testimony, Mr. York's expert opinion and testimony, combined with other documents and evidence as to the events during the 48 month relationship. Texaco's arguments are simply ones that can be presented to the jury and used in their deliberations as to whether a contract existed. The type of business relationship between Texaco and Christiana is the core of this litigation, and to assert that the facts are settled and undisputed is simply unsupportable by the record when viewed in light most favorable to the non-moving party. Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

FN31. Restatement (Second) Torts § 19.

FN32. Id.

C. Negligent Misrepresentation Claim

Finally, Texaco asserts that Christiana's negligent misrepresentation claim is barred by the economic loss doctrine and must be dismissed as all of Christiana's alleged losses are purely economic in nature, i.e., lost profits, lost investments, and acquired debt. Texaco also asserts that Christiana cannot employ the Restatement (Second) of Torts § 552, a state law exception to the economic loss doctrine, because federal maritime law governs this case, and maritime law does not permit exceptions to the economic loss doctrine. [FN33]

FN33. The Court need not decide whether federal maritime law governs this action as Christiana's negligent misrepresentation will be dismissed on other grounds.

Christiana admits its damages are purely economic in

nature, but contends (1) that the economic loss doctrine does not apply to its claims because the doctrine is applicable to torts under the products liability realm, i.e. when 'products' are involved; and (2) that even if the doctrine is applied to Christiana's claims, Delaware has adopted the Restatement (Second) of Torts § 552, an exception to the economic loss doctrine otherwise known as negligent misrepresentation. Christiana asserts it falls within this exception.

The economic loss doctrine "prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage." [FN34] The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. [FN35] Economic loss is "any monetary loss[ ], costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value ." [FN36] While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount of plaintiff's tort claims, which result when contract provisions limit their recoveries, or as in the instant case, where a contract may not have existed at all. While there appears to be no dispute that Christiana's damages are economic in nature, this fact alone does not necessarily result in the dismissal of the tort claim

FN34. Hon. Sheldon Gardner, Matthew Sheynes, The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule, 89 Ill. B.J. 406, 406-11 (2001) (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

FN35. Danforth v. Acorn Structures.Inc., 608 A.2d 1194,1195 (Del.1992)(citing Moorman Mfg. Co. v. National Tank Co., 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 448 (Ill.Supr.1982).

FN36. Hon. Sheldon Gardner, Matthew Sheynes,

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 7

The *Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule,* 89 Ill. B.J. at 406. *See also Danforth,* 608 A.2d at 1196(quoting *Moorman Mfg. Co.* 61 Ill.Dec. 746, 435 N.E.2d at 449)(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits-without any claim of personal injury or damage to other property.").

\*6 The Restatement (Second) of Torts § 552 provides an exception to the economic loss doctrine's bright line rule and Delaware has explicitly adopted this exception in *Guardian Construction v. Tetra Tech Richardson.*[FN37] The Restatement provides that

    FN37. 583 A.2d 1378 (Del.Super.1990).

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delaware's narrow application and strict construction of § 552, has thus far held that for a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, "the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties."[FN38] Christiana has satisfied this element. When viewed in a light most favorable to Christiana, there is sufficient evidence, which would indicate that Texaco allegedly informed Christiana, on several occasions, that it intended to put through 200,000 bbls. of oil per month. Christiana relied upon that information to secure loans from FNBM, and incur significant debt to purchase additional tug boats, barges, and equipment to transport Texaco's bunker oil. Thus, it appears that Christiana shared the information Texaco supplied to it, to use in its business transactions, the loans, with FNBM. Christiana as such, has satisfied the first prong of a negligent misrepresentation claim under § 552.

    FN38. *Danforth v. Acorn Structures, Inc.,* Del.Super. C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991)(Mem.Op.)

