LEXSEE 2001 DEL. SUPER. LEXIS 166

**OUTDOOR TECHNOLOGIES, INC., Plaintiff, v. ALLFIRST FINANCIAL, INC., F/K/A FIRST MARYLAND BANCORP, a Maryland corporation; ALLFIRST BANK, F/K/A FIRST NATIONAL BANK OF MARYLAND, a United States Association; and ALLFIRST FINANCIAL CENTER, N.A., F/K/A FIRST OMNI BANK, N.A., a United States Association, Defendants.**

C.A. No. 99C-09-151-JRS

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2001 Del. Super. LEXIS 166; 44 U.C.C. Rep. Serv. 2d (Callaghan) 801*

February 9, 2001, Submitted
April 12, 2001, Decided

**DISPOSITION:** [*1] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT GRANTED.

**COUNSEL:** Kathleen M. Miller, Esquire, SMITH, KATZENTSTEIN & FURLOW, LLP, Wilmington, Delaware, Andrew C. Kassner, Esquire, DRINKER, BIDDLE & REATH, LLP, Philadelphia, Pennsylvania. Attorneys for Plaintiff.

Neal J. Levitsky, Esquire, AGOSTINI, LEVITSKY, ISAACS & KULESZA, Wilmington, Delaware, James T. Heidelbach, Esquire, GEBHART & SMITH, LLP, Baltimore, Maryland. Attorneys for Defendants.

**JUDGES:** Joseph R. Slights, III.

**OPINIONBY:** Joseph R. Slights, III

**OPINION: SLIGHTS, J.**

**I. INTRODUCTION**

My predecessor on the Court has stated that "the facts of this case look like a payment systems hypothetical written by a law school professor." n1 As usual, an apt observation from a wise jurist. Plaintiff, Outdoor Technologies, Inc. ("Outdoor"), presented a check for payment to defendants, Allfirst Financial Center, N.A. f/k/a First Omni Bank, N.A. ("Omni"), Allfirst Financial, Inc. f/k/a Maryland Bankcorp ("Bancorp") and Allfirst Bank f/k/a First National Bank of Maryland ("FNB"). The defendant banks refused to cash the check. Because the drawer of the check, Hechinger, Inc., filed for bankruptcy protection before the check could be paid, leaving [*2] Outdoor without a remedy against Hechinger, Outdoor has determined to pursue its remedies against the banks in this Court.

n1 *Outdoor Technologies, Inc. v. Allfirst Financial, Inc.*, 2000 Del. Super. LEXIS 16, *2, Del. Super., C.A. No. 99C-09-151 WTQ, Quillen, J., (Jan. 24, 2000).

At first glance, this controversy would appear to be subsumed within Delaware's Uniform Commercial Code ("UCC"). Article 3 of the UCC governs negotiable instruments n2; Article 4 governs bank deposits and collections. n3 The parties agree, however, that statutory remedies under the UCC are not available to Outdoor in this case. Article 3 does not provide a basis for relief when the drawee bank has not accepted the negotiable instrument. n4 And Article 4 limits the bank's statutory liability to its customer. n5 In this case, the banks' customer was Hechinger as the drawer of the check, not Outdoor. n6 Accordingly, left without a UCC remedy, Outdoor has raised common law claims against the banks for breach of a contract to which it was a third party [*3] beneficiary, fraud, negligent misrepresentation and civil conspiracy.

n2 *6 Del. C. § 3–101 et seq.*

n3 *6 Del. C. § 4–101 et seq.*

n4 *6 Del. C. § 3–408*

n5 *6 Del. C. § 4–402.*

n6 *Id.*

This Court has already dismissed Outdoor's breach of contract claim upon concluding that the claim is precluded by the UCC. n7 The Court has also determined that Outdoor's claims for fraud (Count II), negligent mis-

2001 Del. Super. LEXIS 166, *3; 44 U.C.C. Rep. Serv. 2d (Callaghan) 801

representation (Count III) and civil conspiracy (Count IV) are not preempted by the UCC and that Outdoor's complaint states a legally viable claim on each of these legal theories. n8 Discovery has run its course and defendants have now moved for summary judgment on all remaining claims against them. For the reasons that follow, defendants' motion is **GRANTED**.

n7 *Outdoor Technologies, Inc., supra.*

[*4]

n8 *Id.*

## II. FACTS

Outdoor is a Delaware corporation with its principle place of business in Macon, Mississippi. n9 Outdoor manufactures and distributes garden accessories and related goods such as vinyl fencing, decking and rail material. Outdoor enjoyed an ongoing business relationship with Hechinger, a retail supplier of garden, outdoor and hardware products. On June 2, 1999, Hechinger issued a check for $706,735.62 made payable to Outdoor as delayed payment for goods previously supplied by Outdoor. That check was drawn on Hechinger's account at Omni, although it mistakenly indicated on its face that it was drawn on a Hechinger account at FNB. n10 When Outdoor received Hechinger's check it was aware that Hechinger was on the verge of filing for bankruptcy protection. Outdoor's desire to expedite payment of the check, in advance of Hechinger's bankruptcy filing, animated the events which give rise to this litigation.

n9 At the time these events took place, Outdoor was a wholly owned subsidiary of Jannock Limited, a Canadian corporation.

[*5]

n10 Hechinger maintained accounts at each of the three defendant banks. Hechinger also printed its own checks. Apparently, Hechinger mistakenly identified FNB as the drawee bank on the printed check even though the check correctly identified the Omni account number.

The Hechinger check was received by Outdoor at its Macon, Mississippi offices on June 4, 1999. Rather than deposit the check in the Outdoor corporate account, and face the delays of the Federal Reserve's inter-bank payment system, the corporate decision-makers at Outdoor determined that Outdoor's controller, John Hurt ("Hurt"),

would travel personally to a FNB branch in Baltimore, Maryland to negotiate the check. Hurt's purpose was to secure immediate payment of the check through a wire transfer or receipt of certified funds.

On the morning of June 7, Hurt arrived at the Baltimore FNB branch to present the check for payment. The branch manager informed Hurt that the check was drawn on an Omni account, not a FNB account as indicated on the check, and that FNB could not negotiate the check. The branch manager also provided Hurt with [*6] the name of FNB corporate attorney, William Thomas ("Thomas"), to whom Hurt's questions should be addressed. Hurt returned to his hotel room and placed a telephone call to Omni. During that call, Hurt was informed that Omni was owned by Bancorp.

Armed with this information, Hurt traveled to Bancorp's corporate headquarters in downtown Baltimore seeking guidance on the quickest means to get paid on the Hechinger check. Hurt ultimately was directed to Thomas. n11 Hurt and Thomas met for between five and fifteen minutes in the Bancorp legal department's lobby area. n12 This brief conversation is the genesis of Outdoor's claims of fraud and misrepresentation.

n11 As it turned out, Thomas served as corporate counsel to all three corporate affiliates named as defendants: Bancorp, Omni, and FNB.

n12 Thomas stated during his deposition that the conversation lasted for five minutes, while Hurt stated that it lasted between ten and fifteen minutes. Because the parties do not dispute the essential content of the conversation, its actual duration is of little import.

[*7]

The parties agree that during the course of the Hurt/Thomas conversation Thomas inspected the Hechinger check and confirmed that it was drawn on an Omni account. He then advised Hurt that neither FNB nor Bancorp were obligated to negotiate the check and that neither bank would do so. Thomas also generally discouraged Hurt from attempting to negotiate the check in person and, instead, prodded him to deposit the check in Outdoor's depository account and obtain payment of the check through customary channels. Undaunted, Hurt pressed Thomas to commit Omni to negotiate the check if he traveled to the closest Omni branch (located in Millsboro, Delaware). Thomas responded that if Hechinger maintained sufficient funds in the account, and if Hechinger had not yet filed for bankruptcy protection, Omni would negotiate the check upon presentation by Hurt of "proper authorization." n13 Aside from Hurt's

2001 Del. Super. LEXIS 166, *7; 44 U.C.C. Rep. Serv. 2d (Callaghan) 801

mention that "proper authorization" would be required, Thomas and Hurt did not discuss what Omni would require as evidence of Hurt's "proper authorization" to negotiate the check. In his apparent haste to accomplish his mission, Hurt did not inquire what form of authorization would be required [*8] by Omni and Thomas did not volunteer this information. n14

> n13 Thomas' concession was contrary to Hechinger's account agreement with the defendant banks which provided that the banks were not obligated to cash a check made payable to a corporation. The banks' written policies also provided that the banks generally would not certify funds or initiate a wire transfer except at the request of a customer. The proffered reason for these policies is that the bank would bear the risk of loss if it provided immediate funds to the presenter of a check who, for whatever reason, was not authorized to negotiate the check. *6 Del. C. § 3-417.*

> n14 The record reveals that Hurt was aware that banks generally required a board of directors' resolution as evidence of an individual's authorization to conduct banking business on behalf of the corporation. The record also reveals, however, that Hurt had never himself attempted to "cash" a check made payable to Outdoor and that he was aware that others had done so by simply presenting personal identification.

[*9]

Hurt then contacted his superior, Ian Douglas, to discuss the next move. Hurt and Douglas decided that Hurt should attempt to negotiate the check at Omni's branch in Millsboro. They also decided that for "proper authorization" Hurt would present a letter from Peter Orebaugh ("Orebaugh"), Outdoor's President, indicating that Hurt was authorized to negotiate the check on behalf of Outdoor. That letter, printed on Outdoor stationary, was faxed to Hurt on the morning of June 8, 1999. It read: "Please accept this letter as authorization for John Hurt, Controller of Outdoor Technologies Inc., to certify the check in the amount of $706,735.62 as payment from Hechingers [sic], Inc. Please release a certified check or wire transfer the amount according to the instructions John Hurt will provide." The letter is signed: "Peter Orebaugh, President."

Hurt entered the Omni branch in Millsboro at 9:00 A.M. on the morning of June 8 in possession of both the check and the faxed Orebaugh letter. After some delay, an Omni employee at the branch reported to Hurt that she had been speaking with Thomas on the telephone and that Thomas now wished to speak with Hurt. Thomas informed Hurt that the letter [*10] from Orebaugh was not "proper authorization" and that Omni would require a resolution from Outdoor's board of directors authorizing Hurt to negotiate the check. Unable to obtain a board resolution on such short notice, Hurt sent the check, via federal express, to a Detroit, Michigan bank where Outdoor maintained a depository account. As feared by Outdoor, Hechinger initiated its bankruptcy filing on June 11 before the check was paid. This filing froze Hechinger's accounts and prevented Omni from paying the check. Consequently, the check was returned to Outdoor unpaid. The $706,735.62 owed to Outdoor by Hechinger remains outstanding.

