Case 1:05-cv-00858-JJF    Document 92-4    Filed 10/15/2007    Page 1 of 2

RLI Insurance Company v. Indian River School District, et al.
William H. McDaniel,

```
                                74
 1    Q.  I appreciate that.  Okay.  So we're looking now
 2  at McDaniel 10.  Sir, have you seen that document
 3  before today?
 4    A.  I have.
 5    Q.  And are you familiar with what Mr. McHenry is
 6  talking about in this letter?
 7    A.  I am.
 8    Q.  And what was your understanding of -- well,
 9  let's get more specific.  The letter says in the first
10  sentence, "Since last December, we have been delayed
11  by the lack of progress of the concrete contractor."
12  If we then jump down to the very last sentence that
13  says, "Everyday the job gets farther behind due to
14  lack of work by the concrete contractor and everyday
15  our costs increase."  Do you see that?
16    A.  Yes.
17    Q.  Can you tell me what he means by the lack of
18  progress of the concrete contractor?
19    A.  Well, it says in the letter, right in the
20  second sentence, the two main problems is "lack of
21  manpower and inability to pour the footers in the
22  correct places."  They poured a whole wing in the
23  wrong place.
24    Q.  Okay.  What do you mean they poured a whole
```

```
                                75
 1  wing in the wrong place?
 2    A.  It was not in the proper location.
 3    Q.  Okay.  And do you know what the concrete -- did
 4  the concrete contractor have to fix the situation?
 5    A.  They had to redo it.
 6    Q.  Did they have to rip out concrete, do you know?
 7    A.  I don't know whether they did or they made a
 8  new place.  I had to move my work.
 9    Q.  Okay.
10    A.  Because it was now in the wrong place.  I
11  didn't have to, but I was required to.
12    Q.  Was there other work available for your company
13  to perform at that time?
14    A.  No.
15    Q.  Well, you just said you had to move to another
16  place.  Did you mean another job?
17    A.  No, no.  I can't -- if they put the building in
18  the wrong place, the plumbing is in the wrong place.
19  So it has to be redone.
20    Q.  So were there other areas that McDaniel could
21  have been working on plumbing at that time?
22        MS. HALATYN:  Objection.  Calls for
23  speculation.  You can answer.
24    A.  I could look at the job.  I mean --
```

```
                                76
 1    Q.  Do you know as you sit here today?
 2    A.  No, I don't know.  I don't know.
 3    Q.  All right.  If you can take a look at McDaniel
 4  11.  Take your time to look at it, sir.  My first
 5  question is going to be whether or not you wrote this
 6  letter.
 7    A.  I am ready.
 8    Q.  Sir, did you write this letter?
 9    A.  I did.
10    Q.  If you'd take a look at the first page, and,
11  specifically, the indented paragraph, which is the
12  third one down, it says, "The contractor agrees to
13  adhere to the intermediate milestone dates and dates
14  of substantial and final completion established
15  herein."  Do you see that?
16    A.  Yes.
17    Q.  Sir, was that, do you understand, a citation of
18  specification Section 1305?
19    A.  You are confusing me.  I'm sorry.
20    Q.  Are you citing there language from the
21  specifications?
22    A.  Do you want me to read it again?  It's been
23  since May 8th of '03.
24    Q.  Okay.  The letter speaks for itself, I think.
```

```
                                77
 1  So we'll leave it at that and move to another
 2  question.
 3        At the third page, at the end of the first
 4  full paragraph, the sentence reads, "As a result,
 5  McDaniel Heating & Plumbing has been forced to find
 6  other work to perform, which" --
 7    A.  I am not in the right place.  Okay.  I see it.
 8    Q.  All right.  "As a result, McDaniel Heating &
 9  Plumbing has been forced to find other work to
10  perform, which is out of sequence with its original
11  bid proposal to the owner."  Do you see that?
12    A.  Mm-hmm.
13    Q.  Sir, what did you mean when you wrote that
14  sentence?
15    A.  Like I said, it's a long time ago.  I mean it's
16  just like you said, it speaks for itself.  The
17  concrete -- the same as the first letter.  The
18  concrete contractor wasn't doing the job.  We were
19  there; we weren't there.  We started; we stopped.  We
20  put it in; we took it out.
21    Q.  You said the sentence speaks for itself.
22  Correct me -- I want to know if my understanding is
23  correct.  What I think that sentence is saying is that
24  McDaniel had to move to another place in the building
```

