# EXHIBIT C

```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
                             - - -

RLI INSURANCE COMPANY,    :   CIVIL ACTION

          Plaintiff
                          :

     vs.
                          :
INDIAN RIVER SCHOOL
DISTRICT and EDiS
COMPANY and BECKER        :
MORGAN GROUP, INC.,

          Defendants      :   NO. 05-858

                             - - -

          Oral deposition of BRAD A. HASTINGS,
taken at the law offices of Seitz, Van Ogtrop
& Green, P.A., 222 Delware Avenue, Suite
1500, Wilmington, Delaware, on Wednesday, May
2, 2007, at 10:15 a.m., before Karyn M.
Geftman, a Registered Professional Reporter,
an Approved Reporter of the United States
District Court, pursuant to notice.



              KARYN M. GEFTMAN & ASSOCIATES
              Registered Professional Reporters
                Certified Court Reporters (NJ)
                       837 Margo Lane
              Penn Valley, Pennsylvania  19072
              610-608-1040   610-747-0412 fax
                     karynrpr@comcast.net
```

Brad A. Hastings

1   Q.   So you're not sure whether --
2   A.   No.
3   Q.   As we sit here today you don't know
4   one way or the other?
5   A.   I'm not exactly positive.
6   Q.   The gas piping, was that 100%
7   complete as of that date, August 31st?
8   A.   I believe so.
9   Q.   How about fuel oil piping?
10  A.   I believe so also.
11  Q.   How about chilled water piping?
12  A.   I don't recall.
13  Q.   The work that was complete, whatever
14  percentage it was for chilled water piping,
15  was it properly performed?  In other words,
16  had it been performed consistent with the
17  expectations of the contract?
18  A.   I believe so, to the best of my
19  knowledge.  There may have been some
20  insulation issues but I think those may be
21  covered elsewhere.
22  Q.   How about the fixtures line item?
23  It's represented as being 100% complete with
24  a --

Brad A. Hastings

1   A.   I would say that was not.
2   Q.   The fixtures were not 100% complete
3   as of August 31st, 2004?
4   A.   Were not 100%, that is correct.
5   Q.   What percentage would you estimate
6   was not complete as of that date, August 31st
7   2004?
8   A.   It would be an Area B piece of it
9   and I'm not sure what percentage that would
10  equate to.
11  Q.   HVAC equipment, was that 100%
12  complete as of August 31st, 2004?
13  A.   I would say no.
14  Q.   Can you give me an estimate of what
15  percentage was yet to be completed as of the
16  end of August?
17  A.   Again, I couldn't really, I wouldn't
18  know that I could break it down into a
19  percentage.
20  Q.   Could you break it down by wings of
21  the building?
22  A.   Probably Area B again would have
23  been an outstanding piece of it there and
24  some of his corrective work in other areas.

Brad A. Hastings

1    Q.   Of the work, of the HVAC work that
2 had been completed as of August 31st, 2004,
3 was all of it correctly done in conformance
4 with the contract requirements?
5    A.   I would say no.
6    Q.   Was that known on August 31st, 2004
7 by you?
8    A.   Yes.
9    Q.   What are GRDs?
10   A.   I don't recall.
11   Q.   There's a water storage tank?
12   A.   Correct.
13   Q.   Was that 100% installed and hooked
14 up as of August 31st, '04?
15   A.   Yes, I believe it was.
16   Q.   Was it done properly?
17   A.   No, not completely.
18   Q.   What was wrong?
19   A.   There were, I recall there were some
20 other issues we had after the fact along with
21 just operational, I think, issues and some
22 other things that came up after the fact.
23   Q.   The exhaust fan -- I'm going to skip
24 a couple down here -- but was that 100%

