# EXHIBIT D

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

                   - - -

3  RLI INSURANCE COMPANY, : CIVIL ACTION

4       Plaintiff

5                 :

6     vs.

7  INDIAN RIVER SCHOOL

    DISTRICT and EDiS

    COMPANY and BECKER     :

8  MORGAN GROUP, INC.,

9      Defendants   :  NO. 05-858

10

                   - - -

11

12       Oral deposition of GREGORY C. WEER,

13  taken at the law offices of Seitz, Van Ogtrop

14  & Green, P.A., 222 Delware Avenue, Suite

15  1500, Wilmington, Delaware, on Tuesday, March

16  20, 2007, at 10:15 a.m., before Karyn M.

17  Geftman, a Registered Professional Reporter,

18  an Approved Reporter of the United States

19  District Court, pursuant to notice.

20

21

22       KARYN M. GEFTMAN & ASSOCIATES

       Registered Professional Reporters

        Certified Court Reporters (NJ)

23          837 Margo Lane

      Penn Valley, Pennsylvania  19072

24     610-608-1040   610-747-0412 fax

          karynrpr@comcast.net

Deposition of Gregory C. Weer - IRSD Supervisor of Buildings and Grounds - March 20, 2007

Page 68

8    Q.  Now, from, let's say, the beginning
9  of '04 up into the spring, were any other
10  problems, aside from falling behind on the
11  scheduling with McDaniel, brought to your
12  attention?

13    A.  He would occasionally work out of
14  sequence.

15    Q.  Tell me what you mean by that.

16    A.  The building construction is set up
17  in a sequence, this wing is a priority and
18  then another wing and then another wing; the
19  projects are broken down into sections.  And
20  there is a detailed schedule that was
21  published before and during the project.

22    Q.  Okay.  I take it Mr. McCone
23  indicated that he was not mobilizing in the
24  right areas, working --

Page 69

1    A.  Yes.

2    Q.  -- not working where he should be or
3  working where he shouldn't be yet or both?

4    A.  Both.

5    Q.  Did that happen more than once?

6    A.  Yes.

7    Q.  Other than being behind and working
8  out of sequence, were there other problems
9  associated with McDaniel's work that were
10  brought to your attention during the first
11  four months, let's say, of 2004?

12    A.  Not that -- no, not that I remember.

13    Q.  So nothing related to quality of the
14  work?

15    A.  No.

16    Q.  What caused you to seek out the
17  termination information in the contract in
18  April or May of 2004?

19    A.  Mr. McDaniel was falling a little
20  further behind in the schedule and we were
21  getting inquiries from his vendors requesting
22  payment for materials.  He also informed us
23  in some instances that he could not get
24  materials because he couldn't pay for them.

Page 70

1    Q.  Do you recall approximately when you
2  first became aware of inquiries from
3  McDaniel's suppliers concerning status of
4  their payments?

5    A.  I believe the first one would have
6  been April or May of '04.

7    Q.  And you told me in response to my
8  prior question that on occasions Mr. McDaniel
9  told you that he was having trouble getting
10  materials because of payment issues.

11    A.  Yes.

12    Q.  And when did he tell you that?

13    A.  It would have been in the spring of
14  '04.

15    Q.  Okay, so, again, April or May?

16    A.  Yes.

17    Q.  Did he tell you that at a progress

18  meeting or --

19    A.  Yes.

20    Q.  And would that have, would that be
21  the type of information that would be
22  memorialized in the project meeting minutes
23  that Mr. McCone would prepare?

24    A.  The fact that he was having trouble

Page    71

1  getting materials would probably have been in
2  there, not necessarily that he didn't have
3  the money for it.  It should have been in the
4  minutes.

5    Q.  You would have expected to see that
6  type of information?

7    A.  I would have expected to see that he
8  was having problems getting materials.  I
9  would not expect to see in the minutes that
10  it was due to lack of payment.

11    Q.  Did you, during May -- April, May,
12  of 2004, did you discuss the problems that
13  had arisen to that point with McDaniel with
14  Mr. McCone outside of the project meetings?

15    A.  We may have discussed it after a
16  meeting.

17    Q.  Your decision to look at the
18  contract to determine what was necessary to
19  terminate the contractor, was that something
20  you undertook on your own initiative?

21    A.  Only after the question had been, or
22  the -- excuse me -- only after the
23  possibility had been raised by EDiS.

