# EXHIBIT F

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
2                              - - -

3    RLI INSURANCE COMPANY,  :   CIVIL ACTION

4              Plaintiff
                                :
5
        vs.
6                               :
     INDIAN RIVER SCHOOL
7    DISTRICT and EDiS
     COMPANY and BECKER         :
8    MORGAN GROUP, INC.,

9              Defendants   :   NO. 05-858

10
                               - - -
11

12
               Oral deposition of JOSEPH M.
13
     ZIMMER, JR., taken at the law offices of
14
     Seitz, Van Ogtrop & Green, P.A., 222 Delaware
15
     Avenue, Suite 1500, Wilmington, Delaware, on
16
     Thursday, May 31, 2007, at 11:15 a.m., before
17
     Karyn M. Geftman, a Registered Professional
18
     Reporter, an Approved Reporter of the United
19
     States District Court, pursuant to notice.
20

21            KARYN M. GEFTMAN & ASSOCIATES
              Registered Professional Reporters
22              Certified Court Reporters (NJ)
                       837 Margo Lane
23          Penn Valley, Pennsylvania  19072
             610-608-1040   610-747-0412 fax
24               karynrpr@comcast.net
```

Joseph M. Zimmer, Jr.

1  basically mean to you? What are they?
2     A.   Well, just my notes of things for me
3  to do, if you will, or to, as I say on one of
4  these, to resolve.
5     Q.   And have I read the date correctly?
6  It looks to me it says August 28th, '04?
7     A.   That seems to be correct, yes.
8     Q.   The handwriting is quite legible; I
9  just wanted to make sure I was right about
10 the numbers.
11           MR. SHIELDS:  Let's make this
12 one No. 8.  The next one is 8/29, "To Resolve
13 with EDiS."
14           (Exhibit Zimmer-8 is marked for
15 identification.)
16 BY MR. SHIELDS:
17    Q.   What's that one?
18    A.   Same thing, just my notes going into
19 the process.
20    Q.   And is this something that you do
21 typically on a job?
22    A.   I do for myself.
23    Q.   And this is a list, am I right, this
24 is a list of issues that you needed to get

Joseph M. Zimmer, Jr.

1  clarified with EDiS before you would commit
2  to doing the work on this project?
3      A.   Correct.
4      Q.   Ultimately you achieved satisfactory
5  resolution of those things to your way of
6  thinking; is that right?
7      A.   Generally speaking.
8      Q.   Because you actually did proceed.
9      A.   Right.
10     Q.   Now, you told us before we took the
11 break that this was something of an evolving
12 process.  Was that I think your term?
13     A.   Evolving, yes.
14     Q.   In terms of what kind of work needed
15 to be done, the scope, the amount, things of
16 that nature.
17     A.   Yes.
18     Q.   You told, you also told me, I think,
19 that you informed someone that this was the
20 type of job that you could only do on a time
21 and materials basis; is that right?
22     A.   That I would only do on a time and
23 material basis.  There were far too many
24 unknowns to do it differently.

Joseph M. Zimmer, Jr.

