# EXHIBIT 1

**Theodore H. Dwyer, Jr.**

1  are you referring to the penthouse work, the

2  carved out piece?

3      A.    Yes, so ductwork and penthouses had

4  not been completed, there were some controls

5  that had not been installed and that's what

6  we asked Zimmer to come in and do on an

7  emergency basis because if some inspector had

8  come in there and seen that and knew what he

9  was looking at he could have shut us down.

10     Q.    I'm going to show you next an

11  exhibit that has two markings.  And just so

12  the record is clear and so you understand,

13  counsel have heard this a couple of times

14  before, we originally marked an exhibit at

15  Mr. Weer's deposition as Weer-11, Payment

16  Application 24 and realized that the first

17  page of the one that was marked didn't have

18  both of the certificate signatures, so we

19  added another copy of that page that did and

20  made that Weer-11A.

21            So with that introduction,

22  would you take a look at Weer-11 and 11A.

23     A.    Okay.

24     Q.    Have you seen that before today?

**Theodore H. Dwyer, Jr.**

1      A.    Yes.

2      Q.    And this is the 24th payment

3   application for Mr. McDaniel for the period

4   up to August 31st, 2004, correct?

5      A.    Yes.

6      Q.    And Mr. McCone signed it on

7   September 13th and the Becker Morgan

8   representative on the 15th of September; am I

9   correct?

10     A.    Yes.

11     Q.    I'd like you to take a look at the

12  last page of the exhibit, okay?

13     A.    Yes.

14     Q.    Do you see the Column G, total

15  completed and stored to date?

16     A.    Yes.

17     Q.    And then to the right of that as

18  part of Column G is percentage.

19     A.    Yes.

20     Q.    Do you see that?

21     A.    Yes.

22     Q.    At the bottom of that column it says

23  as a grand total that 98.05% of the project,

24  the scope of McDaniel I should say, is

Theodore H. Dwyer, Jr.

1    completed and/or stored.

2              Do you see that?

3        A.   Yes.

4        Q.   On September 13th, 2004, was

5    McDaniel's scope of work 98% complete and in

6    conformance with the contract documents?

7              MR. LOGAN:   Object to the

8    form.

9        A.   Well, we know now that it wasn't.

10   BY MR. SHIELDS:

11       Q.   Did you know then that it wasn't?

12       A.   Well, you've fast-forwarded from one

13   point to this point and I want to fill in the

14   blanks, so I'm not going to answer the

15   question directly.

16              But I look at the balance here

17   and the balance shows over $300,000, 213 in

18   retainage and $85,000 in work left to

19   complete.

20       Q.   Okay.

21       A.   Frankly, in our estimation, that was

22   probably enough to cover the remaining work

23   at that time.   That's what we thought at the

24   time.   Subsequently it's been proven that

**Theodore H. Dwyer, Jr.**

1    that's not the case.  But what this, without

2    looking at the cover sheet or the cover

3    letter and without talking about what this

4    represents, this represents payment to some,

5    this and invoices, the two invoices that

6    preceded it represent payment to subs and

7    suppliers in order to get material on the

8    site that was, that had not been, would not

9    be delivered if they had not been paid by

10    joint checks.

11            McDaniel had been paid

12    previously for this work and he chose to use

13    the money for something else.  Whatever it

14    was, I don't know.  But there were people who

15    had not been paid.  And in order to get this

16    done, we had to get them paid and we paid

17    them on joint checks.  And he agreed to it.

18    He signed them.  He had to because we

19    couldn't pay them directly, we had to go

20    through him.

21            So he agreed to all of it and

22    our assumption was that RLI knew what was

23    going on.  Because every time we talked to

24    somebody about joint checks, they said joint

Theodore H. Dwyer, Jr.

1    checks are fine with us, we have no problem

2    with joint checks.

3        Q.    And a joint check, in general, is a

4    check that instead of being made out simply

5    to the contractor is made out to the

6    contractor and some subcontractor or supplier

7    of his that is owed a defined sum of money;

8    is that correct?

9        A.    That's correct.

10       Q.    And would you agree with me that

11   inherent in the concept of joint checks is

12   that that subcontractor or supplier has, in

13   fact, provided the service or the material

14   that's called for?

15                  MR. LOGAN:  Objection.

16       A.    I think -- objection meaning?

17                  MR. LOGAN:  It calls for

18   speculation.

19                  MR. SHIELDS:  Well, I want to

20   know what his understanding of the

21   circumstances under which a joint check is

22   appropriate.

23                  MR. LOGAN:  Which job?  This

24   job or philosophically?

**KARYN M. GEFTMAN & ASSOCIATES**

# EXHIBIT 2

**Brad A. Hastings**

1    deposition together.

2                    The first page I'm going to

3    show you is marked Weer-11A; the second,

4    third and four pages are marked Weer-11,

5    McDaniel pay application No. 24.  The reason

6    we added the page 11A is that the page, the

7    first page of 11, which are the same document

8    except for the absence of a signature, so we

9    added this for completeness sake.

10                   Other than the signature status

11   I'll represent to you that 11A and the first

12   page of 11 are, were provided to us as the

13   same document.

14                   So please take a look at those.

15       A.   Okay.

16       Q.   You've seen that before?

17       A.   Yes.

18       Q.   This is Mr. McDaniel's 24th payment

19   application, correct?

20       A.   Yes.

21       Q.   Now, it contains, does it not, a

22   certification section for the signatures of a

23   representative of the construction manager

24   and of the architect?

**Brad A. Hastings**

1       A.    That is correct.

2       Q.    And does it bear your signature,

3    sir?

4       A.    Yes, it does.

5       Q.    Now, if you would, please, would you

6    read aloud for the record the paragraph that

7    appears below the phrase certificate for

8    payment in the lower right-hand corner.   I

9    hope your copy is sufficiently legible.

10      A.    "In accordance with the contract

11   documents, based on on-site observations and

12   data comprising this application, the

13   construction manager and architect certify to

14   the owner that to the best of their

15   knowledge, information and belief the work

16   has progressed as indicated and the quality

17   of the work is in accordance with the

18   contract documents and the contractor is

19   entitled to payment of the amount certified."

20      Q.    Okay.   Thank you.

21            And you signed below that

22   certification on, I believe, September 15th

23   approving that payment application submitted

24   for the period through August 31st of 2004,

**Brad A. Hastings**

1  correct?

2      A.    That is correct.

3      Q.    And did you review this payment

4  application before you signed it?

5      A.    Yes.

6      Q.    It came to you having already been

7  executed by Mr. McDaniel and also Mr. McCone;

8  is that correct?

9      A.    That is correct.

10     Q.    Did you review the schedule, the

11 continuation sheets, attached pages two and

12 three, as part of your review of the

13 document?

14     A.    Yes.

15     Q.    Did you make the on-site

16 observations that are referred to in the

17 paragraph you just read for me?

18     A.    They would have been the ongoing

19 observations that we've discussed, yes.

20     Q.    Okay.  But, I mean, up to the point,

21 the period submitted for is up through August

22 31st, correct?

23     A.    Correct.

24     Q.    And you executed the document

**Brad A. Hastings**

1    approximately two weeks later.

2                    Had you made an on-site

3    inspection or an on-site observation, rather,

4    observation, between August 31st and

5    September 15th, 2004?

6        A.    I would assume we had been on-site

7    somewhere between late August and that time

8    frame before we signed it, yes.