As such, the focus of the Court's attention is on the second requirement for negligent misrepresentation. In *Danforth v. Acorn Structures Inc.,*[FN39] the Court, again adhering to Illinois precedent, held that a plaintiff, in addition to the first element mentioned above, must also show that "the defendant is in the business of supplying information." [FN40] In relying upon Illinois precedent, the *Danforth* court did not delineate which types of businesses are "in the business of supplying information" that would meet the Restatement's definition, but instead referred to the Illinois cases that made such determinations.[FN41]

    FN39. The first *Danforth* opinion granted the defendant's motion for summary judgment on the grounds that the plaintiff's claims were purely economic losses and were thus barred by the economic loss doctrine. *Danforth v. Acorn Structures Inc.,* C.A. No. 90C-JN-30, 1991 WL 215658 (Del.Super.Aug.27, 1991). Thereafter, the *Danforth* plaintiff filed a motion for reargument asserting his claims fell under the Restatement (Second) of Torts § 552 exception to the economic loss doctrine, and thus his negligent misrepresentation claim against the defendant should survive. *Danforth v. Acorn Structures, Inc.,* C.A. No. 90C-JN-30, 1991 WL 269956 (Del.Super.Nov.22, 1991). The Court's expansive discussion concerning the Restatement (Second) of Torts § 552, and the two requirements a plaintiff must satisfy to lift the economic loss doctrine's bar are found in the November 22, 1991 opinion.

    FN40. *Danforth v. Acorn Structures, Inc.,* Del.Super. C.A. No. 90C-JN-30, 1991 WL 269956, (Del.Super.Nov.22, 1991). Since Danforth, Illinois law has altered its requirements for a negligent misrepresentation claim: a plaintiff must now demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Tolan and Son, Inc. v. KLLM Architects, Inc., 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 296 (App.Ct.Ill.1999).*

FN41. *Danforth,* at *4 (citing *Rankow v. First Chicago Bank, 870 F.2d 356, 360-366 (7th Cir.1989); Gerdes v. John Hancock Mutual Life Insurance Co., 712 F.Supp. 692, 697-98(N.D.Ill.1989)).*

In *Rankow v. First Chicago Corp.,* FN42 the Seventh Circuit, reversing the District Court's decision, held that shareholders had sufficiently alleged negligent misrepresentation, noting that "[a] precise, case-specific inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions." FN43 The *Rankow* court went further to hold that "[w]hether [a defendant] can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted." FN44 In its attempts to determine whether a bank was "in the business of supplying information" the *Rankow* court noted that while "there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information" the lower court decisions have found that "manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information." FN45 The *Rankow* court then noted that

FN42. 870 F.2d 356 (7th Cir.1989).

FN43. *Rankow,* 870 F.2d at 360.

FN44. *Rankow,* 870 F.2d at 361.

FN45. Various Illinois cases, although not dispositive, are instructive in deciding whether a party is in the businesses of supplying information. *See e.g. Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach., 109*

Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (Ill.App.Ct.1982)(holding a computer hardware and software supplier was not in the business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp., 117 Ill.App.3d 304, 72 Ill.Dec. 703, 453 N.E.2d 8 (Ill.App.Ct.1983)(holding a roofing materials supplier was not in the business of supplying information); Tan v. Boyke, 156 Ill.App.3d 49, 108 Ill.Dec. 229, 508 N.E.2d 390 (Ill.App .Ct.1987)(seller of an apartment building was not a supplier of information); Vacuum Industrial Pollution, 764 F.Supp. 507 (N.D.Ill.1991)(holding an oil company who negligently cleaned a tank that contained a chemical catalyst was not a supplier of information);.*

*7 a great many businesses involve an exchange of information as well as of tangible products-manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, pecipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental. FN46

FN46. *Rankow,* 870 F.2d at 364.

In a more recent opinion, *Tolan and Son Inc. v. KLLM Architects, Inc.,* FN47 the Illinois court noted that "a great many businesses exchange information as well as products" and "[w]here the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings." FN48 The *Tolan* court further stated that "businesses that supply tangible goods and/or non-informational good or services ... may exchange information, [but] the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product." FN49

FN47. 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288 (Ill.App.3d 1999).

Westlaw.

Not Reported in A.2d                                           Page 9
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: Not Reported in A.2d)

> FN48. *Tolan Sons Inc.*, 241 Ill.Dec. 427, 719
> N.E.2d at 296.
>
> FN49. *Tolan*, 241 Ill.Dec. 427, 719 N.E.2d at 297.