## II. STANDARD OF REVIEW

Summary Judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. n15 The Court must view the evidence of record in the light most favorable to the non-moving party. n16 In making its determination, the Court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits submitted by the parties. n17

> n15 *Dale v. Town of Elsmere, Del. Supr., 702 A.2d 1219, 1221 (1997)*(citation omitted).

[*11]

> n16 *See Brzoska v. Olson, Del. Supr., 668 A.2d 1355, 1364 (1995)*(citation omitted).

> n17 Super. Ct. Civ. R. 56(c).

The movant bears the initial burden of showing the absence of a material factual dispute. n18 Upon sustaining this burden, the burden then shifts to the nonmoving party to demonstrate that a material factual issue exists. n19 Neither bare assertions nor conclusory allegations will allow the nonmoving party to meet this burden. n20 "Facts adduced under oath by the movant which remain uncontroverted must be assumed to be true." n21

> n18 *Sterling v. Beneficial Nat'l Bank, N.A., 1994 Del. Super. LEXIS 252, *7, Del. Super., C.A. No. 91C-12-005, Ridgely, P.J.* (April 13, 1994) (citing *Moore v. Sizemore, Del. Supr., 405 A.2d 679, 680 (1979)).*

> n19 *Id.* (citation omitted).

> N20 *Sterling, 1994 Del. Super. LEXIS 252, *7* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Martin*

2001 Del. Super. LEXIS 166, *11; 44 U.C.C. Rep. Serv. 2d (Callaghan) 801

v. Nealis Motors, Del. Supr., 247 A.2d 831, 833 (1968)).

N21 Ward v. Fox & Lazo, 1996 Del. Ch. LEXIS 92, *10, Del. Ch., C.A. No. 13582, Chandler, V.C. (July 8, 1996) (citation omitted).

[*12]

### III. DISCUSSION

#### A. The Choice of Law

The parties disagree on choice of law. Outdoor argues that Delaware law applies; the defendant banks argue that Maryland law applies. The defendants perceive an advantage under Maryland's law with respect to negligent misrepresentation in that Maryland arguably requires privity of contract as a predicate to a duty of care where Delaware law does not. n22 The Court is not certain that the distinction appreciated by the parties is actually supported by the case law. In any event, the Court need not resolve this issue. The Court will give Outdoor the benefit of the doubt and apply the arguably less onerous burden imposed by Delaware law. In the Court's view, at the end of the day, the mandated result is not affected by choice of law considerations.

> n22 Compare Weisman v. Connors, Md. Ct. App., 312 Md. 428, 540 A.2d 783, 790–94 (1988)(holding that when claiming only economic loss plaintiff must prove an "intimate nexus" or "special relationship" between the parties to establish a duty of care), with Guardian Constr. Co. v. Tetra Tech Richardson, Inc., Del. Super., 583 A.2d 1378, 1381–86 (1990)(applying Restatement (Second) of Torts, § 552, court recognized a duty of care absent contractual privity where plaintiffs allege only economic loss).

[*13]

#### B. Count II, Fraud

In Delaware, the elements of fraud are: "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance." n23 Delaware courts require proof of fraud to be made by a preponderance of the evidence. n24

> n23 Stephenson v. Capano Dev., Inc., Del. Supr., 462 A.2d 1069, 1074 (1983)(citing Nye Odorless

Incinerator Corp. v. Felton, Del. Super., 35 Del. 236, 162 A. 504, 510–11 (1931); W. Prosser, Law of Torts, 685–86 (4th ed. 1971)).

> n24 State v. Gardiner, 2000 Del. Super. LEXIS 208, *16, Del. Super., C.A. No. 98C-02-135-WTQ, Quillen, J. (June 5, 2000) (citations omitted).

The Court need not go beyond the first element [*14] of Outdoor's prima facie case for fraud to dispose of this claim. The evidence of record simply does not support the contention that Thomas made a false statement to Hurt or any other representative of Outdoor. Thomas advised Hurt that Omni would require the presentation of "proper authorization" before it would negotiate the Hechinger check. This statement was consistent with the direction Thomas provided to the Omni bank branch after Hurt left his office and consistent with banking industry practice. The fact that the conversation did not last long enough for either party to address what would or would not be deemed "proper authorization" is unfortunate but not a basis for actionable fraud. n25

> n25 See Miller v. Fairchild Indus., Inc., Md. Ct. Spec. App., 97 Md. App. 324, 629 A.2d 1293, 1303 (1993)(a statement that is not false does not support claim of fraud).

Moreover, the statements made by Thomas clearly related to future events. Generally, "'statements which are merely promissory in nature and expressions [*15] as to what will happen in the future are not actionable as fraud.'" n26 Only when such statements are made with the present intention not to perform will courts endorse a fraud claim. n27 Defendants have presented evidence indicating that Thomas authorized Omni to negotiate the Hechinger check. n28 Outdoor has failed in its burden to present evidence contradicting the banks' proffer. n29 The only evidence of record that Thomas did not intend to negotiate the check is that he refused to do so when Hurt presented the check at Omni. "Ordinarily, in the absence of additional circumstances, it will be found that a mere failure to perform is as consistent with an honest intent as with a dishonest one." n30

> n26 Miller, 629 A.2d at 1302 (quoting Finch v. Hughes Aircraft Co., Md. Ct. App., 57 Md. App. 190, 469 A.2d 867 (1984)). See also Esso Standard Oil Co. v. Cunningham, Del. Ch., 35 Del. Ch. 210, 114 A.2d 380, 383 (1955)("Opinions and statements as to probable future results are not generally fraudulent even though they relate to material mat-

ters ....")(citing *E. States Petroleum Co. v. Universal Oil Prods. Co., Del. Ch., 24 Del. Ch. 11, 3 A.2d 768 (1939)).*

[*16]

n27 *Miller, 629 A.2d at 1302* (citations omitted).

n28 Specifically, Thomas testified that "If [Hurt] showed up [at the Omni branch] with the proper authorities [sic] and there was money in the account and [Hechinger] hadn't filed bankruptcy, I was going to go ahead and cash it for him." (D.I. 47, Ex. 5 at 101) Defendants also presented the testimony of Shaun Murphy, a senior credit officer at FNB. Murphy's testimony establishes that he and Thomas discussed the Hurt situation, and that Thomas was prepared to authorize Omni to pay the Hechinger check. (D.I. 47, Ex. 11 at 28-36)

n29 *Moore, 405 A.2d at 680.*

n30 *Murphy v. T.B. O'Toole, Inc., Del. Super., 47 Del. 99, 87 A.2d 637, 638 (1952).*

Finally, it is apparent from the record that Hurt made no effort during his discussions with Thomas to ascertain what would suffice as "proper authorization." Although the "deliberate concealment of material facts would qualify as a false representation," n31 the Court cannot conclude on this record that a jury could find Thomas deliberately concealed [*17] anything from Hurt. In this regard, it is particularly probative that Hurt had absolutely no evidence of authorization from Outdoor to negotiate the check at the time he first discussed the issue with Thomas. It is also clear that Hurt had not yet received his "marching orders" to proceed to Omni when he discussed procedures with Thomas. It cannot be said, then, that Thomas even knew what Hurt was going to do next with the check when he discussed Omni's requirements with Thomas, much less what evidence of authorization Hurt might present to Omni if he attempted to negotiate the check. And, in light of these and the other circumstances of the conversation, it cannot be said that Thomas deliberately concealed either that the faxed letter would be insufficient evidence of authorization or that only a board resolution would be sufficient.

n31 *In re Asbestos Litigation, Spong Trial Group, 1993 Del. Super. LEXIS 476,* *7, Del. Super., C.A. No. 90C-10-72, Gebelein, J. (June 2, 1993) (citing *Gaffin v. Teledyne, Inc., Del. Supr. 611 A.2d 467, 472 (1992)).*

[*18]

When a plaintiff fails to present sufficient evidence of a factual controversy with respect to an essential element of a claim after a full and fair opportunity to discover such evidence, summary judgment is proper. n32 Defendants' Motion for Summary Judgment as to Count II (fraud) is GRANTED.

n32 *Burkhart v. Davies, Del. Supr., 602 A.2d 56, 59 (1991)*(quoting *Celotex, 477 U.S. at 322-23); Murphy v. Berlin Constr. Co., 1999 Del. Super. LEXIS 5,* Del. Super., C.A. 98C-01-097 WTQ, Quillen, J. (Jan. 22, 1999), Letter Op. at 4-7; *Giordano v. Marta, 1998 Del. Ch. LEXIS 63,* Del. Ch., C.A. No. 11613, Lamb, V.C. (Apr. 27, 1998), Mem. Op. at 12-14; *In re Asbestos Litigation, 1993 Del. Super. LEXIS 476,* Mem. Op. at 4 (citations omitted); *Miller, 629 A.2d at 1303.*

## C. Count III, Negligent Misrepresentation

Under Delaware law, allegations of negligent representation require proof of the following elements: "(1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise [*19] reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information." n33

n33 *Outdoor, 2000 Del. Super. LEXIS 16,* *13 (citations omitted).

As was the case with Outdoor's claim of fraud, Outdoor cannot sustain a claim of negligent misrepresentation when it has failed to produce any evidence that the defendant banks supplied false information. n34 Since the Court has already concluded that Thomas' statement incontrovertibly was not false or on its face misleading, the Court would be inclined to stop its analysis here and to enter summary judgment in favor of the defendants but for Outdoor's contention that Thomas negligently misrepresented facts by omission. n35 Outdoor's presentation at oral argument suggested that this, in fact, is Outdoor's showcase argument. Accordingly, the Court will address this argument and the remaining elements of plaintiff's *prima facie* burden on this claim.

n34 *Darnell v. Myers, 1998 Del. Ch. LEXIS 84,* *14, Del. Ch., C.A. No. 14859-NC, Steele, V.C. (May 27, 1998) ("If plaintiffs fail to prove any of the four required elements, their claim for negligent misrepresentation must fail").