RLI Insurance Company v. Indian River School District, et al.
William H. McDaniel,

**Page 78**

1  to do its work and was being forced to do work out of
2  sequence?
3  A. At the time I wrote this, I reviewed the job
4  logs. It's been a long time ago. I don't know if I
5  have seen them since. There is a daily log, so.
6  Q. Okay. Were daily logs kept for the entire
7  duration of the project? The reason I ask
8  specifically is that the daily logs that have been
9  produced end in June of 2004. So I am really asking
10 whether there are logs after that time frame for this
11 project.
12 A. If -- EDiS required them to be turned in every
13 day. If they don't have them, I would say there
14 weren't any. I know they stopped at a certain point.
15 Q. If you had had copies of daily log after June
16 of 2004, would you have kept copies in your file?
17 A. I would have.
18 Q. If we look down to the second paragraph, second
19 full paragraph on the last page.
20 A. The bottom paragraph?
21 Q. Yes. The third sentence.
22 A. "We intend"?
23 Q. Correct. It says, "We intend to provide you
24 with details concerning our additional costs,

**Page 79**

1  including labor overruns, extended field conditions
2  costs, extended home office overhead costs to account
3  for delays caused by the owner or its concrete
4  contractor." Do you see that?
5  A. Mm-hmm.
6  Q. Yes?
7  A. Yes.
8  Q. Did you provide details?
9  A. No.
10 Q. The next sentence says, "We are in the process
11 of determining these additional costs and will
12 transmit them to you once they are finalized." Did
13 you do that?
14 A. No.
15 Q. Did you ever follow up on this letter?
16 A. I never got a response.
17 Q. Did you ever send any additional letters?
18 A. I did.
19 Q. What letters do you recall sending?
20 A. I sent this additionally, again.
21 Q. You sent this a second time?
22 A. Yes.
23 Q. When was that?
24 A. It was later on. I never had an answer to this

**Page 80**

1  letter. I still haven't gotten one.
2  Q. Do you recall whether you resubmitted that
3  before McDaniel was terminated?
4  A. It was before I was terminated.
5  Q. And you don't recall when you submitted it?
6  A. No.
7  Q. Have you ever prepared a formal delay claim for
8  the project?
9  A. No.
10 Q. Why not?
11     MS. HALATYN: Objection. You can answer.
12     THE WITNESS: Pardon?
13     MS. HALATYN: You can answer to the extent
14 that you know.
15     THE WITNESS: Well, we got fired.
16 BY MS. PETRONE:
17 Q. Okay. McDaniel 12. McDaniel 12 is an
18 August 20th, 2003 letter written by
19 Christian J. McCone from EDiS to Bill McDaniel. To
20 you, sir. Do you recall receiving this letter?
21 A. I believe I received it, yes. I don't
22 particularly recall, but, yes.
23 Q. All right. In this letter, in the first
24 sentence, he, Mr. McCone, is saying now McDaniel is

**Page 81**

1  falling behind schedule. Do you see that?
2  A. Yes.
3  Q. He goes on to say, "This is impacting the
4  completion of the project."
5  A. Mm-hmm.
6  Q. And then in the final full paragraph, he says,
7  "You are directed to take the necessary steps to
8  regain the schedule." Do you see that?
9  A. Yes.
10 Q. Then he is threatening to call your bonding
11 company?
12 A. Yes.
13 Q. Did you respond to this letter?
14 A. Not that I recall.
15 Q. Did you take any action in response to this
16 letter?
17     MS. HALATYN: Objection. You can answer.
18 A. You know, we're talking about August 20th of
19 '03. Of course, I took action, but I don't remember
20 what it was. You keep asking me about these things in
21 '03, like what I did that day. Do you know what I
22 mean? I -- I certainly went there. But I don't
23 remember what day I went there or what time or
24 anything.

21 (Pages 78 to 81)