Brad A. Hastings

1  complete, that work?
2      A.   No.
3      Q.   What amount of it was incomplete?
4      A.   Again, I couldn't give you a
5  percentage.  I'd say it was Area B type
6  issues.
7      Q.   And of the work that had been
8  completed, was it all done in accordance with
9  the expectations of the contract?
10     A.   I'm sure there were issues.
11     Q.   Dust collectors, were they 100%
12 complete?
13     A.   It was a single dust collector in
14 Area B, and, no, it was not.
15     Q.   I think this is engine and welding
16 duct?
17     A.   Yes.
18     Q.   That is an item that appears to have
19 been billed for during this payment
20 application in its entirety.
21     A.   That is correct.
22     Q.   Was it there?
23     A.   I believe it was on-site.
24     Q.   Was it installed and functioning

Brad A. Hastings

1  properly?
2      A.   It was not installed.
3      Q.   How about was Mr. McDaniel expected
4  to install it as well as supply it?
5      A.   Absolutely.
6      Q.   The water heaters, were they 100%
7  installed, his work scope completed?
8      A.   To the best of my recollection, yes.
9      Q.   Were they functioning properly?
10     A.   Yes.
11     Q.   Was the boiler breaching completed?
12     A.   I believe so.
13     Q.   How about the boilers themselves,
14 were they 100% installed, hooked up,
15 functioning?
16     A.   I believe they were, yes.
17     Q.   Were they functioning properly?
18     A.   To my knowledge, yes.
19     Q.   There are fuel oil pumps and fuel
20 oil tank.  Were they installed at that point?
21     A.   I believe so, yes.
22     Q.   Were they installed properly and
23 performing properly?
24     A.   I think so.

Brad A. Hastings

1  Q. There are a couple of categories of
2  pumps here, heating and cooling as well as
3  wells.
4       Were those pumps all installed
5  and functioning properly as of August 31st,
6  2004?
7  A. I would say for the welds, yes;
8  heating and cooling, I would say no. That
9  would be an Area B issue, I think, is what
10 would come to mind.
11 Q. And with respect to those in the
12 other areas, were they running properly,
13 installed properly?
14 A. I don't know.
15 Q. You don't know?
16 A. I don't know.
17 Q. Air compressors and filters, some of
18 that work appears to have been done during
19 this pay period.
20      Were they 100% complete?
21 A. I don't recall.
22 Q. The glycol, that item appears again
23 to have been billed for entirely in this
24 payment period.

Brad A. Hastings

1  Q. Was that work 100% complete as
2  of August 31st, 2004?
3  A. I believe there were issues with
4  that, but I'm not, I couldn't give you exact
5  specifics because I don't remember.
6  Q. Gas accessories, were those all
7  supplied and installed?
8  A. I'm not sure exactly what piece
9  those are for.
10 Q. And there's something called a
11 booster pump. Was that one item or --
12 A. That was one item and I believe that
13 was in and functional.
14 Q. If you'll go with me to the next
15 page.
16       I'm not going to go through
17 each item with you, but the fifth one down,
18 ductwork, was the ductwork 100% complete as
19 of August 31st, 2004?
20 A. No, it was not.
21 Q. What percentage of it was
22 incomplete?
23 A. Again, Area B, the materials I
24 believe were there but had not all been

Brad A. Hastings

1  installed and there were, I think, some other
2  corrective actions that had to be taken.
3      Q.   On the work that had been
4  installed?
5      A.   Correct.
6      Q.   And what percentage of the work that
7  had been installed needed corrective action,
8  if you can estimate?
9      A.   I don't know. I wouldn't be in a
10 position to really estimate a percentage of
11 that.
12     Q.   Was it a significant portion of the
13 duck work?
14     A.   I don't know that I'd consider it a
15 significant portion.
16     Q.   The insulation, was it, some of that
17 was billed in this pay period. It was 100%
18 in?
19     A.   No.
20     Q.   What wasn't in?
21     A.   Area B and probably some other
22 corrective work.
23     Q.   Was the water treatment system
24 completely in place?