24    Q.  Tell me about that discussion.  When

Page 72

1  is the first time that you were involved in a
2  discussion with anyone about the possibility
3  of terminating McDaniel.

4     A.  I would say late April.

5     Q.  And tell me about the circumstances
6  of that discussion.

7     A.  We were looking at the schedule for
8  completion of the project knowing that we
9  were quite behind at that point with the
10  possibility that the B-wing would not be
11  completed in time to open the school in
12  September and there were questions about some
13  of the other wings being ready.

14     Q.  And the commencement of the,
15  generally speaking, the school was expected
16  or desired to be open and ready for the
17  beginning of the '04-'05 school year?

18     A.  That's correct.

19     Q.  So in late April 2004 you're looking
20  at the schedule and becoming concerned about
21  the prospect of meeting that goal?

22     A.  Yes.

23     Q.  And who else were you looking at
24  that schedule with?

Page 73

1     A.  EDiS and Becker Morgan.

2     Q.  Was there a meeting called for this
3  purpose of reviewing the schedule?

4     A.  No, we generally would have done
5  that prior to or following the progress
6  meeting.

7    Q.  In this particular instance, do you
8  recall which it was?

9    A.  It was probably after.

10    Q.  So one of the meetings in late
11  April, a general progress meeting took place?

12    A.  Yes.

13    Q.  And is it your recollection that
14  after that you and the EDiS and Becker Morgan
15  representatives talked about the schedule and
16  the problems that you saw?

17    A.  Yes.

18    Q.  Would that have been Mr. McCone or
19  his site superintendent?

20    A.  Well, it would have been both.

21    Q.  So both gentlemen it's your
22  recollection were there when you had that
23  first, the first discussion on that topic?

24    A.  Yes.

Page 74

1    Q.  Do you recall who was there for the
2  architect?

3    A.  No.  It would have been probably
4  Sandy Carpenter.

5    Q.  The three architect representatives
6  that you told me about before, were they on
7  the project in succession or did they
8  alternate from time to time?  In other words,
9  was it different people because some left or
10  got transferred or could it have been any of
11  those three people at any --

12    A.  It could have been any one of the

13 three. Lisa was the lead architect, Sandy
14 was operating as an office manager or project
15 manager and Brad is a principal in the
16 company.

17    Q. And, if you know, were all three of
18 those folks with Becker Morgan pretty much
19 throughout the time frame we've been talking
20 about?

21    A. Yes.

22    Q. Do you know whether any or all three
23 of them are still with Becker Morgan?

24    A. Yes.

Page 75

1    Q. And all three are still?

2    A. Yes.

3    Q. So the probably four of you talk
4 about the schedule, McDaniel's falling behind
5 and the target opening date is looming.
6          Tell me everything you recall
7 about that discussion. What did you talk
8 about? What was decided? I know that you
9 ultimately looked at the contract, but tell
10 me what happened in between.

11    A. After discussing the schedule within
12 the progress meeting with the contractors,
13 we, after the meeting we sat down and again
14 went through the schedule to see where our
15 problems were, where our hold-ups were and to
16 try to brainstorm solutions to get it done
17 short of additional manpower or whatever.
18 And we even discussed the possibility of not
19 opening the B-wing on time and concentrating
20 on the other areas.

21    Q. And was this all during this first
22 meeting that you talked about these various

23 possibilities?

24    A.   We talked about it several times

Page 76

1 after that.

2    Q.   But these were topics covered in the
3 first meeting and then you had other
4 meetings?

5    A.   Yes, that's correct.

...

Page 110

14    Q.   Okay.  McDaniel was still working on
15 the project as of the end of August of 2004,
16 correct?

17    A.   Yes.

18    Q.   In your estimation, what percentage
19 of their overall scope of work had been
20 completed by that time, by the end of August,
21 just before school was supposed to open?

22          MR. AMADIO:  Objection to
23 form.

24 BY MR. SHIELDS:

Page 111

1    Q.   You can answer.  You can answer the
2 question.

3    A.   There was virtually no work done in
4 B-wing.  We still had issues in the rest of
5 the building.  Maybe, I'm going to say maybe
6 70 to 75%.

7    Q.   So 70 to 75% of --

8   A.  Total contract.

9   Q.  -- their total contract had been
10  completed by the end of August?

11   A.  Yes.

12   Q.  Now, would that, would that include
13  or exclude the $120,000 piece that had been
14  subtracted out and given to Zimmer?