```
 1      Q.   Do you remember who you told that
 2  to?
 3      A.   Probably Dwyer.
 4      Q.   And did Mr. Dwyer tell you anything
 5  about needing to obtain approval for engaging
 6  under those circumstances?
 7      A.   No.
 8      Q.   Prior to receiving the notice to
 9  proceed that we looked at before and that you
10  responded to in writing, had you been
11  verbally authorized to begin the work?
12      A.   I don't know because I don't think
13  by that time, by the time we got that notice
14  to proceed that we had done much of anything
15  anyway other than preparatory things.
16      Q.   Preparatory things on site or --
17      A.   This kind of stuff.
18      Q.   Back in the office type.
19      A.   Yes.
20      Q.   So it's your recollection that no
21  actual remediation --
22      A.   I didn't put people on the job, I
23  didn't go out and buy things, et cetera.
24      Q.   I know this is jumping kind of all
```

Joseph M. Zimmer, Jr.

1  the way to the end, but I'm going to ask you,
2  overall, as you look back on the work that
3  you ultimately did, all of it on Sussex
4  Central, some of it was completion work,
5  correct?
6      A.   Yes.
7      Q.   And some of it was remedial work or
8  correction of work that had been done but
9  that was deficient.
10     A.   Correct.
11     Q.   Are you able to put a percentage
12 estimate for me on the aggregate, on all the
13 work you ended up doing, how much was
14 completion of work that wasn't done in the
15 first place and how much was fixing things
16 that weren't right?
17     A.   No.
18     Q.   Do you think there was more of one
19 than the other or was it about even?
20     A.   I don't know. Never having been in
21 a position to put together all of the pieces
22 of one, the other, or both, because it was
23 just commingled as we went along in trying to
24 get things done, I just have no idea.

Joseph M. Zimmer, Jr.

1    Q.   Let me ask you, were you asked by
2 anyone as you embarked on this work to
3 prepare any kind of documenting of the
4 conditions that you found in terms of, you
5 know, what was right or wrong about a
6 particular area?
7    A.   Probably, but we didn't, to the best
8 of my knowledge, other than perhaps
9 conversations occasionally.  That was, the
10 judge of that was Allen & Shariff, not me.
11    Q.   Well, when you say you were probably
12 asked to do that, do you specifically recall
13 anybody telling you?
14    A.   No.
15    Q.   Telling you that they wanted any --
16    A.   No.
17    Q.   And from what you've told me, even
18 if you were asked you did not do that; is
19 that correct?
20    A.   No.
21         MR. SHIELDS:  There are a
22 series of letters, they should be, again,
23 near the top.  I don't think they're
24 precisely in chronological order, although I

Joseph M. Zimmer, Jr.

1  to examine?
2      A.   Not necessarily.  It varied.
3      Q.   So sometimes, if I'm understanding
4  you correctly, sometimes you would get a
5  letter saying we'd like you to do this work
6  as well, please go ahead and do it?
7      A.   Right.
8      Q.   And that would be based on an Allen
9  & Shariff examination of the work?
10     A.   Right.
11     Q.   They wouldn't necessarily have
12  called you in previously and said take look
13  at this, what do you think?
14     A.   No.
15     Q.   As of this time frame now, the end
16  of September, is it still time and materials?
17     A.   Yes.
18     Q.   Was that essentially the arrangement
19  that you maintained throughout the course of
20  your work on Sussex Central?
21     A.   Yes.
22     Q.   This work and your authorization to
23  proceed, the work in the penthouses and some
24  of the work that we're beginning to talk to

Joseph M. Zimmer, Jr.

1  now, this was authorized on an emergency
2  basis; is that your understanding?
3              MR. AMADIO:  Objection to
4  form.
5      A.    That's how Indian River portrayed
6  it.
7  BY MR. SHIELDS:
8      Q.    Right.  Well, yes, and I'm not --
9  when I use the word emergency, they make
10 specific reference in the first letter to
11 some statutory authority.  You weren't asked
12 to bid for the job of doing this work; is
13 that correct?
14             And let's leave B-wing out of
15 it for now; we'll talk about that later.
16     A.    I think the proper answer is there
17 was no way to bid it.  To have taken the time
18 to try and, by anybody, by us, by Allen &
19 Shariff or whatever and try to have made all
20 of the proper determinations before you would
21 or I would have put a firm price to
22 something, it just would never have happened.
23     Q.    Let me ask you this:  As far as you
24 know, did, either before or after Mr. Dwyer

KARYN M. GEFTMAN & ASSOCIATES

Joseph M. Zimmer, Jr.

1  reached out to you in late August, did they
2  also reach out to any other mechanical
3  contractors and ask them to come in and look
4  at doing the work?
5      A.   I have no idea.
6      Q.   Have you ever been told that that
7  happened?
8      A.   No.
9      Q.   Have you ever seen any paperwork
10 that date indicated that?
11     A.   No.
12     Q.   What, understanding that it was a
13 time and materials basis, what were you told
14 about how you would be expected to bill for
15 your services?
16     A.   I don't believe that I was told
17 anything.  We prepared daily time sheets,
18 worksheets that were signed by EDiS personnel
19 and once a month all of that was correlated,
20 priced and sent on to EDiS for payment.
21     Q.   Were you told by EDiS to do it that
22 way or --
23     A.   No, to my knowledge that's the
24 standard methodology in doing that type of

KARYN M. GEFTMAN & ASSOCIATES

Joseph M. Zimmer, Jr.

1  T&A work.
2      Q.  You told me earlier that you did,
3  your company does quite a bit of
4  institutional and governmental work.  So
5  you're familiar with the payment application,
6  certification process that's in place for a
7  quote unquote normal job, correct?
8      A.  Correct.
9      Q.  And would I be correct that that
10 process was employed on the Indian River High
11 School, you'd submit a monthly certificate
12 for payment, the construction manager would
13 review it, sign off on it or not, assuming he
14 signs off on it, it goes to the architect,
15 signs off or not and then it goes up to the
16 state, ultimately, hopefully, results in a
17 check coming into you.
18     A.  Hopefully.  Because the architect is
19 always slow.
20     Q.  Paul will be sure to report that.
21         Had you ever before this job
22 been asked to do these kinds of time and
23 materials quote unquote emergency work on an
24 ongoing project?

KARYN M. GEFTMAN & ASSOCIATES

Joseph M. Zimmer, Jr.

1   A.   To this magnitude, no.

2          MR. AMADIO:  Objection to

3   form.

4   BY MR. SHIELDS:

5   Q.   When you say "to this magnitude,

6   no," what magnitude --

7   A.   Well, in terms of the ultimate scope

8   of work and the dollar value.  But, again,

9   appreciate somehow, if you can, that so much

10  of this evolved over a period of time.  We

11  start off primarily with the penthouses,

12  trying to get them up, run, move some air,

13  hopefully get some heat and air

14  conditioning.  And then more and more things

15  came into play.

16          Now, whether or not it was

17  because EDiS felt that McDaniel was going to

18  proceed with other things outside of that

19  that we were doing or what, I don't know at

20  this point; I had no way of knowing.  But

21  EDiS kept coming to us more and more and more

22  for more and more and more things that needed

23  to be done to make the school whole.  I mean,

24  as it turned out when we started the