9        Q.    And did you examine Mr. McDaniel's

10   work for conformance with the requirements of

11   the contract documents?

12       A.    We have been reviewing it on site as

13   part of our overall site observations, yes.

14       Q.    Now, he had submitted, and if I

15   understand correctly, had had approved 23

16   prior applications in addition to, I think,

17   at least one supplemental application.   I

18   know there's at least one out there that has

19   a number and then a letter designation after

20   it.   But you had, do I understand correctly

21   that you had been making ongoing site

22   observations?

23       A.    Correct.

24       Q.    Let me make sure my question is

**Brad A. Hastings**

1    clear to you.

2            Each time a payment application

3    from McDaniel came in and it reached you

4    having made it through Mr. McCone's scrutiny,

5    did you or a representative of your company

6    make a new on-site inspection to assure

7    yourselves that as it says here the work had

8    been performed, the work had progressed as

9    indicated and the quality was in accordance

10   with the contract documents?

11           MR. COTTRELL:  Objection as to

12   form.

13           MS. PETRONE:  Objection.

14           MR. COTTRELL:  You're using

15   inspections again.

16           MR. SHIELDS:  I'm sorry,

17   observations.

18           MS. PETRONE:  I still have an

19   objection.

20   BY MR. SHIELDS:

21      Q.   You can answer the question --

22      A.   Yes, sir.

23      Q.   -- if you can.

24      A.   I'm trying to be sure I understand.

**KARYN M. GEFTMAN & ASSOCIATES**

**Brad A. Hastings**

1       We would make on-site

2   observations on a regular basis.  There was

3   not they get a payment application, they go

4   make a specific review for that application

5   and they typically would come with others.

6   It was based on the overall review of what

7   was going on.

8       Q.   Okay.  Did you understand your

9   signature on this document to represent a

10  certification that the amount of work

11  Mr. McDaniel was claiming he had done, you,

12  in fact, had verified he had done, correct?

13      A.   I understood it with this

14  application there was a specific, there was a

15  cover letter that was associated with it and

16  there had been some discussion in order to

17  pay one of the suppliers that they had to get

18  money and I think there had been issues with

19  his payment to his suppliers and

20  subcontractors.  So part of this, it was

21  understood, was being put in so that that

22  payment could be made.

23      Q.   Are you referring to like a joint

24  check type of arrangement or --

Brad A. Hastings

1      A.    There had been joint check

2    arrangements prior and I think in this

3    instance it was also the intention that there

4    would be a joint check for, as I recall, this

5    one there was a specific -- I'm sorry, I

6    don't recall who that was without seeing the

7    cover letter from EDiS that accompanied this,

8    but it specifically had broken that piece out

9    and I think with this one it also had stated

10   that, had requested that the Indian River

11   School District not release the other portion

12   to McDaniel pending some other actions on his

13   part.

14      Q.    Okay.  Would you turn to, I guess it

15   would be the third page of this exhibit, the

16   first continuation page.

17      A.    Right.

18      Q.    Are you with me there?

19      A.    I'm with you.

20      Q.    Okay.  Let's take a look at the,

21   going across here, you're familiar with this

22   form obviously.  It's a standard AIA contract

23   form or a payment form, correct?

24      A.    Yes.

**Brad A. Hastings**

1    Q.    You've seen and reviewed these any

2    number of times in the past?

3    A.    That is correct.

4    Q.    Column B lists a description of

5    work.  These are the subparts of the scope of

6    McDaniel's contract, correct?

7    A.    That is correct.

8    Q.    Column C is the scheduled value, the

9    itemization, if you will, of the how much we

10   total up to get to his $4.3 million contract

11   value.

12   A.    That is correct.

13   Q.    D is work previously completed.

14         Do you agree?

15   A.    Correct.

16   Q.    And then G has two subparts.  It's

17   the total on the left column, basically money

18   paid and then the right column percentage of

19   the total that that represents, correct?

20   A.    Correct.

21   Q.    And then the Column I represents the

22   retainage which -- why don't you explain for

23   me what your understanding of retainage in

24   this context is.

**Brad A. Hastings**

1       A.    Retainage is essentially a portion

2   or a percentage of the work that is held with

3   each application pending final completion of

4   the project at which time it's released to

5   the contractor.

6       Q.    So punch list items or the like.  So

7   even when you're, when you're submitting your

8   payment applications, even if you completed

9   something entirely, a percentage is still

10  held back until final completion.  And that's

11  standard in contracts of this type; is that

12  not correct?

13      A.    That's correct.

14      Q.    Let me ask you and I don't want to

15  be overly laborious about this, but to some

16  degree I'm not going to be able to avoid it.

17          Going down this page, as of

18  August 31st, 2004, was the sanitary sewer

19  underground work 100% complete?

20      A.    I would say yes.

21      Q.    Was it completed in a manner

22  consistent with the contract requirements?

23      A.    I believe so, yes.

24      Q.    How about the sanitary sewer above-

**Brad A. Hastings**

1    ground, was that 100% complete?

2        A.    I believe so, yes.

3        Q.    The storm sewers underground?

4        A.    I believe so, yes.

5        Q.    Storm sewers above-ground?

6        A.    There may have been a portion in

7    Area B that was not complete but I don't, I

8    can't recall specifically.

9        Q.    So you think with respect to the

10   item storm sewer above-ground that the 100%

11   completion listed in Column G may not be

12   accurate?

13       A.    It can't be far off because the Area

14   B was, was essentially closed in and roofed,

15   so I would say it was probably at 100%.

16       Q.    The next item down, what is domestic

17   above-ground?

18       A.    Domestic water.

19       Q.    Domestic water, okay.

20             Was that 100% complete as of

21   August 31st, 2004?

22       A.    Again, I'm trying to remember what

23   was in area, that portion of Area B. I don't

24   recall.

# EXHIBIT 3

MAR. 20. 2007  9:31AM                                    NO. 057    P. 11

# APPLICATION AND CERTIFICATE FOR PAYMENT

*AIA DOCUMENT G702/CMa*

| | |
|---|---|
| **TO OWNER:** | **PROJECT:** |
| Indian River School District | Sussex Central High School |
| 31 Hoosier Street | |
| Selbyville, DE | |
| **FROM CONTRACTOR:** | |
| McDaniel Plumbing & Heating | |
| 205 Old Churchmans Rd | |
| New Castle, DE 19720 | **VIA CONSTRUCTION MANAGER:** |
| **CONTRACT FOR:** B-14 Mechanical, Plumbing & ATC | **VIA ARCHITECT:** |

**CONSTRUCTION MANAGER-ADVISER EDITION**

PAGE ONE OF THREE PAGES

| | |
|---|---|
| **APPLICATION NO.:** | 24 |
| **PERIOD TO:** | 08/31/04 |
| **PROJECT NO.:** | 40211-01 |
| **CONTRACT DATE:** | 09/28/02 |