The Court finds the above cited reasoning to be a fair
interpretation of what it means to be "in the business of
supplying information" for the purposes of a negligent
misrepresentation claim. Based upon the above reasoning,
and in heeding the prior precedent of *Guardian
Construction,* and *Danforth,* the Court finds that Texaco
was not "in the business of supplying information for the
guidance of others." FN50 The information Texaco supplied
to Christiana is more aptly categorized as information
incidentally supplied to Christiana for the ultimate
service-that of transporting bunker fuel oil. Clearly, Texaco
is generally in the business of supplying oil, not
information. FN51 The information Texaco supplied, if any,
is best classified as ancillary to the provided service. FN52
As such, this litigation will move forward as a contract
dispute only and the tort claim is dismissed.

> FN50. *See Tolan*, 241 Ill.Dec. 427, 719 N.E.2d at
> 296-96(delineating what business are pure
> information providers where the end product is an
> idea, what businesses are tangible product end
> manufacturers, and what businesses fall between
> the two). *Tolan* notes that businesses such as
> accountants, lawyers, insurance brokers,
> stockbrokers, real estate brokers, and termite
> inspectors and environmental assessors are "pure
> information providers, which would constitute "in
> the business of supplying information for the
> guidance of others." *Tolan* also notes certain
> professions that are tangible good providers, which
> is where this Court finds Texaco falls-that of
> manufacturers of computers and software or
> products of any type.
>
> FN51. *See Vacuum Industrial Pollution, Inc. v.
> Union Oil Co.*, 764 F.Supp. 507
> (N.D.Ill.1991)(holding that a defendant oil
> company was not in the business of supplying
> information.).

> FN52. *See* the Restatement (Second) of Torts § 552
> comment a explaining that "by limiting the liability
> for negligence of a supplier of information to be
> used in commercial transactions to cases in which
> he manifests an intent to supply the information for
> the sort of use in which the plaintiff's loss occurs,
> the law promotes the important social policy of
> encouraging the flow of commercial information
> upon which the operation of the economy rests ."

While this Court has followed the earlier decisions of the
Court that have addressed this issue, other jurisdictions have
taken a more expansive view of § 552 FN53 and clearly an
argument can be made that the decisions from Illinois
followed by Delaware are too limiting and fail to give full
effect to the negligent misrepresentation exception. The
question of when does a business cross the line into the
world of "supplying information" or whether that
requirement is mandated, is anything but clear. If this matter
reaches the Supreme Court it is suggested that they address
these questions and provide clear direction to litigants and
the Court to what is now murky waters.

> FN53. *See Walpert, Smullian & Blumenthal, P.A.
> v. Katz*, 361 Md. 645, 762 A.2d 582
> (Md.2000)(holding that the negligent
> misrepresentation requires: "(1) the defendant,
> owing a duty of care to the plaintiff, negligently
> asserts a false statement; (2) the defendant intends
> that his statement will be acted upon by the
> plaintiff; (3) the defendant has knowledge hat the
> plaintiff will probably rely on the statement, which
> if erroneous, will cause loss or injury; (4) the
> plaintiff, justifiably, takes action in reliance on the
> statement; and (5) the plaintiff suffers damage
> proximately caused by the defendant's
> negligence."); *Jacobson v. Environmental Risk
> Limited,* No. CV 950550991, 1996 WL 168086, at
> *3 (Conn.Super.Mar.4, 1996)(following the
> "governing principals" of the Restatement
> (Second) of Torts § 552 and holding that negligent
> misrepresentation requires a plaintiff to "allege and
> prove that the reliance on the misstatement was
> justified or reasonable," and "reasonableness is a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

question of fact for the trier to determine based on
all of the circumstances.")

### *CONCLUSION*

For the reasons set forth above, Texaco's motion for
summary judgment as to the breach of contract claim is
denied, but Texaco's motion for summary judgment as to
Christiana's negligent misrepresentation claims is granted.

Del.Super.,2002.
Christiana Marine Service Corp. v. Texaco Fuel and Marine
Marketing
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 769215 (Del.Super.)
(Cite as: Not Reported in A.2d)

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware.
Re K & K DEVELOPERS, INC.
v.
MCCANN, INC.
C.A. No. 92C-04-042.

Submitted Aug. 15, 1996.
Decided Dec. 24, 1996.