[*20]

2001 Del. Super. LEXIS 166, *20; 44 U.C.C. Rep. Serv. 2d (Callaghan) 801

n35 See, e.g., Restatement (Second) of Torts § 551 ("Section 551"); Schmeusser v. Schmeusser, Del. Supr., 559 A.2d 1294, 1295–96 (1989).

Section 551 provides: "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question." n36 The question of whether a duty exists, while a mixed question of law and fact, is for the Court to decide as a matter of law. n37

n36 Section 551(1) (emphasis supplied).

n37 Naidu v. Laird, Del. Supr., 539 A.2d 1064, 1070 (1988).

Legal duties arise from relationships. n38 At the heart of Section 551 is a recognition that [*21] certain "business" relationships which evolve in the context of "business transaction[s]" can give rise to a duty of complete disclosure. Restatement (Second) of Torts § 552 (1) speaks in terms of disclosures made in the context of a transaction in which the speaker has a "pecuniary interest." Delaware common law embraces a "pecuniary duty to provide accurate information." n39 In each instance, the law contemplates that a duty of disclosure will arise when the parties are in the midst of a "business relationship" from which they expect to derive "pecuniary" benefits. Thus, while contractual privity may not be required to form a duty, something more than a casual business encounter must be demonstrated before a duty of care will be imposed.

n38 Id. (citing W. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser & Keeton on Torts § 236 (5th ed. 1984).

n39 Wolf v. Magness Constr. Co., 1995 Del. Ch. LEXIS 122, *4, Del. Ch., C.A. No. 13004, Chandler, V.C. (Sept. 11, 1995).

Outdoor cannot establish the requisite relationship [*22] with the defendant banks to justify the duty of complete candor it urges the Court to impose here. Outdoor had no prior relationship with the defendant banks; prior to their meeting, Thomas had never met Hurt. During an unscheduled encounter in the lobby of defendants' legal offices, Hurt asked Thomas some questions and Thomas endeavored to respond. Outdoor has failed to identify what pecuniary interest Thomas or the banks he represented might have been protecting in the course of the discussions with Hurt and the Court cannot discern any such interest from the record sub judice. n40 Consequently, the Court will not impose an affirmative duty of complete disclosure upon the defendants under these circumstances.

n40 Indeed, Thomas' concession to authorize Omni to negotiate the check was contrary to bank policy and possibly exposed the bank to a loss if it later turned out that Hurt was not authorized to cash the check.

Even assuming arguendo that the Court found a duty, and a negligent failure to provide [*23] complete information, summary judgment, nevertheless, is appropriate because Outdoor could not, as a matter of law, reasonably have relied upon Thomas' vague statement regarding "proper authorization" as the sole direction for its future conduct. n41 "A party is chargeable with the knowledge of what may be reasonably found if they make an investigation." n42 The undisputed record reveals that neither Hurt nor his superiors at Outdoor took the time to investigate what was required to accomplish their goal of prompt payment of the Hechinger check. For his part, Hurt was aware that banks generally required individuals to present board resolutions when conducting business with corporate bank accounts. A simple question from him in advance of his "mad dash" to Millsboro would have revealed that Omni's practice was no different than the industry practice. Under these circumstances, the Court concludes that Hurt's reliance on the vague reference to "proper authorization" was not reasonable as a matter of law. n43

n41 Sipple v. Kaye, 1995 Del. Super. LEXIS 452, *3, Del. Super., C.A. No. 93C-01-105-1-CV, Del Pesco, J. (Oct. 30, 1995) (finding, as a matter of law, that plaintiff could not reasonably have relied on statements alleged to have been misleading).

[*24]

n42 Ward, 1996 Del. Ch. LEXIS 92, *11 (citing Lock v. Schreppler, Del. Super., 426 A.2d 856, 862 (1981)); Stidham v. Kinnamon, 1988 Del. Super. LEXIS 483, Del. Super., C.A. No. 86C-AP-18 (Kent), Ridgely, J. (Dec. 29, 1988), Mem. Op. at 7.

n43 Ward, 1996 Del. Ch. LEXIS 92, *14-15.

Defendant's Motion for Summary Judgment as to Count III (negligent misrepresentation) is GRANTED.

2001 Del. Super. LEXIS 166, *24; 44 U.C.C. Rep. Serv. 2d (Callaghan) 801

### D. Count IV, Civil Conspiracy

Under both Maryland and Delaware law, allegations of civil conspiracy cannot be sustained as an independent tort, but rather the allegations must relate to the completion of a tort independent of the conspiracy itself. n44 Since the Court has determined that Outdoor's fraud and negligent misrepresentation claims are not viable as a matter of law, Outdoor's civil conspiracy claim also must fail as there is no independent tort to sustain it. Accordingly, Defendants' Motion for Summary Judgment on Count IV (civil conspiracy) is GRANTED.

n44 See, e.g., Connolly v. Labowitz, Del. Super., 519 A.2d 138, 143 (1986)(citing Phoenix Canada Oil Co. v. Texaco, Inc., D. Del., 560 F. Supp. 1372, 1388 (1983); McLaughlin v. Copeland, D. Del., 455 F. Supp. 749, 752 (1978)); Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc., Md. Ct. App., 340 Md. 176, 665 A.2d 1038, 1045 (1995)(citing Alexander v. Evander, Md. Ct. App., 336 Md. 635, 650 A.2d 260, 265 n.8 (1994)).

[*25]

### IV. CONCLUSION

Outdoor has failed to present any evidence that the defendant banks made a false statement or that they wrongfully withheld material information. This failure of proof in the record, in the face of evidence that the banks were truthful in their discussions with Outdoor, requires that summary judgment be entered on the fraud, negligent misrepresentation and civil conspiracy claims.

IT IS SO ORDERED.

Joseph R. Slights, III

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 562116 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware, New Castle County.
ROSE HEART, INC., a Delaware Corporation, Plaintiff,
v.
RAMESH C. BATTA ASSOCIATES, P.A., a Delaware
Professional Association, Tetra Tech Inc., a Delaware
Corporation, and Aerial Data Reduction, Inc., a
Pennsylvania Corporation, Defendants.
C.A. No. 92C-10-138.

Aug. 15, 1995.

Upon Defendants Ramesh C. Batta Associates, P.A., and
Aerial Data Reduction, Inc.'s Motions for Summary
Judgment Upon the Negligence Claims of Plaintiff Rose
Heart, Inc.

Joseph Grey and Thomas C. Marconi of Prickett, Jones,
Elliot, Kristol & Schnee, for plaintiff Rose Heart, Inc.
James F. Kipp and Francis J. Schanne of Trzuskowski,
Kipp, Kelleher & Pearce, P.A., for defendant Aerial Data
Reduction, Inc.
Paul Cottrell of Tighe, Cottrell & Logan, P.A., for defendant
Tetra Tech, Inc.
Edward M. McNally and Eric D. Schwartz of Morris,
James, Hitchens & Williams, for defendant Ramesh C.
Batta Associates, P.A.

*OPINION and ORDER*

TOLIVER, Judge.
*1 The Plaintiff, Rose Heart, Inc. (hereinafter "Rose
Heart"), filed this action seeking damages resulting from an
aerial topographic manuscript (hereinafter "topo") [FN1]
which it claims is defective, and which should have been,
but was not, verified by the Defendants. The entities alleged
to be so responsible are Aerial Data Reduction, Inc.
(hereinafter "ADR"), Ramesh C. Batta Associates, P.A.
(hereinafter "Batta") and Tetra Tech, Inc. (hereinafter "Tetra
Tech"). Tetra Tech and Batta, respectively, are a Delaware
corporation and professional association doing business in
this state. ADR is a Pennsylvania corporation doing

business in this state.

FN1. A topo is a graphic representation of existing
terrain derived from aerial photography which
depicts the relevant vertical and horizontal
topographical data of a parcel of land. It is used for
various purposes in connection with real estate
development and/or construction projects.

On April 12, 1994, this Court entered judgement in favor of
Tetra Tech as to Rose Heart's claims against it. That
decision was based on the fact that Rose Heart was required
to arbitrate those claims against Tetra Tech pursuant to the
agreement between the two parties. However, the applicable
period of time within which to pursue that aspect of this
controversy had expired thereby permanently barring Rose
Heart from pursuing the same. Remaining unresolved are
four motions.

Specifically, Batta is seeking the entry of summary
judgement in its favor as to Rose Heart's negligence claims
against it as well as a motion seeking the issuance of a
third-party complaint against Tetra Tech. ADR has filed a
cross claim against Tetra Tech, which the latter seeks to
have summarily disposed of as well. Lastly, ADR has
moved for summary judgement, like Batta, as to Rose Heart
negligence claims against it. That which follows is the
Court's response.

FACTS

Rose Heart, primarily engaged in the business of real estate
development, owned a parcel of land located in New Castle
County known as the "Miller Tract" upon which it planned
to erect a residential housing development to be called
"Rosetree Hunt". Rose Heart retained Batta, a professional
engineering/land surveying firm, to provide services of that
nature in connection with the Rosetree Hunt project. On
May 24, 1988, Batta presented Rose Heart with a proposal
to perform various tasks in that regard, including the
creation of a topo. [FN2] By letter dated July 1, 1988, Rose
Heart accepted Batta's proposal in substantial part, including
the topo.

FN2. The topo portion of the proposal letter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 562116 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

provided, in relevant part:
We propose to provide all the horizontal, vertical control on this site to the extent of setting targets to achieve an aerial topographic manuscript at one foot contour intervals. The cost of all the field, office work and aerial topographic maps is anticipated to be $11,000. However, please note that the flight can not be accomplished until early fall because of the tree cover on this site and it is virtually impossible to do this topo by conventional means in any cost effective way.
(See Proposal Letter, at 1)

On August 2, 1988, Batta engaged ADR, an aerial mapping firm, to provide "photogrammetric mapping services and materials" for the project. (See Batta/ADR Contract, at 1). However, because of existing tree cover, the necessary aerial photography could not be completed within the time frame contemplated by Rose Heart. As a result, Batta directed ADR to provide the document using instead a 1982 aerial photograph which would allow two foot contour intervals, not one foot as Batta had promised Rose Heart. Using that information, Batta would supply the balance of the information necessary to complete the topo.[FN3] ADR did in fact complete the task as directed by Batta. At no time relevant to this dispute, did it have any contact or enter into any agreement with Rose Heart regarding the Miller Tract.