Brad A. Hastings

1   A.   I believe so.
2   Q.   Was it functional, proper and in
3   accordance with the contract requirements?
4   A.   I believe it was. There were, it
5   had to be operational for the school to be
6   occupied and I think we got it operational
7   and then there were some test issues with the
8   water that came up after the fact.
9   Q.   What does ATC stand for?
10  A.   Automatic Temperature Control.
11  Q.   Was the Automatic Temperature
12  Control 94.69 percent complete as of August
13  31st, 2004?
14  A.   That might be, might be heavy.
15  Q.   Heavy meaning higher than the actual
16  percentage?
17  A.   Higher than the actual percentage,
18  yes.
19  Q.   To the extent that it was installed,
20  was it in conformance with the contract
21  expectations?
22  A.   I don't recall.
23  Q.   Testing, adjusting and balancing
24  would all be done basically at the end; is

Brad A. Hastings

```
1   that correct?
2       A.   Correct.
3       Q.   These alternates, I think there's
4   three alternates and then there's five change
5   orders.
6            Do you see where I'm referring
7   to down at the bottom?
8       A.   Yes, sir, I do.
9       Q.   The alternate number one, the
10  auxiliary gym, was that 100% complete?
11      A.   Mechanically, I believe it was.
12      Q.   And I think you've understood in
13  context and I'm talking about McDaniel's
14  aspect of these things.
15      A.   Yes, sir.  I know like with the
16  auxiliary gym there was a flooring issue and
17  I have to try and piece it apart there.
18      Q.   Sure.  And just so we're clear, if
19  it was entirely complete except for the
20  floor, I would not expect you to consider
21  that to be part of Mr. McDaniel's
22  responsibilities.
23      A.   Right.
24      Q.   How about alternate number two and
```

Brad A. Hastings

1  three, the storage area and the classroom,
2  were they 100% complete as far as
3  Mr. McDaniel's scope?
4      A.   I think they were close.
5      Q.   At the bottom we have grand totals.
6  Mr. McDaniel's contract including the change
7  orders and the adjustments was $4,350,471,
8  correct?
9      A.   Correct.
10     Q.   And as of this payment application
11 in Column G, upon approval or in the event of
12 joint check arrangements, suppliers would
13 have been paid $4,265,540.
14          Do you see where I am there?
15     A.   Yes, I see where you are.
16     Q.   And that would represent 98.05%
17 percentage of the total; the lion's share of
18 the balance being retainage.
19          Do you agree?
20     A.   I see it, yes.
21     Q.   Was the McDaniel scope of work
22 98.05% complete as of August 31st 2004?
23     A.   I'd say no.
24     Q.   What would you estimate the

Brad A. Hastings

1  percentage total that was complete as of
2  August 31st, 2004?
3      A.   I don't think I could.
4      Q.   Would it be less than 75%?
5      A.   No, I don't believe so.
6      Q.   So something north of 75%?
7      A.   That would probably be the range,
8  yes.
9      Q.   Of that total work that had been
10 completed, was all of it properly performed
11 in conformance with the contract
12 requirements?
13     A.   No.
14     Q.   And are you able to estimate what
15 percentage was not in conformance with the
16 contract documents?  And, again, what
17 percentage of the work he had actually done.
18     A.   No, I don't want to venture a guess.
19     Q.   Why did you certify this payment
20 application?
21     A.   As I previously mentioned, that
22 there was a subcontractor or supplier, and I
23 don't recall which on this, that had to get
24 payment in order to complete their portion

Brad A. Hastings

1  and they had not been paid before, so it was
2  discussed and agreed that in order to get him
3  paid that these adjustments would be paid
4  here to allow that payment to be made.
5       Q.   Do you recall the amount of money
6  that this contractor was due?
7       A.   I think it's, I'm sure it was on the
8  cover letter from EDiS and I think the cover
9  letters for both 23 and 24 listed the number
10 of suppliers or subcontractors that had
11 specific pieces pulled out.
12      Q.   And this would be an EDiS cover
13 letter to you?
14      A.   Yes, sir.
15      Q.   And when you say this had been
16 discussed, who, who participates in the
17 discussions you're referring to?
18      A.   Chris McCone, either myself or Sandy
19 Carpenter; I believe Greg Weer was there.
20 These were discussions after progress
21 meetings and the like.
22      Q.   Was the superintendent of the Indian
23 River School District a party to these
24 discussions?