15   A.  He would not have completed that
16  work.

17   Q.  Right.  What I guess I'm saying is
18  that --

19   A.  I don't understand.

20   Q.  Let me clarify.

21        By August 30th, 2004,
22  McDaniel's scope has been shrunk a bit by the
23  Zimmer work.

24   A.  Yes.

Page 112

1   Q.  And the 70 to 75% completion that
2  you just talked about, is that what remained
3  in the McDaniel contract?

4   A.  Yes.

5   Q.  You characterized this earlier in
6  response to another one of my questions as
7  late in the project.  So the progress
8  meetings were happening about on a weekly
9  basis now; is that correct?

10   A.  Yes.

11   Q.  And you were attending them all.

12    A.  Yes.

...

Page 123

6    Q.  As of August 31st, 2004, in your
7  estimation, was all of the sanitary sewer
8  lines, underground, which is listed as the
9  third item under description of work, was it
10  100% complete?

11          MR. AMADIO:  Objection to the
12  form.

13    A.  If I recall, I believe that most of
14  the underground was done by that time.

15  BY MR. SHIELDS:

16    Q.  How about the next item line, the
17  sanitary lines above ground, were they 100%
18  complete?

19    A.  No.

20    Q.  Going back to the underground
21  sanitary line, to the best of your knowledge,
22  was the quality of the work in accordance
23  with the contract documents?

24          MR. AMADIO:  Objection to the

Page 124

1  form.

2    A.  Which work?

3  BY MR. SHIELDS:
4    Q.  I should have, I meant to break up
5  the questions.
6          The third line item, sanitary
7  sewer underground, I think you said you
8  believed it was complete.  And my question is
9  was it, was the quality of the work

10 consistent with what was expected under the
11 contract?

12        MR. AMADIO:  Objection to
13 form.

14    A.  I'm not qualified to answer that
15 really.

16 BY MR. SHIELDS:
17    Q.  Fair enough.
18        Continuing on, you told me a
19 moment ago, I think, that you believe that
20 the above ground sanitary lines were not 100%
21 complete as of August 31, 2004?

22    A.  In hindsight, no because B-wing was
23 not complete.

24    Q.  What percentage, and perhaps to

Page 125

1 speed this along just a bit, until I tell you
2 different, all of the questions over the next
3 few minutes will be as of August 31st, 2004.
4        What percentage of the above
5 ground sanitary sewer lines were complete?

6        MR. AMADIO:  Objection to
7 form.

8    A.  Based on my thinking at the time or
9 based on what I know now?  I mean, hindsight
10 I know things were not as we thought they may
11 have been at the time.

12 BY MR. SHIELDS·
13    Q.  Let me ask you as of then, what
14 percentage did you think was complete at that
15 time?

16    A.  At that time I thought things were
17 done except for what was not done in B-wing.

18    Q.  And my question to you is:  Since
19  you certainly know the physical plant better
20  than I, what percentage does B-wing amount
21  to?

22    A.  There are six wings in the building,
23  so that would be one-sixth.

24    Q.  And it wasn't done at all at that

Page 126

1  point.

2    A.  It had been started but it was not
3  complete.

...

Page 132

2    Q.  Were the -- back to 11 -- were the
3  boilers installed as of the end of August?

4    A.  Yes.

5    Q.  Were they operating properly?

6        MR. AMADIO:  Objection to
7  form.

8    A.  No.

9  BY MR. SHIELDS:
10    Q.  What was wrong with them?

11    A.  They were not adjusted properly.

12    Q.  Was that known at that time?

13    A.  I don't recall.

14    Q.  The heating/cooling pumps, were they
15  installed, fully installed in August of '04?

16        MR. AMADIO:  Objection to
17  form.

18    A.  I believe most of them were.

19  BY MR. SHIELDS:
20    Q.  Were they operating properly and in
21  accordance with the contract?

22        MR. AMADIO:  Objection to
23  form.

24    A.  They were operating.  I don't know

Page 133

1  if they were all operating properly or not.

...