Distribution to:
☐ OWNER
☐ CONSTRUCTION
☐ MANAGER
☐ ARCHITECT
☐ CONTRACTOR

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

1. ORIGINAL CONTRACT SUM ............................ $ 4,335,500.00
2. Net change by Change Orders ........................ $ 18,977,000.00
3. CONTRACT SUM TO DATE (Line 1 ± 2) .......... $ 4,350,477.00
4. TOTAL COMPLETED & STORED TO DATE .... $ 4,255,240.00
   (Column G on G703)
5. RETAINAGE:
   a.    % of Completed Work
        (Column D + E on G703)      $
   b.  5 % of Stored Material
        (Column F on G703)      $
   Total Retainage (Lines 5a + 5b or
   Total in Column 1 of G703) ............................ $ 213,277.00
6. TOTAL EARNED LESS RETAINAGE .............. $ 4,032,263.00
   (Line 4 less Line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR
   PAYMENT (Line 6 from prior Certificate) .... $ 3,945,863.00
8. CURRENT PAYMENT DUE ..................... $ 106,400.00
9. BALANCE TO FINISH, INCLUDING RETAINAGE
   (Line 3 less Line 6)     $ 298,208.90

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $12,588.00 | $1,000.00 |
| Total approved this Month | $3,383.00 | |
| **TOTALS** | **$15,971.00** | **$1,000.00** |
| NET CHANGES by Change Order | $14,971.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

**CONTRACTOR:** McDaniel Plumbing & Heating

By: _____    Date: _____

State of: Delaware    County of: New Castle
Subscribed and sworn to before me this 31st day of _____
Notary Public: _____
My Commission Expires: March 17, 2005

## CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Construction Manager and Architect certify to the Owner that to the best of their knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ................... $ 106,400.00
(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this application and on the Continuation Sheet that are changed to conform to the amount certified.)

**CONSTRUCTION MANAGER:**
By: _____    Date: 9/13/04
**ARCHITECT:**
By: _____    Date: 9.15.04

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

EDiS Company
Becker Morgan Group

AIA DOCUMENT G702/CMa · APPLICATION AND CERTIFICATION FOR PAYMENT · CONSTRUCTION MANAGER-ADVISER EDITION · 1992 EDITION · AIA® · ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1745 NEW YORK AVE., N.W., WASHINGTON, DC 20006-5292                    G702/CMa-1992


EXHIBIT

# APPLICATION AND CERTIFICATE FOR PAYMENT

## AIA DOCUMENT G702/CMa

**CONSTRUCTION MANAGER-ADVISER EDITION**

PAGE ONE OF THREE PAGES

TO OWNER:
Indian River School District
31 Hooiser Street
Selbyville, DE

FROM CONTRACTOR:
cDaniel Plumbing & Heating
5 Old Churchmann Rd
New Castle, DE 19720

CONTRACT FOR: B-14 Mechanical, Plumbing & ATC

| PROJECT: | Sussex Central High School |
| --- | --- |

VIA CONSTRUCTION MANAGER:

VIA ARCHITECT:

CONTRACTORS' APPLICATION FOR PAYMENT
Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| APPLICATION NO: | 24 |
| --- | --- |
| PERIOD TO: | 08/31/04 |
| PROJECT NO: | 40211-01 |
| CONTRACT DATE: | 09/28/02 |

Distribution to:
☐ OWNER
☐ CONSTRUCTION MANAGER
☐ ARCHITECT
☐ CONTRACTOR

ORIGINAL CONTRACT SUM ................................ $ 213,277.00
Net change by Change Orders
TOTAL CONTRACT SUM TO DATE (Line 1 ± 2) .......... $
TOTAL COMPLETED & STORED TO DATE .................. $
(Column G on G703)

RETAINAGE:
a.  % of Completed Work $
     (Column D + E on G703)
b.  % of Stored Material $
     (Column F on G703)
Total Retainage (Lines 5a + 5b or
Total in Column I of G703)

TOTAL EARNED LESS RETAINAGE ........................ $
(Line 4 less Line 5 Total)

LESS PREVIOUS CERTIFICATES FOR
PAYMENT (Line 6 from prior Certificate) ............ $

CURRENT PAYMENT DUE ................................. $

BALANCE TO FINISH, INCLUDING RETAINAGE
(Line 3 less Line 6)

| | 213,277.00 |
| --- | --- |
| | 4,052,263.00 |
| | 3,945,863.00 |
| | 106,400.00 |
| | 208,208.00 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
| --- | --- | --- |
| Total changes approved in previous months by Owner | $13,388.00 | $1,000.00 |
| Total approved this Month | $3,383.00 | |
| TOTALS | $16,571.00 | $1,000.00 |
| NET CHANGES by Change Order | | $1,000.00 |

**EDIS Company**
Hector Morgan Group

McDaniel Plumbing & Heating

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____ Date: _____

State of: Delaware    County of: New Castle
Subscribed and sworn to before me this 31st day of
Notary Public:
My Commission expires: March 17, 2005

## CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Construction Manager and Architect certify to the Owner that to the best of their knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED .......... $
(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that changed to conform to the amount certified.)

CONSTRUCTION MANAGER:
By: _____ Date: _____

ARCHITECT:
By: _____ Date: 9/13/04

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

RECEIVED SEP 0 8 2004

AIA DOCUMENT G702/CMa · APPLICATION AND CERTIFICATION FOR PAYMENT · CONSTRUCTION MANAGER-ADVISER EDITION · 1992 EDITION · AIA® · ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, DC 20006-5292

EXHIBIT

# CONTINUATION SHEET

AIA Document G702, APPLICATION AND CERTIFICATION FOR PAYMENT, containing
Contractor's signed certification is attached.

In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703

PAGE 2 OF 3 PAGES

APPLICATION NO: 24
APPLICATION DATE: 08/31/04
PERIOD TO: 08/31/04
ARCHITECT'S PROJECT NO:

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | H BALANCE TO FINISH (C - G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| | Mobilization | $60,000.00 | $60,000.00 | | | $60,000.00 | 100.00% | | $3,000.00 |
| | Bond | $55,000.00 | $55,000.00 | | | $55,000.00 | 100.00% | | $2,750.00 |
| | Sanitary U/G | $140,000.00 | $140,000.00 | | | $140,000.00 | 100.00% | | $7,000.00 |
| | Sanitary A/G | $210,000.00 | $210,000.00 | | | $210,000.00 | 100.00% | | $10,500.00 |
| | Storm U/G | $95,000.00 | $95,000.00 | | | $95,000.00 | 100.00% | | $4,750.00 |
| | Storm A/G | $83,000.00 | $83,000.00 | | | $83,000.00 | 100.00% | | $4,150.00 |
| | Domestic A/G | $180,000.00 | $180,000.00 | | | $180,000.00 | 100.00% | | $9,000.00 |
| | Gas Piping | $36,000.00 | $36,000.00 | | | $36,000.00 | 100.00% | | $1,800.00 |
| | Fuel Oil Piping | $8,000.00 | $8,000.00 | | | $8,000.00 | 100.00% | | $400.00 |
| | Chilled Water Piping | $400,000.00 | $400,000.00 | | | $400,000.00 | 100.00% | | $20,000.00 |
| | Fixtures | $290,000.00 | $280,000.00 | $10,000.00 | | $290,000.00 | 100.00% | | $14,500.00 |
| | HVAC Equipment | $660,000.00 | $660,000.00 | | | $660,000.00 | 100.00% | | $33,000.00 |
| | GRD's | $23,000.00 | $20,000.00 | $3,000.00 | | $23,000.00 | 100.00% | | $1,150.00 |
| | Water Storage Tank | $80,000.00 | $75,000.00 | $5,000.00 | | $80,000.00 | 100.00% | | $4,000.00 |
| | Fire Dampers | $10,000.00 | $10,000.00 | | | $10,000.00 | 100.00% | | $500.00 |
| | Louvers | $15,000.00 | $15,000.00 | | | $15,000.00 | 100.00% | | $750.00 |
| | Exhaust Fan | $115,000.00 | $115,000.00 | | | $115,000.00 | 100.00% | | $5,750.00 |
| | Dust Collectors | $12,000.00 | $12,000.00 | | | $12,000.00 | 100.00% | | $600.00 |
| | Engine & Welding Duct | $18,500.00 | | $18,500.00 | | $18,500.00 | 100.00% | | $925.00 |
| | Water Heaters | $30,000.00 | $30,000.00 | | | $30,000.00 | 100.00% | | $1,500.00 |
| | Boiler Breeching | $12,000.00 | $10,000.00 | $2,000.00 | | $12,000.00 | 100.00% | | $600.00 |
| | Boiler | $95,000.00 | $93,000.00 | | | $95,000.00 | 100.00% | | $4,750.00 |
| | Fuel Oil Pumps | $5,000.00 | $5,000.00 | | | $5,000.00 | 100.00% | | $250.00 |
| | Fuel Oil Tank | $26,000.00 | $26,000.00 | | | $26,000.00 | 100.00% | | $1,300.00 |
| | Pumps - Heating/Cooling | $54,000.00 | $54,000.00 | | | $54,000.00 | 100.00% | | $2,700.00 |
| | Pumps - Wells | $55,000.00 | $55,000.00 | | | $55,000.00 | 100.00% | | $2,750.00 |
| | Air Compressor & Filters | $12,000.00 | $6,000.00 | $6,000.00 | | $12,000.00 | 100.00% | | $600.00 |
| | Grease Trap | $3,500.00 | $3,500.00 | | | $3,500.00 | 100.00% | | $175.00 |
| | Glycol | $17,500.00 | | $17,500.00 | | $17,500.00 | 100.00% | | $875.00 |
| | Gas Accessories | $22,000.00 | $22,000.00 | | | $22,000.00 | 100.00% | | $1,100.00 |
| | Booster Pump | $15,000.00 | $15,000.00 | | | $15,000.00 | 100.00% | | $750.00 |