Decision After Trial. Judgment For Defendant on Plaintiff's
Complaint and for Plaintiff on Defendant's Counterclaim.

Clifford B. Hearn, Jr., Clifford B. Hearn, Jr., P.A.,
Wilmington.
John W. Paradee, Prickett, Jones, Elliott, Kristol & Schnee,
Dover.
RIDGELY, President Judge.

Counsel:

*1 This is a civil action brought by K & K Developers, Inc.
("Plaintiff") against McCann, Inc. ("Defendant") for
damages alleged to have been caused by Defendant's
negligence, breach of implied warranty and breach of
contract in preparing plans for and the staking of a housing
development known as Eagles Chase in Smyrna, Delaware.
Defendant denies liability and has counterclaimed for fees
for survey engineering services rendered which Plaintiff has
admitted but refused to pay because of its own claims.

After a three-day non-jury trial and post-trial arguments,
this is the Court's decision on the merits. For the reasons
which follow, the Court finds that the delays and costs
claimed by Plaintiff were not proximately caused by
Defendant with one exception which serves to offset
Defendant's counterclaim in full.

I. FACTS

In October of 1989 Defendant contracted with Larry
McAllister to provide surveying engineering services for a
housing development for 107 townhomes to be known as

Eagles Chase on land Mr. McAllister owned in Smyrna,
Delaware. During the course of this design work
Defendant's president and chief operating officer, Donald
McCann, received directions from Mr. McAllister who
consulted with prospective developers of the project. These
prospective developers were initially George Chabott and
Leroy Klein, and ultimately Harold Kushin and Edward
Kanin. Messers. Kushin and Kanin incorporated the
Plaintiff to build and develop Eagles Chase.

Various conditions for approval of the plans were imposed
by the Town of Smyrna, the Delaware Department of
Transportation ("DELDOT") and other regulatory agencies.
The Town of Smyrna gave final approval of the plans for
Eagles Chase on March 27, 1991. On April 7, 1991 the
property was purchased by Herman Lefko pursuant to his
financing arrangement with Plaintiff. Plaintiff was obligated
to pay Mr. Lefko a sum for the release of each lot plus
interest at 13% per year on the $325,000 mortgage on the
property.

To reduce development costs Plaintiff initially chose not to
employ Defendant or any other surveying-engineering firm
for on-site supervision during the construction. Rather,
Plaintiff contracted with Defendant on April 17, 1991 for
limited staking services on the project.

On May 10, 1991 Plaintiff contracted with Ray Savage &
Company for site contractor services. During the course of
the work Plaintiff became dissatisfied with Defendant and
terminated Defendant's services. Work was not completed
until May 29, 1992. As will be explained *infra* in the
context of each claim, none of the delay or alleged
additional costs with the exception of the catch basin
problem was proximately caused by Defendant. Although
the amount claimed by Defendant for surveying fees of
$2,638.51 has been admitted by Plaintiff, I find that
Plaintiff's proven damages offset this counterclaim. Further
facts will be recited in the context of the specific claims
which I will discuss.

II. THE LEGAL STANDARD

*2 Plaintiff characterizes its claims as a mixture of a tort
claim and a contract and warranty breach.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 1996 WL 769215 (Del.Super.)
(Cite as: Not Reported in A.2d)

The parties agree that the absence of privity between Plaintiff and Defendant is not fatal to the Plaintiff's claims of negligence. *Hodges v. Smith,* Del. Super., 517 A.2d 299 (1986); *Guardian Constr. v. Tetra Tech Richardson,* Del. Super., 583 A.2d 1378 (1990). On the facts presented, it is clear that K & K Developers, Inc. was a foreseeable plaintiff. Thus, if Defendant failed to exercise reasonable care in supplying information for the guidance of others, such as Plaintiff, it is subject to liability for pecuniary loss proximately caused to Plaintiff by its justifiable reliance upon that information. *See* Restatement (second) of Torts § 522 (1977).

### III. PLAINTIFF'S CONTENTIONS

Plaintiff has alleged the following acts of negligence on the part of Defendant:

(a) The Defendant's plans for street design were improperly prepared and needed to be redesigned with much less thickness causing delay in the project due to the time required for redesign and additional governmental approvals.