> FN3. Batta claims to have informed Rose Heart of the change from one foot contour intervals as stipulated in the Batta proposal to two foot contour intervals as necessitated by use of the 1982 photograph. Rose Heart denies any notice regarding the change in contour intervals.

*2 In December of 1988, for reasons that are not clear upon the present record, the relationship between Rose Heart and Batta was severed and Batta performed no further services in connection with the project. In addition, all monies previously agreed upon as due for this phase of the work were paid to Batta by Rose Heart contemporaneous with or shortly after the termination of their agreement.

On December 4, 1989, Tetra Tech entered into an agreement with Rose Heart to perform surveying and engineering tasks

for the Rosetree Hunt project. The written agreement provided how and when Tetra Tech would design and prepare site and construction plans. With regard to the topo, the agreement stated: "[Tetra Tech] shall field verify the above-referenced topographic plan as required by the New Castle County Department of Public Works." It also appears that in January of 1989, pursuant to that agreement and at the direction of Rose Heart, Tetra Tech retrieved all documents pertaining to the project from Batta, including the Batta/ADR prepared topo. At that point in time, the topo had not been verified.

In January of 1990, Tetra Tech requested that Batta certify the accuracy, including the topography, of a Record Minor Subdivision Plan (the "Minor Plan") that Tetra Tech was submitting on behalf of Rose Heart to New Castle County. Batta, by letter dated January 12, 1990, responded to Tetra Tech's request by stating: "As Dave and I discussed on 1/11/90-we will certify to *Boundary Only* ... we have not checked the interior data-that's your baby." Batta did in fact so limit its certification.

Tetra Tech certified to the remainder of the Minor Plan as well as a "Record Major Subdivision Plan". Both were filed and recorded as required by law with appropriate governmental agencies of New Castle County. Construction thereafter commenced on the project. In August of 1991, after substantial work had been completed, Rose Heart discovered that the topo was inaccurate and that the inaccuracy had resulted in additional expenses in the completion of the project.

*DISCUSSION*

A motion for summary judgment requires this Court to examine the record to determine whether there are any genuine issues of material fact or whether the evidence is so one-sided that one party should prevail as a matter of law. *Burkhart v. Davies*, Del.Supr., 602 A.2d 56, 59 (1991), *cert. denied*, 112 S.Ct. 1946 (1992). This Court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in making its determination. Super.Ct.Civ.R. 56(c). If, after viewing the record in a light most favorable to the nonmoving party, this Court finds no genuine issue of material fact, summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 562116 (Del.Super.)
(Cite as: Not Reported in A.2d)

judgment is appropriate. _Burkhart,_ 602 A.2d at 59;
_Hammond v. Colt Ind. Operation Corp.,_ Del.Super., 565
A.2d 558, 560 (1989). However, summary judgment may
not be granted when the record indicates a material fact is in
dispute or if it seems desirable to delve more thoroughly
into the facts in order to clarify the application of the law to
the circumstances. _Ebersole v. Lowengrub,_ Del.Supr., 180
A.2d 467, 470 (1962); _Wilson v. Triangle Oil Co.,_
Del.Super., 566 A.2d 1016, 1018 (1989); _Teder v. Jet
Group,_ Del.Super., C.A. No. 94C-02-126, Quillen, J. (Feb.
23, 1995) (Letter Op.).

*3 The moving party bears the initial burden of showing
that no genuine material issue of fact exists. _Moore v.
Sizemore,_ Del.Supr., 405 A.2d 679, 680 (1979). If a
properly supported motion for summary judgment shows no
genuine issue of material fact, the burden shifts to the
nonmoving party to prove that a material issue of fact exists.
_Id._ at 681. To carry its burden, the nonmovant must produce
specific facts that would sustain a verdict in its favor.
_Anderson v. Liberty Lobby Inc.,_ 477 U.S. 242, 248-49
(1986). However, the nonmovant cannot create a genuine
issue for trial through bare assertions or conclusory
allegations. _Celotex Corp. v. Catrett,_ 477 U.S. 317, 324
(1986); _Martin v. Nealis Motors, Inc.,_ Del.Supr. 247 A.2d
831, 833 (1968).

Rose Heart contends that the Defendants are liable in tort
for Rose Heart's economic losses pursuant to the negligent
misrepresentation exception to the economic loss rule. [FN4]
In order to sustain its claim of negligent misrepresentation,
Rose Heart must show:

> FN4. The economic loss rule is a judicially created
> doctrine arising out of product liability law which
> prohibits recovery for economic loss in tort where
> a product has damaged only itself and the only
> losses suffered are economic in nature. _Danforth v.
> Acorn Structures, Inc.,_ Del.Supr., 608 A.2d 1194,
> 1195 (1992). It is undisputed that the damages
> alleged in Rose Heart's Complaint are solely
> economic in nature and recovery in tort under a
> conventional negligence theory therefor is barred.
> An exception to the economic loss rule is the
> negligent misrepresentation cause of action which

allows recovery in tort for economic loss. This
cause of action was adopted by Delaware in
_Guardian Construction Co. v. Tetra Tech
Richardson,_ Del.Super., 583 A.2d 1378 (1990).
Restatement (Second) of Torts § 552 (1977) sets
forth the elements thereof:
Information Negligently Supplied for the Guidance
of Others
(1) One who, in the course of his business,
profession or employment, or in any other
transaction in which he has a pecuniary interest,
supplies false information for the guidance of
others in their business transactions is subject to
liability for pecuniary loss caused to them by their
justifiable reliance upon the information, if he fails
to exercise reasonable care or competence in
obtaining or communicating the information.
(2) Except as stated in Subsection (3), the liability
stated in Subsection (1) is limited to loss suffered
(a) by the person or one of a limited group of
persons for whose benefit and guidance he intends
to supply the information or knows that the
recipient intends to supply it; and
(b) through reliance upon it in a transaction that he
intends the information to influence or knows that
the recipient so intends or in a substantially similar
transaction.
(3) The liability of one who is under a public duty
to give the information extends to loss suffered by
any of the class of persons for whose benefit the
duty is created, in any of the transactions in which
it is intended to protect them.

a) Batta and ADR supplied false information in the topo for
the guidance of Rose Heart in the preparation of
construction plans;

b) Rose Heart justifiably relied upon the topo for guidance
in the preparation of construction plans;

c) Batta and ADR failed to exercise reasonable care or
competence in obtaining or communicating the information
in the topo to Rose Heart; and

d) Batta and ADR intended the topo to be relied upon in the



Not Reported in A.2d
Not Reported in A.2d, 1995 WL 562116 (Del.Super.)
(Cite as: Not Reported in A.2d)

preparation of Rose Heart's construction plans, or Batta and ADR knew that Rose Heart intended to rely upon the topo in the preparation of its construction plans.

Initially, Batta and ADR argue that they were not negligent and/or the topo was not deficient given its intended usage. They assert that there are different stages in real estate development, and that the topo they provided was for preliminary land use purposes only, not prospective construction planning. The topo was intentionally prepared in a preliminary manner utilizing two-foot contour intervals due to the stringent time constraints of Rose Heart and the expectation that the topo would ultimately be field verified before being utilized in the construction preparation stage. Consequently, the topo, given its purpose, was prepared in accordance with industry norms. Had Batta remained on the job, it would have field verified the topo when necessary at the appropriate stage of the project. They also allege that Tetra Tech, and therefore Rose Heart constructively, was placed on notice as to the topo's unverified status and therefore reliance thereupon was not justified. In support of these allegations, Batta and ADR have supplied deposition testimony and evidence of communications with Tetra Tech concerning the limitations of the topo.

Setting aside for the moment the issue of negligence, based upon the record as it presently exists, this Court must conclude that Rose Heart has failed to establish that its claim falls within the negligent misrepresentation exception referred to above. Specifically, Rose Heart has failed to establish anything other than the fact that Tetra Tech made representations as to the accuracy and verification of the topo and that Rose Heart took certain actions in light of those representations. No showing has been made that it took any action, or refrained from acting, as a result of information provided in the Batta/ADR prepared topo.[FN5] In short, it has failed to establish the element of justifiable reliance. This conclusion is unavoidable for three reasons.

> FN5. Indeed, the only certification made by Batta related to the accuracy of the boundaries, and not the topographical elevations which are alleged to have been incorrect.

*4 First, Rose Heart seems to have confused the idea of

"relying on its two engineering firms" in a general sense, with the legal term "reliance". See Rose Heart's Brief at 26. Clearly, it relied upon its engineering firms to accomplish certain tasks. However, this is very different from relying upon specific information as a basis for decision making in business transactions with third parties. See, *Danforth v. Acorn Industries, Inc.*, Del.Super., C.A. No. 90C-JN-30, Herlihy, J., (Nov. 22, 1991) Mem.Op. at 3 (citing *Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.*, Ill.App.Ct., 440 N.E.2d 282, 284 (1982)) (in order to sustain a claim for negligent misrepresentation, the information must be supplied for the guidance of others in their business transactions with third parties).

Second, determining whether Tetra Tech was justified in relying upon the Batta/ADR topo, and whether the creation of a preliminary/unverified topo is customary, requires a familiarity with the standards of the engineering industry, as these are not matters within the common knowledge of lay persons. See, *Seiler v. Levitz Furniture Co.*, Del.Super., 367 A.2d 999, 1007 (1976); *Williams v. Durstein*, Del.Super., C.A. No. 87C-FE-18, Gebelein, J. (April 26, 1988) (ORDER). The witnesses for Batta and ADR possess such a familiarity and have stated that Tetra Tech was not justified in relying upon the topo, and that the preparation of such a preliminary/unverified topo for preliminary land use purposes is an industry norm.[FN6] Rose Heart has attempted to rebut this evidence and create a genuine issue of material fact with bare assertions or conclusory allegations unsupported by expert and/or other qualified testimony.[FN7] This is insufficient for present purposes. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Martin v. Nealis Motors, Inc.*, Del.Super., 247 A.2d 831, 833 (1968).

> FN6. Batta has offered the deposition testimony of Mr. Ramesh C. Batta, a licensed engineer and surveyor, and Mr. Toland Van Stan, a licensed surveyor.