Page 136

2  BY MR. SHIELDS:
3    Q.  Let me ask you, do you know what ATC
4  stands for?

5    A.  Automatic Temperature Control.

6    Q.  That's what I was going to guess,
7  but I'd be foolish if I guessed wrong.

8        Do you know if the automatic
9  temperature control was fully installed as of
10  August?

11        MR. AMADIO:  Objection to
12  form.

13    A.  No, it was not.

14  BY MR. SHIELDS:

15    Q.  All right.  What percentage of
16  completion had been achieved by then?

17          MR. AMADIO:  Objection to
18  form.

19    A.  I couldn't say.
...

Page 178

13          I'd like to go back to Weer-11
14  and 11A just for a moment.  I'm going to show
15  you the last page first.
16          Now, this, again, just for the
17  record, this is Application 24.  I understand
18  that you have indicated to me that you're not
19  sure whether you've seen this one before
20  since this copy does not bear your stamp or
21  your initials.
22          Notwithstanding that
23  information, would you agree with me that on
24  the second page it indicates that the level

Page 179

1  of completion of the McDaniel contract
2  overall is 98.05%.
3          Do you see that?

4    A.  That's what it says.

5    Q.  In August, the end of August of
6  2004, and I'm asking you for your
7  recollection back then, what percentage of
8  the building, of the McDaniel contract do you
9  think was complete or did you think was
10  complete at that time?

11          MR. AMADIO:  Objection to
12  form.

13    A.  Well, I would say it would be less
14  than 100%.  At that time versus what I know
15  now would change my response.

16  BY MR. SHIELDS:
17    Q.  So the information you've learned

18  since then makes it difficult for you to --
19    A.  To say what my impression was on
20  August 31st.

21    Q.  And today that opinion is 70 to 75%?

22        MR. AMADIO:  Objection to the
23  form.

24    A.  At this point in time, knowing what

Page 180

1  I know since August 31st of '04, there was
2  definitely less than 80% done.

3  BY MR. SHIELDS:
4    Q.  Of the percentage that was done, was
5  there, was some of that not qualitatively in
6  accordance with the contract documents?

7        MR. AMADIO:  Objection to the
8  form.

9    A.  You mean was it done properly?

10  BY MR. SHIELDS:
11    Q.  Right.

12        MR. AMADIO:  Objection to
13  form.

14  BY MR. SHIELDS:
15    Q.  Was it consistent with what the
16  contractor had agreed that the quality would
17  be?

18        MR. AMADIO:  Objection to
19  form.

20    A.  Knowing what I know now, there was
21  work that was done that was not in accordance
22  with the contract documents.

23  BY MR. SHIELDS:

24   Q.  So of the 70 to 75% that was done,

Page 181

1 some portion of that was not done properly.

2         MR. AMADIO:  Objection to
3 form.

4 BY MR. SHIELDS:
5    Q.  Knowing what you know now.

6    A.  No, I would say that within that
7 percentage, the 25% undone or improperly
8 done.

9    Q.  So you're including work that might
10 have been complete in, by McDaniel's lights,
11 let's say, but not by yours in the 25 to 30%
12 below 100?

13         MR. AMADIO:  Objection to
14 form.

15   A.  I would include work that was not
16 properly done.

17 BY MR. SHIELDS:
18   Q.  So you're at 70 to 75% done and done
19 right.

20   A.  Yes.

21   Q.  Have you ever discussed with
22 Mr. McCone why in hindsight EDiS reported the
23 project to be 98%, the McDaniel scope, 98%
24 complete and properly done back then?

Page 182

1         MR. AMADIO:  Objection to
2 form.

3         MS. PETRONE:  Objection to
4 form.

5    A.  No.

6 BY MR. SHIELDS:

7    Q.  Never had a discussion with him on
8 that topic at all?

9        MR. AMADIO:  Objection to
10 form.

11        MS. PETRONE:  Objection.

12    A.  No, I did not question that
13 specifically.

14 BY MR. SHIELDS:
15    Q.  Have you ever had such a
16 conversation with anyone from Becker Morgan?

17        MR. AMADIO:  Objection to
18 form.

19        MR. COTTRELL:  Objection to
20 form.

21    A.  No.

22 BY MR. SHIELDS:
23    Q.  Have you ever had a discussion with
24 anyone associated with the Indian River

Page 183

1 School District or anyone that was hired as
2 to the difference between that statement of
3 level of completion and quality and what you
4 now in hindsight know or considered to be the
5 case?

6        MR. AMADIO:  Objection to
7 form.  And do you mean excluding counsel?

8        MS. PETRONE:  Objection.

9 BY MR. SHIELDS:

10   Q.  Yes, excluding conversations with
11  your attorney.

12   A.  No.