AIA DOCUMENT G703 · CONTINUATION SHEET FOR G702 · 1992 EDITION · AIA® · ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292

G703-1992

# CONTINUATION SHEET

AIA Document G703, APPLICATION AND CERTIFICATION FOR PAYMENT, containing
Contractor's signed certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

**AIA DOCUMENT G703**

APPLICATION NO: 24
APPLICATION DATE: 08/31/04
PERIOD TO: 08/31/04
ARCHITECT'S PROJECT NO:

PAGE 2 OF 3 PAGES

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | H BALANCE TO FINISH (C - G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| | Balance Valve | $8,000.00 | $8,000.00 | | | $8,000.00 | 100.00% | | $400.00 |
| | Kitchen | $10,000.00 | $10,000.00 | | | $10,000.00 | 100.00% | | $500.00 |
| | Allowance | $10,000.00 | $6,269.00 | | | $6,269.00 | 62.69% | $3,731.00 | $313.45 |
| | Man Hour (840) Allowance | $14,500.00 | $4,000.00 | | | $4,000.00 | 27.59% | $10,500.00 | $200.00 |
| | Ductwork | $440,000.00 | $426,400.00 | $13,600.00 | | $440,000.00 | 100.00% | | $22,000.00 |
| | Welded Duct | $7,000.00 | $7,000.00 | | | $7,000.00 | 100.00% | | $350.00 |
| | Insulation | $265,000.00 | $254,200.00 | $10,800.00 | | $265,000.00 | 100.00% | | $13,250.00 |
| | Water Treatment | $216,100.00 | $216,100.00 | | | $216,100.00 | 100.00% | | $10,805.00 |
| | Spiral Duct | $39,000.00 | $39,000.00 | | | $39,000.00 | 100.00% | | $1,950.00 |
| | Pump House | $17,000.00 | $17,000.00 | | | $17,000.00 | 100.00% | | $850.00 |
| | ATC | $320,000.00 | $303,000.00 | | | $303,000.00 | 94.69% | $17,000.00 | $15,150.00 |
| | A/O Gas & Fuel Oil | $5,000.00 | $5,000.00 | | | $5,000.00 | 100.00% | | $250.00 |
| | Concrete Pads | $9,000.00 | $9,000.00 | | | $9,000.00 | 100.00% | | $450.00 |
| | Excavation | $69,000.00 | | $17,600.00 | | $17,600.00 | 25.51% | $51,400.00 | $880.00 |
| | Testing, Adjusting & Balancing | $16,500.00 | $16,500.00 | | | $16,500.00 | 100.00% | | $825.00 |
| | O&M Manuals | $1,200.00 | | | | | 0.00% | $1,200.00 | $0.00 |
| | As-Built Drawings | $4,200.00 | $2,100.00 | | | $2,100.00 | 50.00% | $2,100.00 | $105.00 |
| | Alternate #1 - Auxiliary Gym | $33,000.00 | $33,000.00 | | | $33,000.00 | 100.00% | | $1,650.00 |
| | Alternate #2 - Storage Area | $4,500.00 | $4,500.00 | | | $4,500.00 | 100.00% | | $225.00 |
| | Alternate #3 - Classroom | $9,000.00 | $9,000.00 | | | $9,000.00 | 100.00% | | $450.00 |
| | CO#1 Fume Hood Service | $2,300.00 | $2,300.00 | | | $2,300.00 | 100.00% | | $115.00 |
| | CO#2 Add Installer Rm F138 | $771.00 | $771.00 | | | $771.00 | 100.00% | | $38.55 |
| | CO#3 Delete (4) L-11 fixtures | ($1,000.00) | | | | | 0.00% | ($1,000.00) | $0.00 |
| | CO#4 Wellness Center | $9,517.00 | $9,517.00 | | | $9,517.00 | 100.00% | | $475.85 |
| | CO#5 Overflow nozzles | $3,383.00 | $3,383.00 | | | $3,383.00 | 100.00% | | $169.15 |
| | | | | | | | | | $0.00 |
| | | | | | | | | | $0.00 |
| | **GRAND TOTALS** | $4,350,471.00 | $4,153,540.00 | $112,000.00 | $0.00 | $4,265,540.00 | 98.05% | $84,931.00 | $213,277.00 |

AIA DOCUMENT G703 · CONTINUATION SHEET FOR G702 · 1992 EDITION · AIA® · ©1992
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5232

G703-1992

# EXHIBIT 4

$F$

# Harry R. Blackburn
## & Associates, P.C.    Attorneys at Law

*Harry R. Blackburn\*+*

*Of Counsel*
*Federico Calaf-LeGrand~*

*\*Also Admitted in NJ*

*+Also Admitted in CT*

*~Admitted Only in PR*

*Direct Dial*
*Ext. 102*

August 17, 2004

**Via Facsimile and First Class Mail**

Donald Logan, Esquire
Tighe, Cottrell & Logan, P.A.
First Federal Plaza, Suite 500
Wilmington, DE 19801

|     |     |     |
| --- | --- | --- |
| Re: | Principal: | **McDaniel Plumbing & Heating** |
|     | Projects: | **Caesar Rodney & Sussex High School** |
|     | File Nos: | **151193 and 163615** |
|     | Our File No.: | **729.004** |

Dear Mr. Logan:

Pursuant to our conversation yesterday, please allow this letter to confirm that my client, RLI Surety, will set up a trust fund/escrow account for your two (2) clients, Caesar Rodney and Sussex High School subject to your receipt of an assignment of funds from McDaniel Plumbing. It is my understanding that your clients each prefer to send one payment to the trust fund rather than to continue to issue joint checks and/or split the payments up for labor and materials. A condition that you requested was that the Surety agree to indemnify the School District for any funds that are misapplied, etc. While we believe the chances of that happening are very slim, the Surety will agree to indemnify the School District and comply with your request. If you have a draft of an indemnity agreement that you prefer to use, please email it to me (at hblackburn@hrblackburn.com) and I will review same and, if acceptable, have it properly executed.