(b) The Defendant's plan for sanitary sewer was improperly prepared at excess depth requiring those plans to be redesigned at a higher depth resulting in a delay of the project due to redesign time and additional governmental approvals.

(c) The Defendant's plans included an error of 5 feet in the location of a deceleration lane off Glenwood Avenue (Delaware Route 300), which was actually 10 feet but was marked 5 feet on the plans. This resulted in substantial increased costs for the Plaintiffs and in delay of the project due to redesign time, labor and materials, and additional governmental approvals.

(d) The Defendant's plans provided for a water line under Glenwood Avenue of a type not permitted by the Delaware Department of Transportation whose requirements are contained within a published and available manual. The negligence of the Defendant resulted in delay of the project due to additional governmental approvals.

(e) The Defendant's plan provided for a manhole which was approximately five feet in height at an intersection. The negligence of the Defendant resulted in delay of the project due to redesign and costs.

(f) The Defendant's plan provided for a road, High Street, which was improperly designed and resulted in the necessity of redesigning it in the field and replacing many truckloads of fill. This caused costs of redesign, and time, labor and materials involved in the refilling.

(g) The Defendant failed to take into consideration an existing storm sewer line which could have been located by reviewing the available county maps. As a result of Defendant's negligence, the Plaintiffs had to place the sewer line for each house above the existing storm sewer line causing each house to be raised, then running two feet or so of more concrete block for many of the units, as well as additional fill and redesign time, delays and redesign costs.

*3 (h) The Defendant's plan resulted in a sewer lateral station being 15 feet too far to the east of seven housing units. Due to this negligence each sewer line for each house on the north side of High Street had to be redesigned resulting in increased costs due to delay, redesign costs and additional materials and labor.

(i) The Defendant's plan incorrectly placed a fire plug in the middle of a storm drain, resulting in redesign costs and project delay.

(j) The Defendant's plan had a street (High Street) which was too high causing Plaintiff to redesign Eagle's Way and a portion of Green Way with redesign costs and delays in the project, and substantial increased need for fill and extra concrete block for each house and full basements in some houses.

(k) The Defendant's plan placed a catch basin in the wrong place which caused the Plaintiff to redesign and to install a more expensive and larger catch basin.

As breaches of implied warranty and contract Plaintiff claims Defendant:

(1) failed to exercise proper supervision of the project;

(2) failed to coordinate the work as needed;

(3) failed to cooperate with the site contractor;

(4) failed to properly stake in the field and to perform pursuant to its agreement with the Plaintiff;

(5) failed to recognize the errors and problems in the plans that it had prepared and to make appropriate adjustments, amendments or corrections.

### IV. DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 1996 WL 769215 (Del.Super.)
(Cite as: Not Reported in A.2d)

Plaintiff's first claim that attributes delay to Defendant because of redesign of the thickness of the street overlooks the fact that Defendant was expressly directed by the Town Engineer to conform the thickness of the street to certain specifications. After several meetings, the last of which was February 1, 1991 consent was given for a different design for road thickness. No time constraints were placed on this aspect of the design and, even if concessions should have been forthcoming sooner, Plaintiff did not commence development until May 10, 1991. I find no negligence by Defendant which proximately caused damages.

Plaintiff next claims that the sanitary sewer was designed at an excess depth which required the plans to be redesigned with the sewer at a higher level. The original design was made in consultation with the first prospective developers to accommodate an existing force main at a four foot depth. Mr. McAllister later asked Defendant to raise the design of the sewer lines which Defendant advised against because laterals to the townhomes may hit other utilities. Mr. McAllister, after conferring with Mr. Kushin, told Defendant to do it anyway because it was cheaper to adjust the laterals. In any event, the revised plan was completed February 12, 1991 which was before Plaintiff finalized financing or commenced the development of the project. I find no negligence by Defendant which proximately caused damages.