> FN7. In rebuttal, Rose Heart has offered the deposition of Mr. Arnold Boyer, a former principal of Rose Heart, who admittedly has little or no expertise in the fields of engineering, surveying or the specific uses of a topo. (See Boyer Dep. at 6, 11, 18-20, 24, 29, 31, 101, 107-108, 110-111, 113,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Page 5

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 562116 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

and 116).

END OF DOCUMENT

Third, even if one were to assume that Tetra Tech's having obtained the topo from Batta and used the same during the course of the project constitutes "reliance" on the part of Rose Heart, presumably under an agency theory,[FN8] such reliance was unjustified. Simply put, the record supports the conclusion that Batta not only notified Tetra Tech that the topo had not been verified, but that they would not verify the same given its preliminary status. If reliance by Tetra Tech constitutes reliance on the part of Rose Heart, then too notice to Tetra Tech would constitute notice to Rose Heart under similar agency principles. At that point, and for whatever reason, Tetra Tech proceeded, to certify that portion of the topo which Batta would not. Any misrepresentations and/or misplaced reliance therefore occurred after Batta was no longer involved in the project, and during the course of the relationship between Rose Heart and Tetra Tech.

FN8. *See,* Rose Heart's Br. at 20.

Based upon the foregoing, the motions by Batta and ADR as to Rose Heart's negligent misrepresentation claims against them must be granted. *See, Williams v. Law Firm of Cooch & Taylor,* Del.Super., C.A. No. 92C-03-024, Graves, J. (May 11, 1994), Slip op. at 3, n. 5. It therefore must follow that the motion by Batta seeking the issuance of a third-party complaint against Tetra Tech as well as the latter's motion seeking the entry of summary judgement as to ADR's cross claims against it are moot.

CONCLUSION

*5 The Defendants' motions seeking summary judgement as to the negligent misrepresentation claims of Plaintiff, Rose Heart, are hereby GRANTED. The remaining motions filed on behalf of Batta and Tetra Tech are hereby dismissed as moot given this disposition.

IT IS SO ORDERED.

Del.Super.,1995.
Rose Heart, Inc. v. Ramesh C. Batta Associates, P.A.
Not Reported in A.2d, 1995 WL 562116 (Del.Super.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1996 DEL. SUPER. LEXIS 34

THOMAS RUGER, VIRGIL SCOTT, JR. AND VIVIAN FIKE, RESIDENTS OF THE
STATE OF DELAWARE, Plaintiffs v. VANCE A. FUNK III, ESQUIRE, BAYARD,
HANDELMAN & MURDOCH, P.A. AND COMMONWEALTH LAND TITLE
COMPANY, A CORPORATION OF THE STATE OF PENNSYLVANIA, Defendants

C. A. NO. 93C–04–210

SUPERIOR COURT OF DELAWARE, NEW CASTLE

1996 Del. Super. LEXIS 34

August 24, 1995, Oral Argument
January 22, 1996, Date Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court March 13, 1996.

**PRIOR HISTORY:**

Supplemental Briefing Received: October 2, 1995.

**COUNSEL:**

Jeoffrey L. Burtch, Esquire, Cooch & Taylor, Wilmington, Delaware, Attorney for Plaintiffs.

Richard H. May, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, Attorney for Defendants Funk and Bayard, Handelman & Murdoch, P.A.

Jeffrey M. Weiner, Esquire, Wilmington, Delaware, Attorney for Defendant Commonwealth Land Title Company.

**JUDGES:** LEE, J.

**OPINIONBY:** LEE

**OPINION:**

MEMORANDUM OPINION

Motion for Summary Judgment

LEE, J.

Plaintiffs Thomas L. Ruger and Virgil Scott, Jr. ("plaintiffs") together with non-party, Vivian H. Fike n1, purchased a piece of real property from Consolidated Rail Corporation ("Conrail") on February 25, 1987. This piece of real property (the "branch property") had been used by Conrail and its predecessors as a branch railway known as the Pomeroy Branch in Newark, Delaware n2. The branch property was composed of a number of parcels acquired by Conrail at various times from various owners.

n1 Fike has brought similar claims against the defendants here in another action (Fike v. Funk, Civil Action No. 93C-05-62).

[*2]

n2 For the sake of clarity, both Conrail and its predecessors which operated a railroad on the Pomeroy Branch shall be known collectively as "Conrail."

Defendant Vance A. Funk III, Esquire n3, represented the plaintiffs and Fike in the purchase of the branch property. At the time of the closing on the real estate, Funk issued a title certificate certifying "a good marketable fee–simple title" to the branch property. At the same time, defendant Commonwealth Land Title Company ("Commonwealth") issued a policy of title insurance to the plaintiffs and Fike for the branch property. The branch property comprised 12.5 acres in a parcel 50 feet wide by 1.4 miles long. The purchase price was $275,000.

n3 Both Funk and his law firm, Bayard, Handelman & Murdoch, P. A., are defendants in this action. For clarity's sake, "Funk" shall refer, where appropriate, both to lawyer Funk and to his law firm.

On the same day that settlement [*3] occurred, Funk was informed by an attorney representing two adjoining property owners that these owners claimed to have title to a portion of the branch tract. On April 29, 1987, these ad-

1996 Del. Super. LEXIS 34, *3

joining owners, the "Dean heirs," filed suit in the Court of Chancery seeking a determination of their rights to a portion of the branch property. The Dean heirs' claim was that their predecessor-in-title had conveyed to Conrail only a "fee simple determinable" estate to a portion of what became the branch property. This portion of the branch property, the "Dean parcels," was deeded to Conrail "so long as the same shall be used, needed or required for railroad purposes." The basis of the Dean heirs' suit was that Conrail had ceased using the branch property as a railway before sale of the property to the plaintiffs and Fike. The Dean heirs' theory was that at the time use as a railway ceased, the railroad's title to the Dean parcels terminated and was vested in the Dean heirs. Therefore, Conrail had no ownership interest in the Dean parcels prior to transfer to the plaintiffs and Pike.

Responding to its obligations under the policy of title insurance which it had issued to the plaintiffs and Fike, [*4] Continental retained Wendy Cohen, Esquire, to represent the plaintiffs' and Fike's interest in the lawsuit. By order of October 20, 1989, the Court of Chancery granted plaintiffs and Fike summary judgment based on the Court's determination that the plaintiffs and Fike were "vested with color of title to the property."

Commonwealth then retained Ms. Cohen to represent the plaintiffs' and Fike's ("the buyers") interest in a quiet title action against the Dean heirs to resolve remaining title questions in the Dean parcels. The quiet title action was filed on March 5, 1990.

On February 23, 1990, the plaintiffs brought suit against Funk on negligence grounds in connection with the title search and certificate issued on the branch property.

Meanwhile, in December, 1989, the City of Newark indicated to the buyers that it sought to condemn a portion of the branch property comprised of the Dean parcels for public use. The buyers retained Andrew P. Taylor, Esquire, to represent them in connection with the condemnation.

In December, 1990, the buyers settled their claims with the Dean heirs. The Dean heirs received $90,000 for a release of their claims to the portions of the branch property [*5] arguably transferred by fee simple determinable deed. This amount, as well as the legal fee in connection with the quiet title action, was paid by Commonwealth. The negligence suit brought by plaintiffs against Funk was thereafter dismissed without prejudice.

Subsequently, the State of Delaware became interested in acquiring the branch property. On October 18, 1991, the State informed the buyers of the State's belief that the buyers held "only an easement or right of way

over six of the parcels," rather than fee simple title.

After receiving the State's letter, the plaintiffs demanded that Commonwealth bring a quiet title action on their behalf with respect to the title defects alleged by the State. Commonwealth refused to bring a quiet title action and instead tendered the remaining policy limits. Plaintiffs' counsel refused to accept the tender of policy limits, and on April 23, 1993, this action was filed alleging negligence and fraud against defendants Funk and Commonwealth.

On June 2, 1993, the State brought an action against the plaintiffs and Fike seeking to condemn the branch property.

The Defendants have moved for summary judgment. Funk argues that the plaintiffs' [*6] claims against him are barred by the statute of limitations. Commonwealth argues that the plaintiffs' claims are barred by the statute of limitations, and, to the extent that any claim survives the statute of limitations, that its liability cannot exceed the policy limits to which the parties agreed. This is my decision on defendants' motion for summary judgment.

Of course, summary judgment can be granted only where a court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Superior Court Civil Rule 56(c). Summary judgment is granted only where, considering the facts in the light most favorable to the non-moving party, there is no material issue of fact. *Pullman, Inc. v. Phoenix Steel Corp., Del. Super., 304 A.2d 334 (1973).* "In considering the record... the Court presumes that the party opposed to summary judgment will present its best case at trial. If the Court concludes that even with its best effort the non-moving party will fall short, the Court must grant summary judgment as a matter of law. *Lilquist v. Rodriguez, Del. Super., C.A. No. 92C-11-142, Silverman, J., (November [*7] 30, 1995)(citations omitted).

STATUTE OF LIMITATIONS

The parties agree that the tort claims arising from the February 25, 1987 title certificate and policy of title insurance are subject to the three year statute of limitations found in *10 Del. C. § 8106.* That statute requires actions to be commenced within three years from the time the cause of action "accrues"; generally, at the time of injury. *Nardo v. Guido DeAscanis & Sons, Inc., Del. Super., 254 A.2d 254 (1969).* In certain instances, however, courts have recognized the fundamental unfairness of applying the statute in instances where the discovery of the existence of a cause of action at the time of injury is a practical impossibility. In this limited class of cases, courts have recognized that the running of the statute may be delayed

1996 Del. Super. LEXIS 34, *7

or interrupted. Although the exception to the running of the statute from the time of injury is often referred to as the "time-of-discovery" rule, this is something of a misnomer. Under the rationale of these cases, the running of the statute is tolled so long as the injury is "inherently unknowable" and the party–plaintiff "blamelessly ignorant." *Layton v. Allen, Del. Supr., [*8] 246 A.2d 794 (1968).* The "time of discovery" analysis is "narrowly confined" to these circumstances as an exception to the traditional rule that the statute begins to run with injury or breach of contract, and that ignorance of the facts of the situation does not toll the statute. Kaufman v. C. L. McCabe & Sons, Inc.; *Del. Supr., 603 A.2d 831, 835 (1992).* Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party–plaintiff no longer blameless. "If all parties were allowed to toll the statute of limitations until they learned of the legal theory of a proposed action or so pursued an action, there would be no purpose to the statute of limitations." *Began v. Dixon, Del. Super., 547 A.2d 620 (1988).*

It is clear that injury resulting from an attorney's failure to discover a title defect is "inherently unknowable" to layman, and that the time within which those so injured may sue does not begin to run until discovery or some other circumstance changes that status. *Pioneer National Title Ins. Co. v. Child, Inc., Del. Supr., 401 A.2d 68 (1979);* Pioneer [*9] *National Title Ins. Co. v. Sabo, Del. Super., 382 A.2d 265 (1978).* "In a defective title case, the statute of limitations does not begin to run as long as there are no observable or objective factors which, as laymen, put [plaintiffs] on notice of a defect." *Child, Inc. v. Rodgers, Del. Super., 377 A.2d 374, 377, (1977),* aff'd. in part, rev'd. in part not pertinent, 401 A.2d 68 (1979). "Application of the 'time of discovery' rule is limited, and each case must stand and fall on its own facts ..." *Isaacson, Stolper & Co. v. Artisan's Saving's Bank, Del. Supr., 330 A.2d 130, 133 (1974)* (refusing "broad brush" application of the time of discovery rule to malpractice case).