Additionally, as we discussed, since there was no formal declaration of default by your clients, it is our intention to have McDaniel Plumbing issue an assignment for the funds from itself over to the RLI trust. In that way, the Surety and McDaniel Plumbing working together will be best able to complete the projects in the most efficient and economical way possible.

Finally, it is my understanding that you are faxing to me a list of the joint checks that have been issued which were being sent out so that the Surety would know where such checks are going. Please be advised that notwithstanding my client's previous directive to hold distribution of any funds, we agree

EXHIBIT

RLI 00336

Harry R. Blackburn
& Associates, P.C.

Donald Logan, Esquire
August 17, 2004
Page 2

with the issuance of the joint checks at this point and authorize their release. Moreover, once we set the trust account up, any and all funds released to the trust account will be expeditiously processed.

Thank you for your cooperation and courtesy in this matter.

Very truly yours,

HARRY R. BLACKBURN

HRB/erl

cc:    **Via Facsimile and First Class Mail:**
       David S. Berry, Esquire
       Edward Seglias, Esquire

Q:\RLI Surety.729\Logan 08.17-04.wpd

**RLI  00337**

137

DEPOSITION OF DAVID S. BERRY, 3/8/07

1          (Exhibit 29 was marked for

2    identification.)

3    BY MR. AMADIO:

4        Q.    Exhibit 29 is an August

5    17th, 2004 letter from your counsel

6    to Donald Logan.

7              Have you seen this letter

8    before?

9        A.    Yes.

10       Q.    This letter applies to two

11   different projects, right, the Caesar

12   Rodney and the Sussex High School

13   project?

14       A.    Correct.

15       Q.    And what this letter

16   indicates is that on both projects

17   RLI was going to set up a trust

18   fund/escrow account, correct?

19       .A.    Yes.

20       Q.    And the idea was that the

21   contract payments were going to be

22   put into the trust fund escrow

23   account and then monitored and used

24   by or directed by the surety to the

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905          FAX  215.751.0581

138
DEPOSITION OF DAVID S. BERRY, 3/8/07

1    payment of the costs of completing

2    the work upon these projects,

3    correct?

4        A.    Correct.

5        Q.    In the third paragraph on

6    the first page, in the second

7    sentence, your counsel says, quote,

8    Please be advised that

9    notwithstanding my client's previous

10   directive to hold distribution of any

11   funds, we agree with the issuance of

12   the joint checks at this point and

13   authorize their release.

14            Do you see that?

15       A.    Yes.

16       Q.    Was your counsel authorized

17   to make that statement on behalf of

18   RLI?

19       A.    Yes.

20            MR. AMADIO:    Let me show

21   you the next exhibit, Exhibit 30.

22            (Exhibit 30 was marked for

23   identification.)

24   BY MR. AMADIO:

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

# EXHIBIT 5



# Cashin Spinelli & Ferretti, LLC

### Surety and Engineering Consultants

Bohemia, New York  ●  Southington, Connecticut  ●  Blue Bell, Pennsylvania  ●  Lincolnshire, Illinois  ●  Wichita, Kansas

September 9, 2004

VIA FACSIMILE 302-421-5715

Mr. Chris McCone

EdiS Company
110 South Poplar Street
Suite 400
Wilmington DE, 19805-0697

Re:   Surety:        RLI Insurance Company  ("RLI")
      Principal:     McDaniel Plumbing And Heating Inc, ("McDaniel")
      Obligee:       Indian River School District ("IRSD")
      Bond No.:      SSB 365837
      Project:       Sussex Central High School
      CSF No.:       19:419

Dear Mr. McCone,

We want to follow up our meeting on August 31, 2004 and provide you with the routing information for the special project account for the Sussex Central High School Project.

As discussed during the meeting, on behalf of the Surety, Cashin Spinelli & Ferretti has opened a trust account to receive and disburse the project funds.

The account information is:

|  |  |
|---|---|
| Bank: | Wachovia Bank, NA |
| Branch: | Chalfont Financial Center |
| Acct Manager: | Kathleen White, Assistant Vice President |
| Phone No: | 215-997-5634 |
| Account Name: | Cashin Spinelli & Ferretti, LLC |
|  | Sussex Central High School Special Account |
|  | F/B/O RLI Insurance |
| Account No: | 2000012959273 |
| Routing Number: | 031201467 |

We understand that there is a payment pending and that a portion will be paid as a joint check to Baltimore Air Coil, and the remainder will be sent to the project account. Please confirm the amounts and the dates of the transactions.

Nothing herein shall be deemed to be an estoppel, waiver or modification of any of Surety's rights or defenses or an admission as to the enforceability of the bond in question and Surety hereby reserves all of its rights and defenses under any contracts, agreements, bonds, or applicable law.

Sincerely,
Cashin Spinelli & Ferretti, LLC

By: _Louis M. Baldassarre_

Louis M. Baldassarre, Senior Project Manager

CSF  00365

CC: Dave Berry, Esq.

Louis M. Baldassarre

**Page 150**

1  arranging or attempting to arrange a meeting
2  after the letter was sent?
3      A.    No, I was not involved with
4  arranging or attempting to arrange.
5      Q.    Did you attend a meeting after
6  September 8th, 2004?
7      A.    My recollection is, I did
8  attend a meeting.
9      Q.    Do you remember when you
10 attended a meeting?
11     A.    It was sometime in September.
12          MS. PETRONE: This will be 9.
13              - - -
14     (Exhibit Baldassarre-9 was
15  marked for identification.)
16              - - -
17          MS. PETRONE: I skipped over
18  8.
19 BY MS. PETRONE:
20     Q.    Please identify Baldassarre-8.
21     A.    It is a September 9th letter
22  drafted by myself to Chris McCone informing
23  him that the surety has directed Cashin
24  Spinelli & Ferretti to open a trust account

**Page 151**

1  for the project funds.
2      Q.    And if you look down to the
3  fourth paragraph starting with, "we
4  understand."
5      A.    Yes.
6      Q.    Would you read that paragraph?
7      A.    We understand that there is a
8  payment pending and that a portion will be
9  paid as a joint check to Baltimore Air Coil,
10 and the remainder will be sent to the
11 project account. Please confirm the amounts
12 and the dates of the transactions.
13     Q.    What did you mean when you
14 wrote that first sentence? What were you
15 talking about?
16     A.    I'm talking -- my recollection
17 is, I was talking about this joint check,
18 the subject of Baldassarre-6.
19     Q.    And you said earlier that you
20 thought that the remainder of that payment
21 application was not actually paid?
22     A.    That's my recollection. I
23 don't recall that it ever was paid.
24     Q.    All right. Let's now go to