Plaintiff claims these plans included an error of five feet in the location of the deceleration lane off of Glenwood Avenue. However, any additional costs and delays associated with moving utility poles and the construction of the deceleration lane were due to a failure to conform to the plans rather than an error in them. The deceleration lane was designed to be twelve feet. The existing roadway was sixteen feet which allowed Defendant to design based on using four feet of the existing roadway. Only twelve feet of roadway was required by DELDOT. Instead Plaintiff left the sixteen foot roadway as it was and added the twelve foot deceleration lane to the west of it. While the plans contemplated moving the existing utility pole five feet, this change by Plaintiff required a move of nine feet which proximately caused all the additional expenses claimed. I find no negligence by Defendant which proximately caused

damages.

*4 Plaintiff claims the Glenwood Avenue water line was of a type not permitted by DELDOT. The plans called for what is known as an "Ogden cut" and the plans required all materials and workmanship meet Division of Highways standards and specifications dated July 1985. While an installation was attempted using another method on the instructions of regulators, ultimately the water line was installed as Defendant designed it and as regulators had earlier approved. I find no negligence by Defendant which proximately caused damages.

Plaintiff's next claim of negligence is that the plans provided for a manhole which was five feet in height at an intersection. It is undisputed that this was an error whereby "27.20" was written instead of "22.20" as a design elevation for the manhole. This error constitutes negligence. However, given the surrounding measurements on the plans this error should have been and was apparent to the site contractor. Thus, justifiable reliance by Plaintiff has not been shown. Moreover, I am not convinced this mistake delayed the completion of the overall project.

Plaintiff's next claim of negligence relates to the cut on 1600 feet of High Street and the placement of 146 truckloads of fill on this road which was more fill than the site contractor anticipated. However, the site itself had more than enough fill which could have been used for this purpose because of the stripping of 2,662 cubic yards of top soil from other areas of the development. Instead of using this topsoil, additional fill was purchased. Even assuming negligence, Defendant has shown a failure by Plaintiff to mitigate damages and that defeats this claim.

Plaintiff also claims that Defendant failed to take into consideration the existing storm sewer line and as a result Plaintiff had to place the laterals, which are the sewer lines for each house, above the existing storm sewer line. As a consequence each house had to be raised. The facts are that Defendant originally designed the sewer line at a deeper depth to accommodate the existing storm sewer and changes were made against his advice. Plaintiff assumed that risk of adjusting the laterals when it ignored Defendant's advice on the depth of the sanitary sewer and instructed him, through



Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 1996 WL 769215 (Del.Super.)
(Cite as: Not Reported in A.2d)

the owner, to raise the line. I find no negligence by Defendant which proximately caused damages.

Plaintiff next claims negligence due to a sewer lateral station being fifteen feet too far to the east of seven housing units. However, neither the design of this station nor the staking of it were within the scope of the Defendant's responsibilities.

Plaintiff claims the plan incorrectly placed a fire hydrant in the middle of a storm drain and at trial there was testimony that it was incorrectly marked out. I do not find in the plans any such placement as alleged. Further, Defendant was not responsible for the staking of fire hydrants under his contract with Plaintiff.

Plaintiff next claims that redesigns of Eagle's Way and a portion of Green Way caused delays in the project and the need for fill and extra concrete block for each house. I have already found a failure to mitigate damages on the need for fill. Furthermore, the houses were built lower than Defendant had designed and no additional cost for block is attributable to Defendant.

*5 The final claim of negligence pertains to the placement of a catch basin which was redesigned to match the placement of storm sewer piping. Whether due to errors in design or staking, Plaintiff has established a failure to meet the standard of care by demonstrating that piping installed pursuant to the plans did not match the location of the catch basin. This proximately caused a redesign, additional materials and a two week delay. I infer from all of the evidence that these damages equal and offset the amount of Defendant's counterclaim.

I find no basis to award damages for breaches of implied warranty and contract. Plaintiff declined to hire Defendant for on-site supervision. Ironically, this expense saving measure cost more than it saved because with such supervision it appears that most of the additional expenses claimed could have been avoided.

### V. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendant on Plaintiff's complaint with the exception of the

negligence claim pertaining to the catch basin. On that claim judgment is entered in favor of Plaintiff but the amount of that award is offset by Defendant's counterclaim. Accordingly, each party is assessed the costs of their respective complaint and counterclaim.

IT IS SO ORDERED.

Del.Super.,1996.
K & K Developers, Inc. v. McCann, Inc.
Not Reported in A.2d, 1996 WL 769215 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.