The question in this case is when the plaintiffs' period of "blameless ignorance" ended, the point at which the statute began to run. The plaintiffs argue that accrual occurred when they were notified of title defects by the State of Delaware in September, 1991. Thus, the plaintiffs contend that this suit filed on April 23, 1993 is timely. The defendants argue that the period of blameless ignorance ended prior to April 23 1990, and thus, that the cause of action is time-barred.

The cases which have [*10] applied the time-of-discovery rule to title cases are based on two premises. First, that title defects are "inherently unknowable" to

the layman; that is, that a purchaser would not be able, from a reasonable inspection of the settlement documents and the property, to perceive that some defect may exist leading to liability on the part of those involved in certifying title. Second, and related to the first premise, is that a purchaser may reasonably rely on the trust which he naturally places in professionals, such as lawyers hired to check the status of a title. See Pioneer v. Child, Inc.. supra; Pioneer v. Sabo, supra; *Isaacson, Stolper & Co. v. Artisan's Savings Bank, supra.* Because of this trust, a client who fails to investigate the quality of a title search without circumstances placing him on notice of a problem in that search remains "blamelessly ignorant."

In this case, the inherently unknowable nature of the defects in title, and the reasonable belief of the plaintiffs in the quality of the work performed, began to diminish within a few hours of the time of settlement. On the day of settlement, the Dean heirs informed the plaintiffs' attorney, defendant Funk, that they [*11] believed that Conrail had held only a fee simple determinable interest in the Dean parcels, and that this interest had reverted prior to the plaintiffs' purchase of the branch property. Two months later, the Dean heirs filed suit to perfect their title. When the Court of Chancery determined only that the buyers had held "color of title," the buyers had Commonwealth bring a quiet title action on their behalf with respect to the "Dean parcel" portions of the branch property. The suit eventually was settled with a $90,000 payment to the Dean heirs in return for a quit claim of the interest in the Dean parcels. n4

n4 This represented a substantial payment for the interest of the Dean heirs. The portion of the property comprising the Dean parcels was only a fraction of the whole, the purchase price for which was $275,000.

On February 23, 1990, the plaintiffs filed suit against Funk, claiming negligence in the title search and breach of the certificate of title. This suit was dismissed without prejudice once Commonwealth [*12] purchased the interests of the Dean heirs on the buyer's behalf.

I believe that as of the time of filing of the Dean heirs' suit, and certainly by the time of the filing of plaintiffs' lawsuit against Funk, plaintiffs were on sufficient notice of problems with the title to the branch property to overcome the "inherent unknowability" which had tolled the running of the statute. Failure to investigate the quality of title at this point was no longer "blameless ignorance."

Plaintiffs point out that the Chancery actions were concerned only with certain deeds to parcels of the property (the "Dean parcels"), which themselves were only a

portion of the branch property that the buyers purchased from Conrail. Plaintiffs argue that this did not put them on notice of defects in the chain of title to other portions of the branch property (nor, presumably, to other defects in title to the Dean parcels). I assume for purposes of this analysis that the plaintiffs remained ignorant of the "right of way" problems until notified by the State in September, 1991. Ignorance of facts alone does not toll the statute, however. *Mastellone v. Argo Oil Corp., Del. Supr., 46 Del. 102, 82 A.2d 379 (1951).* [*13] The plaintiffs were of the belief that the title search involved actionable negligence on the part of Funk, and stated in their lawsuit against him filed more than three years before the commencement of this action. That lawsuit alleged negligence generally against Funk in the title search and breach of warranty generally in the certificate of title. Even if that suit had specifically based liability on failure to consider the Dean heirs' deeds, however, the result would be the same. Plaintiffs believed in February, 1990, as they stated in their complaint, that Funk failed "to exercise that degree of skill and care required of attorneys in searching title; [and] ... exercise due diligence and reasonable care in the examination of titles." Clearly, by this time, plaintiffs could no longer reasonably rely on Funk's skill and care in this matter, and did not remain "blamelessly ignorant" of title problems. n5

> n5 If plaintiffs' argument is accepted, the statute of limitations even now has not begun to run on any problems which may exist in title to the branch property exclusive of the "fee simple determinable" issues settled with the Dean heirs, and the right-of-way problems at issue here.

[*14]

As I stated above, I believe that plaintiffs' knowledge of the fee simple determinable issue raised by the deeds of the Dean heirs was sufficient to begin the running of the statute with respect to title defects. I need not so find, however, because the plaintiffs had additional notice of title problems, including the "right of way" title issues which formed the basis of this lawsuit.

By letter of February 2, 1989, Commonwealth provided the plaintiffs and Fike "a copy of a letter from Vance Funk, Esquire outlining the title for the property insured by Commonwealth" – the branch property. The letter enclosed was written by Funk to a lawyer at Commonwealth and dated January 10, 1989. The letter states that, "There was a variance in the quality of the title in the various areas purchased. For the purposes of review, the area purchased has been divided [into five 'parcels'] to reflect their quality." The letter goes on to describe "Parcel 1" as involving "classic real estate questions which because of

the continued use and possession over the years would be resolved in favor of fee ownership." The letter describes title as stemming from a condemnation shown by a file which has "disappeared [*15] from the archive." Other portions of this parcel were conveyed by "right-of-way" deeds. The letter points out that "long occupancy, ... payment of taxes, the various rights-of-way and easements granted by the railroad over the years claiming ownership and the absence of any reverter clauses strengthen this title."

The letter describes Parcel 2 as consisting of property transferred by "right-of-way deed" and notes that title is "strengthened" by the same factors which "strengthened" title to Parcel 1. The letter also describes the fee simple determinable problem of the Dean heirs' deeds (Parcel 4) and describes only two of the five "parcels" as being granted in "fee simple ... without any reservation." (Parcels 3 and 5). n6

> n6 It should be noted that the branch property is divided into "parcels" in various ways in the record, the numbers of which do not necessarily correspond.

The plaintiffs claim that, in light of the then ongoing litigation over the Dean heir parcels, they did not read the Funk letter as [*16] indicating any problems with title. They argue that they focused on the description in the title of "Parcel 4" referring to the Dean heirs' property.

Once again, the analysis is not whether the plaintiffs knew of the right-of-way problems on receipt of this letter, but whether they remained "blamelessly ignorant" of an "inherently unknowable" problem. As of receipt of this letter, the plaintiffs had before them clear indication that several of the deeds to portions of their property granted not fee simple title, but a "right-of-way," title to which was "strengthened" by Conrail having paid taxes and performed other acts indicating ownership. As of this time, the right-of-way problems were no longer hidden. Evidence sufficient to put the plaintiffs on the trail of inquiry had been made available to them in writing. While the letter was received in the context of the Dean hear litigation, plaintiffs' knowledge of the problems with title represented by the Dean heirs' deed made it more reasonable, not less so, that the plaintiffs would take seriously the title defects indicated in the January 10, 1989 Funk letter . n7

> n7 In connection with the condemnation by the City of Newark of a portion of the Dean heirs section of the branch property, the plaintiffs and Fike had hired Andrew P. Taylor, Esquire, to rep-

resent their interest. Taylor had requested, and on February 5, 1990, received from Commonwealth the title search document made in connection with the branch property. This title search document indicated that several portions of the branch property contained chains of title in which the interest transferred was a right-of-way rather than fee ownership. Since I have found that the receipt of the January 10, 1989 Funk letter ended the inherently unknowable nature of the title defects, I need not decide whether the plaintiffs' attorney's receipt of this document was sufficient to run the statute of limitations.

[*17]

The recent case of Kaufman v. C. L. McCabe & Sons, Inc., supra, is instructive here. That case involved a suit against an insurance agent for negligent procurement of insurance coverage. The plaintiff had requested loss-of-use coverage on a beach house, which the agent had failed to provide. The plaintiffs were ignorant of this omission until fire damaged the house. The plaintiffs filed suit more than three years after the receipt of the policy but less than three years from the discovery of its coverage omission.

The Supreme Court rejected plaintiff's argument that the time of discovery rule should apply. The Court found that the omission of loss-of-use coverage was not "inherently unknowable;" "rather, it was available to be ascertained by anyone who cared to read the policy." 603 A.2d at 835. Similarly, the plaintiffs were not "blamelessly" ignorant of the terms of a policy which they could have read.

Here, the fact that the plaintiffs may not have fee simple absolute title to the branch property was "inherently unknowable" at the time of settlement. At the time of the receipt of the January 10, 1989 Funk letter, the plaintiffs had been sued on title disputes regarding a [*18] portion of the property. In this context, they received a letter stating that, among other title problems, some deeds granted only a right of way, the problem for which plaintiffs now seek damages in this lawsuit. As in Kaufman, the title search problems were in plain sight to anyone reading the January 10, 1989 Funk letter.

More than three years before this action was filed, injury to the plaintiffs had become no longer "inherently unknowable," and the plaintiffs were no longer "blamelessly ignorant." Thus, application of the "time of discovery" exception does not save this action from being time barred, unless the statute is otherwise tolled.