**Page 152**

1  Baldassarre-9.
2      A.    Okay.
3      Q.    Please identify this document.
4      A.    It's a September 16th, 2004
5  letter from Chris McCone to McDaniel
6  Plumbing & Heating referencing a seven-day
7  notification on area B.
8      Q.    Have you seen this letter
9  before today?
10     A.    My recollection is that I
11 have.
12     Q.    Did you receive it on or about
13 September 16th, 2004?
14     A.    Yes.
15     Q.    There's a very faint stamp on
16 the top of it. It says September 20th,
17 2004. Do you see that?
18     A.    Yes.
19     Q.    Was that stamp affixed by your
20 company?
21     A.    It's very possible that it
22 was. It appears to be our stamp.
23     Q.    If you see the third
24 paragraph, it states: In accordance with

**Page 153**

1  article 2.4.1 of reference A and paragraph
2  2.4 of reference B, you are hereby given
3  notice that you must complete the following
4  items of work in area B by close of business
5  on Friday, 9/24/2004.
6          Is that a fair reading?
7      A.    That's what it says.
8      Q.    Did you discuss with McDaniel
9  his progress in area B after receiving this
10 letter?
11     A.    I have no specific
12 recollection, but more than likely, yes.
13     Q.    Do you remember McDaniel's
14 response?
15     A.    I do not.
16     Q.    Did you discuss this letter
17 with RLI?
18     A.    I do not recall doing that,
19 no.
20     Q.    Did McDaniel explain to you or
21 tell you how he planned to complete the work
22 noted in this letter by the deadline noted
23 in this letter?
24     A.    I don't recall any specific

# EXHIBIT 6

## CERTIFICATE OF DEPONENT

I hereby certify that I have read the foregoing transcript of my deposition

testimony, and that my answers to the questions propounded, with the attached

Errata Sheet setting forth corrections or changes, are true and correct.

_20 APRIL 2007_

DATE

GREGORY C. WEER

ERRATA SHEET

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 14 | 9-10 | the "letter of intent" was a letter under the bond stating that IRSD was considering declaring a default, not declaring a default at that time. | I re-read the letter |
| 47 | 19 | it's not Vander Wendt; it's VandeMark | checked records |
| 59 | 19 | "corrected factor" should be "corrective action" | typo in transcription |
| 70 | 5-6 | The first one was between June and July | |
| 86 | 6-7 | I don't know whether EDIS contacted RLI prior to 6/4/04 but they had copied RLI on letters prior to 6/4/04 | clarification |
| 95 | 8-9 | It was in September, 2004 | I corrected this later in the deposition after I was shown Weer-26 |
| 97 | 8 | Zimmer started work in September | same as above |
| 102 | 10 | Zimmer started work in September | same as above |
| 106 | 9 | "attorneys" should be "attachments" | typo in transcription |
| 108 | 24 | Zimmer started work in September | same as above |
| 110 | 3-5 | Zimmer started work in September | same as above |
| 111 | 6 | The percentage I estimated was based on looking back in hindsight, not what I thought at the time the project was actually going on. I corrected this later during my testimony at the deposition. Although I'm not a mechanical expert, I would say in hindsight that McDaniel had probably completed that percentage of its work by 8/31/04. | |
| 111 | 24 | Zimmer started work in September | same as above |
| 150 | 20-22 | the "letter of intent to dismiss" was a letter under the bond stating that IRSD was considering declaring a default | I re-read the letter |
| 151 | 15 | the 9/8/04 letter was a letter under the bond stating that IRSD was considering declaring a default | I re-read the letter |

| 153 | 14-21 | what I am describing in these lines is the contract procedure for assigning work to another contractor. The termination procedure did not require a notice of intent, although the bond required a notice that IRSD was considering declaring a default | I re-read the documents |
| 156 | 7-8 | the 9/8/04 letter was a letter under the bond stating that IRSD was considering declaring a default | clarification |
| 171 | 23-24 | Tri State was paid about $635,000 | I checked the records |
| 172 | 4-6 | The total paid to Zimmer was about $958,000 | I checked the records |

Dated: April 19, 2007

Gregory C. Weer

# EXHIBIT 7

DB 00163615



**Your Total Project Solution**

27 August 2004

Mr. William McDaniel
McDaniel Plumbing & Heating, Inc.
205D Old Churchmans Road
New Castle, De 19720

Re: Sussex Central High School

EDiS Company

110 South Poplar Street
Suite 400
P.O. Box 2697
Wilmington, DE 19805-0697

Tel. (302) 421-5700
Fax. (302) 421-5715

www.EDiSCompany.com

Dear Mr. McDaniel:

References:
a. AIA Document A201/CMa, General Conditions of the Contract for Construction.
b. Section 00900 Supplementary Conditions of the Contract for Construction.
c. EDiS Company Letter to McDaniel Plumbing and Heating Inc., Subject: Seven Day Notification, dated 20 August 2004.

On 20 Aug 04 you were notified, via reference c, that you needed to complete specific activities in penthouses A301, C301, D301, E301, F301, & F302. As of 27 Aug 04 you have failed to complete the following items listed in reference c:

- Air handling units in penthouses A301, C301, D301, E301, F301, & F302 will be operational and under automatic temperature control.
- The remaining fresh air ductwork for the AHU in penthouse C301.
- The remaining fresh air ductwork for the AHU's in penthouses A301, D301, E301, F301, & F302.

Therefore in accordance with article 2.4.1 of reference a and paragraph 2.4 of reference b, the owner will be supplementing your work force to complete the work in penthouses A301, C301, D301, E301, F301, & F302. You are not to perform any more work in these penthouses. The cost to complete the work in the penthouses will be tracked on a time and material basis and deleted from the balance of your contract.

This is not a termination of your contract. You are required to diligently pursue the completion of work in other areas of the building and pump house.

Sincerely,

Christian J. McCone
Project Manager

cc:
IRSD, Mr. Greg Weer
EDiS, Mr. Theodore Dwyer
EDiS, Mr. Ernie Luoto
Mr. Don Logan, Esq.
RLI Insurance Company ✓
File

RLI 09468

# EXHIBIT 8

Chapter 426 Chapter 427
Vol.73 ol.73

g on the first judicial
y Section 1937(b) of

hysical harm or

child immediately;

mediately after the

this State.
e appearance of the

and reasonable
nses, attorney's fees,
course of the
t the award would be

authorized by law

ate and consistent with
he order has been
s Chapter.

accordance with
gency order under
ody determination

e is held invalid, the
t without the invalid

r to enforce a child-
d by the law in effect at

CHAPTER 427

FORMERLY

SENATE BILL NO. 386

N ACT TO AMEND CHAPTER 69 OF TITLE 29 OF THE DELAWARE CODE RELATED TO STATE
PROCUREMENT TO AUTHORIZE THE PROCUREMENT OF PROFESSIONAL SERVICES BY
COOPERATIVE AGREEMENT.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE :

Section 1. Amend Chapter 69 of Title 29 of the Delaware Code by adding a new Section 6987 to read as
follows:

"§6987. Cooperative Procurement.
An agency may participate in, sponsor, conduct or administer a cooperative agreement for the procurement of
professional services with one or more public procurement units either within this State, with another State, or with a
consortium of other states in accordance with an agreement entered into between the participants. Such agreement may
include material and/or non-professional services with professional services. The other provisions of this subchapter shall
not apply when an agency participates in an existing cooperative agreement for the procurement of professional services
with a contractor holding a current contract as part of such cooperative agreement."