This does not end the analysis, however. Plaintiffs have also argued that fraudulent concealment on the part

of the defendants tolled the running of the statute. n8

n8 The plaintiffs did not brief or argue fraudulent concealment per se, although they refer to allegedly misleading statements of the defendants in the briefs as part of their "inherently unknowable" analysis. In post-trial memoranda, plaintiffs make it clear that they are raising fraudulent misrepresentation as a defense to the operation of the statute of limitations. Fraudulent concealment is a defense to the statute conceptually different from the "inherently unknowable" argument discussed above. Hood v. McConemy, D. Del., 53 F.R.D. 435 (1971).

[*19]

Cases of fraudulent misrepresentation represent an exception to the usual rule that ignorance of the facts does not toll the state of limitations. In order for the statute to be tolled, the defendant must have either acted affirmatively to conceal the facts, or made a knowing misrepresentation intended to put the plaintiff off the trail of injury. Shockley v. Dyer, Del. Supr., 456 A.2d 798 (1983). If the action or misrepresentation does put the plaintiff off the "trail of inquiry" leading to knowledge of actionable injury, the statute is tolled until the injury is discovered, or until it should have been discovered through the exercise of reasonable diligence. Id.

The plaintiffs here allege that they were put off the trail of inquiry by statements by the defendants that there were no title problems with the branch property. Although the plaintiffs state that they were repeatedly assured that they had no problems with title other than with the Dean parcels, they can point to only a few instances of representations they characterize as fraudulent. Since fraudulent misrepresentation does not toll the statute with respect to third parties, I will examine the statements of each [*20] defendant in turn. Truitt v. Beebe Hospital of Sussex County, Inc., Del. Super., 514 A.2d 1128 (1986), app. dism'd., 515 A.2d 398.

ALLEGED FRAUD OF FUNK

The plaintiffs first point to two May 8, 1987 letters from Funk to Commonwealth and from Funk to a representative of the City of Newark. The Funk/Commonwealth letter states that, "It has been brought to our attention that there are additional problems in the [plaintiffs'] title policy." Presumably, "additional" here means in addition to the Dean parcels.

The Funk-Newark letter states that, "The search [on the branch property title] was defective in that it failed to note that several of the instruments which were cap-

Page 6

tioned as deeds were, in fact, right-of-way agreements."
It is this latter defect on which the plaintiffs' claims rest.
Accepting this evidence in the light most favorable to the
plaintiffs, as I must for purposes of this summary judg-
ment motion, I conclude that as of May 8, 1987, Funk
knew of the title deficiencies for which plaintiff seeks to
recover here. Therefore, any misrepresentation of Funk
must be considered a "knowing" misrepresentation.

The plaintiffs' list of misrepresentations begins with
[*21] a late summer or early fall, 1987 meeting between
Funk and the plaintiffs. Plaintiff Ruger in his deposition
describes Funk's representations at that meeting as fol-
lows:

> "Well, as I recall, when we were there, we
> had asked – whether there were any problems
> with any other deeds, and Vance told us that
> the only two – he had done some preliminary
> work. And one of the other discussions that
> they were going to have or that we had was
> that Gordon was going to authorize him to
> revisit the title issue. But from what my un-
> derstanding was at that point in time, or my
> recollection, Vance told us that the only two
> parcels that we had problems with was the
> Dean parcel, what he referred to as the Dean
> parcels."

Accepting this evidence in the light most favorable to
the plaintiffs, I suppose this could amount to a represen-
tation by Funk that title to the non-Dean parcels was as
warranted in the title certificate. I note, however, that the
reference to the authorization of further title search work
on additional parcels can hardly have been reassuring to
a prudent plaintiff. Even if the statements of Funk were
intended to and did mislead the plaintiffs in the summer
or early fall of 1987, [*22] however, they do not change
the fact that the plaintiffs' receipt of Funk's January 2,
1989 letter would have put a reasonable plaintiff back on
the "trail of inquiry." There is nothing about this repre-
sentation in 1987 that is sufficient to mask the import of
the Funk letter which the plaintiff received a year and a
half later.

Next, the plaintiffs point to a late 1988 or early 1989
meeting in Funk's office among Funk, Commonwealth
and the plaintiffs. At this meeting, a representative of
Commonwealth allegedly told the plaintiffs that they had
good, insurable title to the non-Dean portions of the
branch property. This meeting is described in more detail
in the section on Commonwealth's alleged fraud. With
respect to Funk, however, the plaintiffs' argument is that,
in standing by and saying nothing in his capacity as a
fiduciary to the plaintiffs, he misled them as to the state

of their title. However, fraudulent misrepresentation for
purchases of tolling the statute of limitations requires an
affirmative act. The argument that a fiduciary's silence
tolls the statute has been specifically rejected, most re-
cently in *Shockley v. Dyer, supra.*

Since these are the only specific misrepresentations
[*23] alleged by the plaintiffs against Funk, I find that
fraudulent misrepresentation on the part of Funk did not
toll the running of the statute of limitations. Therefore,
Funk and his law firm are entitled to summary judgement.
I note, however, that plaintiffs seek to amend their com-
plaint to allege civil conspiracy and other new counts. I
shall withhold summary judgment in favor of Funk pend-
ing submission of memoranda concerning whether this
amendment should be allowed and its impact on the entry
of summary judgment on statute of limitation grounds.

## COMMONWEALTH'S FRAUD

In examining the evidence in the light most favor-
able to the plaintiffs, I conclude that Commonwealth,
like Funk, became aware that there was a problem with
some portions of the branch property having been con-
veyed by right-of-way deed rather than by fee. First,
Commonwealth received the Funk May 8, 1987 letter de-
scribed above. This letter referred to "additional problems
with the above title policy." In addition, Daniel J. Herron,
Vice-President of Commonwealth, had prepared an inter-
office memorandum on July 28, 1988. That memorandum
refers to the title on the branch property. The memo dis-
cusses various problems [*24] with the chain of title,
including the right-of-way problems. Therefore, I find
for purposes of this motion that any misrepresentations
made by Commonwealth as to the quality of title will be
assumed to be knowing misrepresentations.

With respect to misrepresentations of
Commonwealth, the plaintiffs point to the "late 1988
or early 1989 meeting among Funk, the plaintiffs and
Fike and M. Gordon Daniels, Esquire, an attorney for
Commonwealth." This meeting may have taken place
after the plaintiffs received the January 2, 1989 Funk
letter. In interrogatory answers, the plaintiffs described
these representations at the meeting:

> "We expressed concern regarding the abil-
> ity to sell any of the land and we were as-
> sured by M. Gordon Daniels, Esquire, of
> Commonwealth that we had no problem with
> our title on the whole railroad line and that
> we would have no problem with any sale.
> Gordon Daniels advised that Commonwealth
> would insure the title of any of the parcels."

Appendix to Answering Brief of Plaintiffs in Opposition

1996 Del. Super. LEXIS 34, *24

Defendant Commonwealth's Motion for Summary Judgment at B35.

These representations raise a factual issue as to whether Commonwealth knew the statements were [*25] false, intended to mislead the plaintiffs and did, in fact, put the plaintiffs off the "trail of inquiry," dissuading them from investigating the quality of their title further n9.

> n9 Commonwealth's intent to mislead the plaintiffs is problematic. I note that it was Commonwealth which made the January 2, 1989 Funk letter and the title search document available to plaintiffs and their counsel. I believe sufficient factual question is raised to go beyond summary judgment, however.

The plaintiffs also allege that "prior to the settlement of the Dean case, we again asked whether there were any problems with our title since the State was interested an acquiring the whole corridor, and Commonwealth said no problem."

I find that the allegations of the plaintiffs are sufficient to raise a factual issue as to whether they were fraudulently misled into reasonably failing to apprehend, within the limitations period, the title defects upon which this action is based. n10

> n10 The plaintiffs also suggest that they were misled by Commonwealth in another way. After receiving the Chancery Court's October, 1989 Opinion stating that they had color of title in the Dean parcels, the plaintiffs asked Commonwealth to correct the title problem. Commonwealth responded by filing a quiet title action with respect to the Dean parcels but did not take any action with respect to the other parcels. Plaintiffs claim this misled them into believing there were no title problems with the other parcels. This does not represent an affirmative act of misrepresentation which can toll the statute of limitations, however.

[*26]

## COMMONWEALTH'S SUBSTANTIVE SUMMARY JUDGMENT MOTION

Plaintiffs seek to recover against Commonwealth, claiming that 1) Commonwealth owed a duty to conduct a proper title search, which it breached; 2) that Commonwealth committed fraudulent or negligent misrepresentation about the status of the title after the plaintiffs purchased the property; and 3) that Commonwealth breached an implied covenant of good faith and fair deal-

ing by concealing the truth about the status of the title and failing to institute a quiet title action as required by the policy. Negligent Examination of Title (Count I)

Plaintiffs claim that Commonwealth is liable to them in tort for negligence in the examination of the title to the branch property. Commonwealth argues that its liability for any losses in connection with the branch property title are controlled by the provisions of the contract of title insurance to which both plaintiffs and Commonwealth agreed. Commonwealth is correct.

The plaintiffs have not alleged that the relationship between the plaintiffs and Commonwealth is anything other than a garden-variety title insurance relationship. The plaintiffs hired Funk to represent them in the acquisition [*27] of the branch property. In connection with his duties, Funk conducted, or arranged, a search of title and issued a title certificate. Funk was an agent for Commonwealth. He acquired a policy of title insurance for the plaintiffs. That document sets out the rights and responsibilities to which each party has agreed. The plaintiffs purchased a policy of indemnity for the branch property. The parties having spelled out their various rights and responsibilities, the plaintiffs have no basis to seek further recovery in tort.