Approved July 30, 2002

CHAPTER 428

FORMERLY

SENATE BILL NO. 416
AS AMENDED BY SENATE AMENDMENT NO. 1

AN ACT TO AMEND TITLE 29 OF THE DELAWARE CODE RELATING TO BID AND PERFORMANCE
BONDS.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE (Three-fifths of all
members elected to each house thereof concurring therein):

Section 1. Amend Section 6927(a), Title 29 of the Delaware Code by deleting paragraph (1) in its entirety and
inserting the following in lieu thereof:

"(1) A deposit of either a good and sufficient bond to the State for the benefit of the agency involved; such
bonds shall be issued with a corporate surety authorized to do business in this State, the surety shall be
approved by the agency, and the bond form used shall be the standard form included as part of the bid
documents issued by the Department of Administrative Services for this purpose; or"

Section 2. Amend Section 6927(d), Title 29 of the Delaware Code by deleting subsection (d) in its entirety and
inserting the following in lieu thereof:

"(d) Performance Bonds. — Simultaneous with the execution of the formal contract where required by 6923(k)(1) and
6924(j)(1) of this title, the procuring agency may require the successful bidder to execute a good and sufficient bond to
the State for the benefit of the agency. Such performance bonds shall:
(1) Be with a corporate surety authorized to do business in this State;
(2) Be in a sum equal to 100% of the contract award, except as otherwise provided in this subsection; and

1127

(3)  The bond form used shall be the standard form issued by the Department of Administrative Services for this purpose and shall be included in the projects' bid documents.

Contracts for the purchase of material with a value less than the threshold amount(s) established by the Contracting and Purchasing Advisory Council may reduce or waive this bond requirement from the successful bidder. Such reduction or waiver shall be stated in the bid specifications."

Section 3.  Amend Section 6962(d)(8), Title 29 of the Delaware Code by inserting the following phase after the phrase "the form of the bond and surety to be approved by the agency" and before the phrase "or a security of the bidders assigned to the agency": "and the bond form used shall be the standard form issued by the Department of Administrative Services for this purpose."

Section 4.  Amend §6962(d)(9)(a) by adding the following phrase after the words "100 percent of the contract price":" and the bond form used shall be the standard form issued by the Department of Administrative Services."

Section 5.  This Act shall become effective on October 1, 2002.

Approved July 30, 2002

CHAPTER 429

FORMERLY

SENATE BILL NO. 272
AS AMENDED BY SENATE AMENDMENT NO. 1

AN ACT TO AMEND TITLE 14 AND TITLE 29 RELATING TO LEAVE OF ABSENCE FOR MILITARY SERVICE.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE :

Section 1.  Amend Section 1327, Chapter 13, Title 14 of the Delaware Code by deleting subsection (b) in its entirety, and substituting in lieu thereof the following:

"(b)  During said leave of absence resulting from Operation Desert Shield/Storm, Operation Noble Eagle, or Operation Enduring Freedom, such principal, teacher or other employee at a school district shall continue to receive his/her State compensation during the initial period of active duty prescribed by the military to be reduced by any military compensation received.  The Department of Education shall adopt rules and regulations necessary to implement the provisions of this paragraph that are consistent with those adopted by the Office of State Personnel pursuant to §5105(b) of Title 29.  These rules shall make it the responsibility of the employee to initiate the claim and supply the required military pay information.  The State shall be responsible for collecting information relating to State compensation. Claims shall be filed within 90 days of release from active duty or passage of this legislation, whichever is later."

Section 2.  Amend Section 5105, Chapter 51, Title 29 of the Delaware Code by deleting subsection (b) in its entirety, and substituting in lieu thereof the following:

"(b)  During said leave of absence resulting from Operation Desert Shield/Storm, Operation Noble Eagle, or Operation Enduring Freedom, such employee shall continue to receive his/her State compensation during the initial period of active duty prescribed by the military to be reduced by any military compensation received.  The Office of State Personnel shall develop any rules and regulations necessary to implement the provisions of this paragraph.  These rules shall make it the responsibility of the employee to initiate the claim and supply the required military pay information. The State shall be responsible for collecting information relating to State compensation.  Claims shall be filed within 90 days of release from active duty or passage of this legislation, whichever is later."

Section 3.  This act shall be effective retroactively to September 11, 2001.

Approved August 12, 2002

AN ACT TO AMEND
FOR RETIRED S

BE IT ENACTED

WHEREAS, t
terrorist attacks has cre

WHEREAS m
retrained for these jobs;

WHEREAS t
during the military acti
BE IT ENACTED BY

Section 1.  A
its entirety and substitu

"c.  A

Section 2.  A
entirety and substituting

"(3)
Trustees."

Approved August 1

AN ACT TO AMEND T
ORDER TO IMPLI
AND MORTALIT

BE IT ENACTED I
members elected to

Section 1.  Am
number "90" in the first

Section 2.  Am
it with the following:

"Such procedu
appropriate for the recog

# EXHIBIT 9

Aug-12-2005  11:57am    From-SUPERINTENDANT                              T-404  P.002/007  F-504

Copy to G. Weer
dmc



**STATE OF DELAWARE**
**DEPARTMENT OF ADMINISTRATIVE SERVICES**
**DIVISION OF FACILITIES MANAGEMENT**
**149 TRANSPORTATION CIRCLE**
**DOVER, DELAWARE 19901**

OCT - 3 2002

September 27, 2002

Ms. Lois M. Hobbs
Indian River School District
31 Hoosier Street
Route 2 Box 156
Selbyville, DE 19975

SUBJECT:    NEW BOND FORMS FOR PUBLIC WORKS CONTRACTS

Dear Ms. Hobbs:

Senate Bill 416, which was passed by the General Assembly and signed by Governor Ruth Ann Minner, outlines changes in Title 29, Chapter 69 of the Delaware Code.  The bill requires that all bid and performance bonds used on public works contracts shall be a standard form issued by the Department of Administrative Services.  The standard bid, performance and payments bonds are attached.  If you wish to receive an electronic version, please contact us at (302) 739-5644, provide an e-mail address and it will be e-mailed to you.  The Department of Transportation has a performance/payment bond form that is acceptable for use on highway projects.

These bond forms are mandatory for all public works bid documents after October 1, 2002, and must appear in all project manuals.  No substitutions will be accepted.

Should you have any questions, please contact us at (302) 739-5644.

Sincerely,

Mark A. DeVore, P.E.
Chief of Engineering and Operations

MAD/nac        E:\DFM\techsvcs\sb416-bonds.doc
Attachments
cc:    Gloria Wernicki Homer, Secretary
        Robert J. Furman, Director
        Louis A. McCloskey, Deputy Director
        William R. Davis, Facilities Program Administrator
        Technical Services Section



## BID BOND

### TO ACCOMPANY PROPOSAL
#### (Not necessary if security is used)

KNOW ALL MEN BY THESE PRESENTS That: _____
_____ of _____ in the County of _____
_____ and State of _____ as **Principal**, and _____
_____ of _____ in the County of _____
and State of _____ as **Surety**, legally authorized to do business in the State of Delaware
("**State**"), are held and firmly unto the **State** in the sum of _____
_____ Dollars ($_____), or _____ percent not to exceed _____
_____ Dollars ($_____)
of amount of bid on Contract No. _____, to be paid to the **State** for the use and
benefit of (*insert State agency name*) for which payment well and truly to be made, we do bind ourselves, our
and each of our heirs, executors, administrators, and successors, jointly and severally for and in the whole
firmly by these presents.