Neither Commonwealth nor the plaintiffs have cited Delaware cases which provide tort recovery against a title insurer in this situation. I have looked carefully at the cases cited by plaintiffs from other jurisdictions, including those collected at *19 ALR 5th 786*. "Title Insurer's Negligent Failure to Discover and Disclose Defect as Basis for Liability in Tort." (1994) See *Walker Rogge, Inc. v. Chelsea Title & Gaur. Co., N.J. Supr., 116 N.J. 517, 562 A.2d 208 (1989)* (collecting and analyzing cases). This examination indicates that the majority rule is that absent some special duty undertaken outside the contract, title insurers are not liable for negligence in [*28] a title search, but only for their contractual obligation under the policy. Id. Where tort liability is imposed, it is generally because the insurer undertook a duty not involved in this case, or because a state statute imposed a duty not present here. The cases cited by the plaintiffs are not to the contrary. See *Cottonwood Enterprises v McAlpin, N.M. Supr., 111 N.M. 793, 810 P.2d 812 (1991)* (involving duty not of insurer but of title searcher employed by insurer); *Shada v. Title & Trust Co. of Florida, Fla. App., 457 So. 2d 553 (1984).* rev. pet. den., *464 So. 2d 556* (involving liability for commitment containing list of title defects, which insurer had reason to know was serving in lieu of attorney's opinion of title). To the extent cases exist which impose a duty, beyond the contractual duty, for a negligent title search, I decline to follow them. The relationship between Commonwealth and the plaintiffs at the

time of settlement was based on the contract of insurance, and liability must rest on the contractual obligations of that document. *Walker Rogge, Inc., supra.* n11

> n11 I note that the contract contains an integration clause, at "Conditions and Stipulations," Part 12.

[*29]

If the insured could seek recovery in tort for the failure of an insurer to discover defects in title, the policy limits agreed to by the parties would become meaningless. The insureds have paid for a policy providing for a certain level of indemnification. They have paid for no more. Therefore, recovery is limited to that provided for in the contract. In other words, no reasonable land purchaser would consider a title insurance company as certifying that no title defect exists, when the whole purpose of the policy is to spell out the rights and responsibilities of parties if a defect does exist.

Finally, the plaintiffs argue that Funk, as Commonwealth's agent, failed to follow procedures set forth in an agency manual provided Funk by Commonwealth. These procedures, arguably, were meant to insure the adequacy of the title examination. The agency manual procedures were not for the benefit of the plaintiffs, however. Their rights and responsibilities are spelled out in the contract they entered directly with Commonwealth. The directives of the agency manual represent Commonwealth's obvious interest in obtaining accurate title information upon which to base its decision to insure. [*30] Nothing in the Funk-Commonwealth agreement can alter the express contractual obligation provided for in the subsequent contract of insurance between the plaintiffs and Commonwealth. *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., Del. Supr., 616 A.2d 1192 (1992).* n12 For the foregoing reasons, Commonwealth's Motion for Summary Judgment with respect to Count 1 of the Complaint is granted.

> n12 To the extent that the plaintiffs argue that they should be regarded as third-party beneficiaries of the agreement between Commonwealth and Funk, it is clear that third parties acquire contractual rights only where intent to benefit the third party is a material part of the contractor's purpose. *Guardian Construction Co. v. Tetra Tech Richardson, Inc., Del. Super., 583 A.2d 1378 (1990).* Only donees and creditors of the promisee acquire such rights. Id. Here, Commonwealth clearly intended the benefits of its agreement with Funk to flow solely to Commonwealth. Again, the plaintiffs' rights are spelled out in their separate contract with

Commonwealth.

[*31]

MISREPRESENTATION AND FRAUD (COUNTS 2 AND 3)

The elements of fraud are:

> 1) A false representation, usually one of fact, made by the defendant;
>
> 2) The defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
>
> 3) An intent to induce the plaintiff to act or to refrain from acting;
>
> 4) The plaintiffs' action or inaction taken in justifiable reliance on the misrepresentation; and
>
> 5) Damage to the plaintiff as the result of such reliance.

*Desert Equities Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P., Del. Supr., 324 A.2d 1199, 1208 (Fn 17) (1993).* As stated in another portion of this opinion, facts exist in the record which, when viewed in a light most favorable to the plaintiffs, indicate that Commonwealth may have represented that the plaintiffs enjoyed fee simple absolute title to their property when in fact Commonwealth knew that title defects existed. Therefore, Commonwealth's summary judgment motion with respect to Count 3 must be denied. I note that even if the plaintiffs can demonstrate at trial that fraudulent representations were made by Commonwealth, they [*32] must demonstrate their reliance on those statements together with resulting damage. The plaintiffs' ability to show reliance and damage is problematic since at the time the statements were made, the plaintiffs had already purchased the branch property and had incurred the loss occasioned by defects in their title. While neither party concentrated on these elements of fraud in the briefing, the plaintiffs allege in the Complaint that additional losses took place as a result of their reliance on Commonwealth's fraud. At this stage of the proceedings, therefore, it is appropriate that summary judgment with respect to Count 3 be denied.

Count 2 alleges negligent misrepresentation. Traditionally, defendants have not been liable for neg-

1996 Del. Super. LEXIS 34, *32

ligent misrepresentation causing purely economic loss in the absence of a contractual duty. Recently, however, this Court has broaden liability for negligence misrepresentation and adopted *Section 552 of the Restatement (Second) of Torts* (1977). That section provides in subsection 1):

> "One who, in the course of his business, professional employment, or in any other transaction in which he has a pecuniary interest, supplies false information for [*33] the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Guardian Construction Co. v. Tetra Tech Richardson, Inc., Del. Super., 583 A.2d 1378 (1990).* Although Commonwealth had no contractual obligation to provide title information to the plaintiffs, negligently making such representations made lead to liability under § 552. Because the record evidence, viewed in the light most favorable to the plaintiffs, is sufficient to state a cause of action under § 552, Commonwealth's Motion for Summary Judgment with respect to Count 2 must be denied.

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (COUNT 4)

The plaintiffs allege that Commonwealth has breached the implied covenant of good faith and fair dealing implicit in the contract. This implied covenant is recognized in Delaware law. *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96 (1992).* The Merrill case notes that the implication the covenant arose at common law and cites [*34] the *Restatement (Second) of Contracts, § 205* (1979). n13 That section of the Restatement provides that every contract imposes upon each party a duty of good faith and fair dealing in both performance and enforcement. The commentary on that section describes the operation of the covenant with respect to the performance of the contract:

> d. Good faith performance. Subterfuges and evasions violate the obligation of good faith performance even though the actor believes his conduct to be justified. But the obligation goes further, bad faith may be overt or may consist of inaction and fair dealing may require more than honesty .

n13 Merrill actually cites § 204 of the Restatement; this appears to be a typographical error.

The plaintiffs contend that in intentionally misleading plaintiffs as to the state of their title, Commonwealth was acting in its own self-interest by postponing a demand for performance under the title insurance policy. The plaintiffs argue that, at the very least, [*35] they should be permitted to go forward with discovery of Commonwealth's files with respect to this claim. I agree that this course of conduct, if proved, could amount a breach of the covenant. Since I have already found that the facts, looked at the light most favorable to the plaintiffs, indicate that the plaintiffs may have been intentionally misled, summary judgment is inappropriate with respect to this ground of Count 4. The parties have not briefed, and I make no decision upon, what elements would have to be proven in order to recover on this ground of the breach of covenant claim.

Next, the plaintiffs argue that Commonwealth has breached the implied covenant of good faith and fair dealing in not instituting a quiet title action with respect to the non-Dean parcels. Both the plaintiffs and Commonwealth agree that the title insurance policy, read literally, gives Commonwealth the choice in this situation either to institute a quiet title action or to tender the policy limits. Commonwealth has chosen the latter.

The applicable provision of the policy is set out in the "policy conditions and stipulations," section 5:

> 5. Options to pay or otherwise settle claims. The company [*36] shall have the option to pay or otherwise settle for or in the name of an insured claimant any claim insured against or to terminate all liability and obligation of the company hereunder by paying or tendering payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred up to the time of such payment or tender of payment, by the insured claimant and authorized by the company.

Commonwealth exercised its option to tender policy limits after learning of the Delaware Department of Transportation letter which questioned certain aspects of plaintiff's title. Plaintiffs, however, refused the tender, citing a separate portion of the policy, Section 3 (c) of the "Stipulations" section:

> (c) The company shall have the right at its

1996 Del. Super. LEXIS 34, *36

own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured, and the company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision [*37] of this policy.

The plaintiffs claim that this provision, as modified by the implied covenant of good faith and fair dealing, effects a mandatory contractual responsibility on Commonwealth to institute a quiet title action with respect to those defects cited in the Department of transportation letter.

As sole support for this proposition, plaintiffs cite *Summonte v. First American Title Insurance Co.*, N.J. Super., Ch. Div., 436 A.Ld 110 (1981), aff'd. *184 N.J. Super. 96, 445 A.2d 409*, cert. den. *89 N.J. 418, 446 A.2d 148.* That case is inapposite for two reasons. First, the case is factually distinguishable. Summonte involved a situation where a title company maintained that it had no obligation where a title defect had been established but in which no law suit had been filed. This placed the insured in the situation of being able to recover nothing despite its defective title (because no actual loss had yet occurred and no law suit had been filed). The case did not involve a tender of policy limits, as here, and accordingly, did not involve the operation of the contract provision allowing Commonwealth to tender policy limits. Second, Summonte converts what [*38] is on its face a provision of the policy permitting the insurer to bring a quiet title action into a mandatory contractual duty of the insurer to quiet title. Summonte bases its interpretation of the policy

on the covenant of good faith and fair dealing and on the expectation of the parties and of the public at large. In the plaintiffs' own words, the Summonte court "rejected the literal reading, choosing instead to adopt a liberal reading in favor of the insured." Plaintiffs' Answering Brief at 29. To the extent Summont is applicable here, I may not follow its rationale, because in this jurisdiction insurance policies, like other contracts, are enforced according to the express agreement of the parties, absent ambiguity. *Rhone-Poulenc v. American Motorists Ins. Co., supra; Indian Harbor, Inc. v. Safeco Title Ins. Co. of Maryland,* Del. Super., C.A. No. 86C-NO-23, Chandler, J. (October 13, 1387). n14

> n14 I make no decision here as to what Commonwealth's duty would have been had it chosen not to tender policy limits.

[*39]

Plaintiffs here do not argue that the language is ambiguous. Under the terms of the contract of insurance, Commonwealth could have brought a quiet title action. It also had the option to tender policy limits. The plaintiffs purchased from Commonwealth a policy of title insurance which gave Commonwealth the option to do precisely that. The exercise of this option by Commonwealth noes not violate any covenant of the policy, expressed or implied. Therefore, Commonwealth's Motion for Summary Judgment is granted with respect to this provision of Count 4.

To the extent the foregoing requires an order to take effect, IT IS SO ORDERED. Outstanding discovery motions may be re-noticed, as appropriate in light of this decision.