NOW THE CONDITION OF THIS OBLIGATION IS SUCH That if the above bounden **Principal**
who has submitted to the (*insert State agency name*) a certain proposal to enter into this contract for the
furnishing of certain material and/or services within the State, shall be awarded this Contract, and if said
**Principal** shall well and truly enter into and execute this Contract as may be required by the terms of this
Contract and approved by the (*insert State agency name*) this Contract to be entered into within twenty days
after the date of official notice of the award thereof in accordance with the terms of said proposal, then this
obligation shall be void or else to be and remain in full force and virtue.

Sealed with _____ seal and dated this _____ day of _____ in the year of our Lord two
thousand and _____ (20____).

SEALED, AND DELIVERED IN THE
              Presence of

                                        _____
                                        Name of Bidder (Organization)

          Corporate          **By:** _____
            Seal                      Authorized Signature

Attest _____                _____
                                                      Title

                                        _____
                                        Name of Surety

Witness: _____     **By:** _____
                                                      Title

## FORM OF PERFORMANCE BOND

Bond Number: _____

KNOW ALL PERSONS BY THESE PRESENTS, that we, _____, as principal ("Principal"), and _____, a _____ corporation, legally authorized to do business in the State of Delaware, as surety ("Surety"), are held and firmly bound unto the State of Delaware, Department of Administrative Services, Division of Facilities Management ("Owner"), in the amount of _____ ($_____), to be paid to Owner, for which payment well and truly to be made, we do bind ourselves, our and each and every of our heirs, executors, administrations, successors and assigns, jointly and severally, for and in the whole, firmly by these presents.

Sealed with our seals and dated this _____ day of _____, 20___.

NOW THE CONDITION OF THIS OBLIGATION IS SUCH, that if Principal, who has been awarded by Owner that certain contract known as Contract No. _____ dated the _____ day of _____, 20___ (the "Contract"), which Contract is incorporated herein by reference, shall well and truly provide and furnish all materials, appliances and tools and perform all the work required under and pursuant to the terms and conditions of the Contract and the Contract Documents (as defined in the Contract) or any changes or modifications thereto made as therein provided, shall make good and reimburse Owner sufficient funds to pay the costs of completing the Contract that Owner may sustain by reason of any failure or default on the part of Principal, and shall also indemnify and save harmless Owner from all costs, damages and expenses arising out of or by reason of the performance of the Contract and for as long as provided by the Contract; then this obligation shall be void, otherwise to be and remain in full force and effect.

Surety, for value received, hereby stipulates and agrees, if requested to do so by Owner, to fully perform and complete the work to be performed under the Contract pursuant to the terms, conditions and covenants thereof, if for any cause Principal fails or neglects to so fully perform and complete such work.

Surety, for value received, for itself and its successors and assigns, hereby stipulates and agrees that the obligation of Surety and its bond shall be in no way impaired or affected by any extension of time, modification, omission, addition or change in or to the Contract or the work to be performed thereunder, or by any payment thereunder before the time required therein, or by any waiver of any provisions thereof, or by any assignment, subletting or other transfer thereof or of any work to be performed or any monies due or to become due thereunder; and Surety hereby waives notice of any and all such extensions, modifications, omissions, additions, changes, payments, waivers, assignments, subcontracts and transfers and hereby expressly stipulates and agrees that any and all things done and omitted to be done by and in relation to assignees, subcontractors, and other transferees shall have the same effect as to Surety as though done or omitted to be done by or in relation to Principal.

Surety hereby stipulates and agrees that no modifications, omissions or additions in or to the terms of the Contract shall in any way whatsoever affect the obligation of Surety and its bond.

Any proceeding, legal or equitable, under this Bond may be brought in any court of competent jurisdiction in the State of Delaware. Notices to Surety or Contractor may be mailed or delivered to them at their respective addresses shown below.

IN WITNESS WHEREOF, Principal and Surety have hereunto set their hand and seals, and such of them as are corporations have caused their corporate seal to be hereto affixed and these presents to be signed by their duly authorized officers, the day and year first above written.

PRINCIPAL

Name: _____

Witness or Attest:  Address: _____

_____        By: _____(SEAL)
Name: _____                   Name:
                                        Title:
        (Corporate Seal)


SURETY

Name: _____

Witness or Attest:  Address: _____

_____        By: _____ (SEAL)
Name: _____                   Name:
                                        Title:
        (Corporate Seal)

Aug-12-2005  11:58am    From-SUPERINTENDANT                    +                    T-404   P.006/007   F-504

## FORM OF PAYMENT BOND

Bond Number: _____

KNOW ALL PERSONS BY THESE PRESENTS, that we, _____, as principal ("Principal"), and _____, a _____ corporation, legally authorized to do business in the State of Delaware, as surety ("Surety"), are held and firmly bound unto the State of Delaware, Department of Administrative Services, Division of Facilities Management ("Owner"), in the amount of _____ ($_____), to be paid to Owner, for which payment well and truly to be made, we do bind ourselves, our and each and every of our heirs, executors, administrations, successors and assigns, jointly and severally, for and in the whole firmly by these presents.

Sealed with our seals and dated this _____ day of_____, 20___.

NOW THE CONDITION OF THIS OBLIGATION IS SUCH, that if Principal, who has been awarded by Owner that certain contract known as Contract No. _____ dated the _____ day of _____, 20__ (the "Contract"), which Contract is incorporated herein by reference, shall well and truly pay all and every person furnishing materials or performing labor or service in and about the performance of the work under the Contract, all and every sums of money due him, her, them or any of them, for all such materials, labor and service for which Principal is liable, shall make good and reimburse Owner sufficient funds to pay such costs in the completion of the Contract as Owner may sustain by reason of any failure or default on the part of Principal, and shall also indemnify and save harmless Owner from all costs, damages and expenses arising out of or by reason of the performance of the Contract and for as long as provided by the Contract; then this obligation shall be void, otherwise to be and remain in full force and effect.

Surety, for value received, for itself and its successors and assigns, hereby stipulates and agrees that the obligation of Surety and its bond shall be in no way impaired or affected by any extension of time, modification, omission, addition or change in or to the Contract or the work to be performed thereunder, or by any payment thereunder before the time required therein, or by any waiver of any provisions thereof, or by any assignment, subletting or other transfer thereof or of any work to be performed or any monies due or to become due thereunder; and Surety hereby waives notice of any and all such extensions, modifications, omissions, additions, changes, payments, waivers, things done and omitted to be done by and in relation to assignees, subcontractors, and other transferees shall have the same effect as to Surety as though done or omitted to be done by or in relation to Principal.

Surety hereby stipulates and agrees that no modifications, omission or additions in or to the terms of the Contract shall in any way whatsoever affect the obligation of Surety and its bond.

Any proceeding, legal or equitable, under this Bond may be brought in any court of competent jurisdiction in the State of Delaware. Notices to Surety or Contractor may be mailed or delivered to them at their respective addresses shown below.

IN WITNESS WHEREOF, Principal and Surety have hereunto set their hand and seals, and such of them as are corporations have caused their corporate seal to be hereto affixed and these presents to be signed by their duly authorized officers, the day and year first above written.

PRINCIPAL

Name: _____

Witness or Attest: Address: _____

_____        By: _____ (SEAL)
Name:                          Name:
                               Title:
    (Corporate Seal)


SURETY

Name: _____

Witness or Attest: Address: _____

_____        By: _____ (SEAL)
Name:                          Name:
                               Title:
    (Corporate Seal)