# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RLI INSURANCE COMPANY, | ) | |
| | ) | C.A. No. 05-858 JJF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| INDIAN RIVER SCHOOL DISTRICT, | ) | |
| EDIS COMPANY, and | ) | |
| BECKER MORGAN GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT INDIAN RIVER SCHOOL DISTRICT'S
## OPENING BRIEF IN SUPPORT OF RENEWED MOTION *IN LIMINE*
## TO STRIKE PLAINTIFF'S EXPERT REPORT AND EXCLUDE TESTIMONY

**SEITZ, VAN OGTROP & GREEN, P.A.**

**/s/ James S. Green**
**JAMES S. GREEN, ESQ. (DE0481)**
**jgreen@svglaw.com**
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE 19899
(302) 888-0600

Attorneys for Defendant and Counterclaimant
Indian River School District

Of Counsel:

K. Gerard Amadio, Esquire
Venzie, Phillips & Warshawer
2032 Chancellor Street
Philadelphia, Pennsylvania 19103
(215) 567-3322

# **Table of Contents**

PAGE

I.   NATURE AND  STAGE OF PROCEEDINGS                                     1

II.  SUMMARY OF ARGUMENT                                                  2

III. CONCISE STATEMENT OF FACTS                                          2

IV. ARGUMENT                                                              4

   A.  THE SUPPLEMENTAL ANALYSIS MUST BE STRICKEN              4

- The New Analysis PCM Performed is Significantly Different From the Original Analysis and is not a Clarification of the Original Analysis.                                            5

- The New Analysis is not Admissible at This Stage of the Litigation.    9

    o   RLI May Not Offer a New Analysis and Conclusions to Comply With Rule 702 After Losing a Daubert Challenge.    9

    o   The Supplemental Analysis Violates Rules 26 and 16.   11

- The Revised PCM Report Fails to Comply With the Methodological Standards of Daubert and Rule 702    12

    o   No Successor Activities                                13

    o   Summary of Delay Analysis is not a Critical Path Analysis    15

    o   Identification of the Critical Path                    17

    o   Inconsistent Method of Calculating Delay              18

   B.  PCM FAILED TO CORRECT THE DEFECTS IN ITS ORIGINAL REPORT, AS DIRECTED BY THE DECEMBER 4 ORDER    19

- Clarification of Methodology                                           19

- Information Considered by PCM and Exhibits                            20

   C.  IRSD is Entitled to Recover its Costs and Fees From RLI in Moving To Strike PCM's Report    21

i

V.  CONCLUSION                                        22

## TABLE OF AUTHORITIES

__CASES__                                                              __PAGE__

Beller v. U.S., 221 F.R.D. 696, 701-701 (D. NM 2003).                  11

Leviton Mfg. Co., Inc. v. Nicor, Inc., 245 F.R.D. 524, 528 (D. NM 2007).   11

Mega Construction Co. v. U.S., 29 Fed. L. 396, 426-427 (1993).        16, 17

Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 250 (6th Cir. 2001).   9, 10

Nisus Corp. v. Perma-Chink Systems, Inc., 327 F.Supp.2d 844 (E.D. TN 2003)   10

Pride v. BIC Corp., 218 F.3d 566 (6th Cir. 2000).                     10

Southern Comfort Builders, Inc. v. U.S., 67 Fed. Cl. 124, 144 (2005).   13

Weaver-Bailey Contractors v. U.S., 19 Cl. Ct. 474 (1990)             20

Weisgram v. Marley Co., 120 S.C. 1011, 528 U.S. 440 (2000).          10

Wilner v. U.S., 26 Cl. Ct. 260 263 (1992).                           13, 16


__FEDERAL RULES__

F.R.C.P. 16(b)(4)                                                      11

F.R.C.P. 16(c)                                                         12

F.R.C.P. 26(a)(2)                                                      11

## I.  <u>NATURE AND  STAGE OF PROCEEDINGS</u>

This action arises out of a school district's performance bond claim against the surety for a prime contractor terminated for default during the construction of the new Sussex Central public high school in Georgetown, Delaware.  In December, 2005, RLI Insurance Company ("RLI"), the performance bond surety for the terminated contractor, McDaniel Plumbing and Heating, Inc. ("McDaniel"), commenced this action against Indian River School District ("IRSD"), the owner of the school, and two professionals hired by the owner:  the construction manager, EDIS Company ("EDIS" or "Construction Manager"), and the architect, Becker Morgan Group, Inc. ("Becker Morgan" or "Architect"), seeking, among other things, a declaration from the Court that it was discharged from its obligations under the performance bond (Count I).  IRSD filed a counterclaim for RLI's failure to complete the work after the default of McDaniel, in violation of the terms of the performance bond.  IRSD's claim against RLI is for over two million dollars, together with interest and litigation costs.

Pursuant to the parties' Second Amended Stipulation to Amend the Rule 16 Scheduling Order, fact discovery ended on June 6, 2007; expert reports were due from RLI on July 31, 2007, and from Indian River, EDIS and BMG on August 31, 2007; and opening briefs for dispositive motions were to be filed by September 28, 2007. On September 27, 2007, EDiS filed a motion for summary judgment, and on September 28, 2007, Indian River and BMG filed a motion for summary judgment. These motions were fully briefed on October 29, 2007.  A Pretrial Conference was held on December 6, 2007, and a July 21, 2008 trial date established.

On December 4, 2007, the Court granted IRSD's previous motion in limine to strike Mr. Cassin's initial expert report, but granted RLI the opportunity to correct the reports' deficiencies

and gave IRSD leave to file a new motion to strike if the corrections were not made.    RLI

served a revised PCM Report by Mr. Cassin on February 4, 2008.

## II. <u>SUMMARY OF ARGUMENT</u>

RLI's Revised PCM Report fails to remedy the deficiencies required by the court's

December 4, 2007 Order. The original analysis remains substantively the same as it was when

the court ruled in its December 4 Order that it was insufficient under <u>Daubert</u> and Rule 702, but

for the redaction of the McDaniel damage calculation.  PCM has done nothing to more clearly

set forth the methodology employed in its original analysis, nor has it complied with the order to

provide IRSD a straight forward statement of the data or other information considered by Mr.

Cassin in forming his opinions.  RLI has not provided IRSD with the all the exhibits referenced

in the report.

Instead, PCM has performed a second completely different analysis, set forth on pages 78

through 114 of the Revised Report and then proffered completely new and different conclusions,

without consent or leave of the court. Applicable law and rules preclude RLI from offering new

analyses and conclusions after the expert report cut-off.   As a result, PCM's Revised Report

should be stricken.

## III. <u>CONCISE STATEMENT OF FACTS</u>

On December 4, 2007, the court entered a memorandum and order in response to IRSD's

original Motion to strike.  The December 4, 2007 Order and Memorandum (herein after

"December 4 Order or Memorandum") indicated that the Original PCM Report, as drafted, failed

to comply with F.R.C.P. 26(a)(2) and F.R.E. 702.  The Original PCM Report is attached hereto

as <u>Exhibit "A."</u>  However, the court afforded RLI the opportunity to remedy the deficiencies

identified in the court's memorandum.  Specifically, the December 4 Order directed that if RLI

were to avoid having the report stricken it must (1) provide IRSD "with a straight forward statement of the data or other information considered by Mr. Cassin in forming his opinions"; (2) provide IRSD with any exhibits to be used as a summary of or in support of his opinions; (3) redact McDaniel's damage calculation; and (4) identify "with greater clarity and precision the analysis methodology." D. I. 119, p. 17.

The Revised PCM Report , attached hereto as Exhibit "B", differs from the original as follows:

- The McDaniel damage calculation contained on pages 75 through the end of the Original PCM Report has been redacted;

- The information on Pages 2 and 3 of the Revised Report is entirely new;

- The information on pages 4 through 78 is the analysis set forth in the original report, virtually unchanged, but for the correction of some typographical errors and stylistic changes.  An identification of the changes in this section is attached hereto as Exhibit "C.";

- The information on pages 78 through 113, excluding the Conclusion section, is entirely new;

- The conclusion section of the PCM Revised Report includes some information contained in the Original PCM Report and some new information.  The text of the new information is set forth below.

> Clearly, the termination of McDaniel by EDiS in October 2004 had an impact on RLI, as at the time of termination, McDaniel was significantly behind schedule, yet it is my understanding based upon a review of the documents that McDaniel was paid by IRSD through the recommendation of EDiS and BGM based upon the certified pay applications that McDaniel was on schedule and that work had been completed.  Based upon the aforesaid analysis of the construction project schedule, at no time was McDaniel on schedule and, in fact, they fell further behind as the project progressed.

The fact that McDaniel was paid for work which it had not completed, despite certifications that the work had been performed, provided McDaniel with advanced payments and significantly depleted the contract balances to the detriment to the detriment of RLI. Given that EDiS failed to extend any of McDaniel's schedules, it was highly inappropriate for EDiS and BGM to certify as complete work McDaniel had not performed, regardless of the cause of the delay. Since EDiS and BGM were the providers of this information to IRSD, which IRSD, which IRSD relied upon in making payments which depleted the contract balances, their conduct caused harm to RLI.

- Exhibit references (1 through 247) have been added throughout the narrative. However, the actual exhibits were not served with the Revised PCM Report or in accordance with the December 4 Order. IRSD's counsel agreed to the extend the date by which RLI was required to serve the corrected report until February 4, 2008, upon the condition that RLI serve all things required by the December 4, 2007 Order no later than that date. See email exchange between counsel attached as Exhibit "D." RLI served a revised report, dated February 4, 2008 ("Revised PCM Report) on that date but no exhibits were included. The exhibits arrived nine days later on February 13, 2004, but 112 of the 247 exhibits were not included. The missing exhibits have to date not been provided.

## IV. ARGUMENT

PCM's Revised Report should be stricken for two reasons. First, it contains a supplemental analysis, which is not admissible at this stage of the litigation. Second, the original analysis has not been corrected as required by the December 4 Order and remains inadmissible under F.R.C.P. 26(a), Daubert and F.R.E. 702.

### A. THE SUPPLEMENTAL ANALYSIS MUST BE STRICKEN

As explained below, the supplemental portion of the Revised PCM Report should be stricken because:

- It is a new analysis, not a clarification of the original analysis, and the December 4 Order did not grant RLI leave to perform a new analysis.

- A new analysis should not be permitted after it is found deficient for failure to comply with <u>Daubert</u> standards.

- New analyses are precluded after the expert report cutoff, with exceptions that RLI has not met.

- The new analysis fails to comply with methodological requirements set forth in <u>Daubert</u> and F.R.E. 702.

<u>THE NEW ANALYSIS PCM PERFORMED IS SIGNIFICANTLY DIFFERENT FROM THE ORIGINAL ANALYSIS AND IS NOT A CLARIFICATION OF THE ORIGINAL ANALYSIS</u>

The supplemental analysis is different from the original analysis because (1) it uses a different baseline schedule; (2) which results in significantly different projected completion dates under each analysis; (3) the calculations under the different baseline schedules result in significant differences in the amount of delay between the two analyses; (4) the sequence of work activities for the two baseline schedules are completely different; (5) the critical paths calculated in each analysis are completely different; (6) the analyses were produced using different computer programs; and (7) the new report contains different conclusions about how the alleged delay affected McDaniel and or RLI.

First, the new analysis purports to calculate the critical path, ***based upon a different baseline schedule than used in the Original PCM Report***. <u>Revised PCM Report, p. 83.</u> The Original PCM Report uses the milestone schedule in the Contract Documents to create what it deemed to be the critical path.[1] See <u>Original PCM Report. P. 3</u>. In the new analysis, PCM used a November 18, 2002 schedule, created after the construction began, as the baseline. <u>Revised PCM Report, p. 83</u>-84. The baseline schedule is the foundation of a Critical Path analysis. When

---

[1] In the original motion to strike PCM's report, IRSD argued that PCM had not identified the critical path, as it stated that the critical path was either concrete ***or*** steel, and there can only be one critical path. See opening brief, page 12, <u>D.I. 93</u>. IRSD stands by that argument.

5

PCM used the November 18, 2002 schedule as the baseline, the resulting analysis was significantly different than the analysis in the Original PCM Report.

Second, the use of different baseline schedules results in significantly different analysis. This conclusion is easily demonstrated by considering the dates upon which construction will be completed under both analyses. In the Original PCM Report, the plate contained on page 71 is the last update performed in the analysis and calculates a "Substantial Completion" date of December 2, 2004 and "Final Punchlist and Move In" date of February 7, 2005. In contrast, the Revised PCM Report's last update, set forth in the Plate on page 107, calculates a "Substantial Completion" date of October 15, 2004 and a "Final Punchlist and Move In" date of December 16, 2004. Thus, in the two reports, *substantial completion differs by 48 days and final completion differs by 53 days*. Mr. Cassin's selection of a different baseline for his revised analysis has resulted in a significantly different result. Certainly, a significant change in the number of days the work was allegedly delayed constitutes a materially different conclusion.

Third, the Revised PCM Report expressly admits that by changing the baseline, a significant delay supposedly identified in the Original PCM Report is now ignored in the supplemental analysis. On pages 91-92 of the Revised PCM Report, Mr. Cassin notes that when delay to foundation work is measured using the November 18, 2002 baseline versus the measure of delay to this activity using the milestone schedule, *there is an eighty seven delay day difference between the two analyses*. On page 87 of the Revised Report, Mr. Cassin states that "though this methodology does result in a credible as-planned schedule it also excuses substantial foundation delays that transpired prior to November 19th, 2002." The original analysis included alleged foundation delays incurred prior to November 19, 2002. See page 8 of the Original PCM Report wherein PCM stated that "given that the baseline schedule referenced

6

the completion of the pad on October 22nd, and the commencement of foundations on the 23rd of October it would appear that these critical milestones, and consequently the contract are two weeks behind schedule" for one example of PCM's calculation of foundation delay prior to November 2002.

Fourth, Mr. Cassin has now chosen a different and expanded sequence of planned construction activities to use in his analysis. On Page 83 of the Revised PCM Report Mr. Cassin states "it is imperative to note that the initial report [Original PCM Report] relied upon initial schedule dates incorporated in the contract documents, which established a sequence [of construction activities] ***much different from*** the November 19th, 2002 [sic]…" schedule used by PCM as the baseline in the supplemental analysis.  (emphasis added).

In his original analysis, his baseline schedule contains 20 work activities, not including substantial and final completion or the two summary bars.  See plate on page 5 of the Original PCM Report.  The November 18, 2002 baseline schedule used in the supplemental analysis contains 162 work activities.  See the November 18, 2002 baseline schedule attached to the Hughes Declaration as Exhibit "2."  Because of the differences in the number of work activities in the two analyses the critical path is going to be calculated through significantly more activities in the supplemental analysis than in the original.

Fifth, the analyses do in fact calculate different critical paths.[2]  Hughes Declaration, 9-12. The original baseline is set forth on page 5 of the Original PCM Report (and also on page 80 of the Revised PCM Report).  Hughes Declaration, ¶ 7.  The activities on the plate in the Original PCM Report with red bars are the critical path activities. See Hughes Declaration, ¶ 10.  Only three activities, erection of structural steel, roofing, and finishes, are critical path activities on

[2]  IRSD also disputes that PCM has calculated any critical path in the supplemental analysis.   Page 88 of the Revised PCM Report states that PCM has calculated "the most critical path" from the baseline.  There is one critical path for a project, not the "most critical path."

7

this baseline schedule.  The critical path in the supplemental section of the Revised PCM Report, calculated from the November 18, 2002 baseline schedule, contains 20 critical activities (those with 3 days of float).  Hughes Declaration, ¶ 11.  Remarkably, the two critical path analyses have only one critical path activity in common, finishes.[3]  Hughes Declaration, ¶ 11-12.

Sixth, the analyses were performed using different scheduling programs. The baseline chart in the Original PCM Report (Original PCM Report, P. 5) was generated using Timelines for Windows whereas the supplemental analysis was derived while using a Primavera software program, which explains the differences in the formats of the plates, among other things.  See Revised PCM Report, P. 3 and Hughes Declaration, ¶ 6-7.

Seventh, the conclusions of the Original PCM Report were that McDaniel was entitled to an extension of time to complete its work and entitled to monetary damages.  The conclusions of the Revised PCM Report now assert that:

- at no time was McDaniel on schedule and fell further behind as the project progressed; notwithstanding, EDiS and BGM certified payment for work not completed; and

- these overpayments significantly depleted the contract balance to the detriment of RLI, who relied on EDiS' and BGM's erroneous certifications, all of which caused harm to RLI notwithstanding, EDiS and BGM certified payment.

Revised PCM Report, p. 114.  These conclusions regarding overpayment are completely different than the original conclusions that McDaniel was entitled to an extension of time to complete the work and entitled to monetary damages.

---

[3] The critical path in the supplementary analysis does contain erection of structural steel as does the Original PCM Report.  However, in the supplemental analysis, erection of structural steel is now scheduled individually at each building at which it is to be performed.  Structural steel erection, one work activity in the original baseline, has six sets of start and finish dates in the supplemental analysis (See Baseline Schedule at Exhibit "—" of the Hughes Declaration), two sets of which are on the critical path (see page 89 of the Revised Report, Building F, activity 222 and  Building B, activity 252).

While both analyses may be attempting to calculate delay to the critical path, they are certainly significantly different analyses with significantly different results. Mr. Cassin performed the new analysis using the November 18, 2002 schedule as a baseline in response to IRSD's schedule expert who criticized the Original PCM Report for using an inadequate baseline schedule. For example see page 79 of the Revised PCM Report, where Mr. Cassin states "given the concerns of the efficacy of the base product…we have opted to, for the purposes of providing this supplementary information, to utilize the Rev 18 November 2002 progress schedule asserted by EDiS to be the baseline."

This new analysis is solely for the purpose of attempting to shore up RLI's case, now six months after the expert report cutoff.   RLI's conduct is serving a supplemental analysis offends principles of fairness and is not acceptable under applicable law.

<u>A NEW ANALYSIS IS NOT ADMISSIBLE<br>AT THIS STAGE OF THE LITIGATION</u>

The supplemental portion of PCM's Revised Report is not admissible because (1) a party is not entitled to a second chance to meet the methodological requirements of F.R.E. 702 after losing a <u>Daubert</u> challenge; (2) a supplemental analysis after the expert report cutoff violates F.R.C.P. 26; and (3) violates F.R.C.P. 16.

**<u>RLI May Not Offer New Analysis and Conclusions to Comply with Rule 702<br>After Losing a Daubert Challenge</u>**

A plaintiff, whose expert witness testimony has been found inadmissible under <u>Daubert</u>, even at the pre-trial stage, should not be afforded a second opportunity "to marshal other expert opinions and shore up his case." <u>Nelson v. Tennessee Gas Pipeline Co.</u>, 243 F.3d 244, 250 (6th Cir. 2001).  In <u>Nelson</u>, the plaintiff's expert testimony was excluded pre-trial for the expert's failure to meet the standards set by <u>Daubert</u>.  After the expert testimony was excluded, the court

9

entered summary judgment in favor of the defendant, as plaintiff could not prove causation without its expert.  The Nelson court cited the Supreme Court stating "it is implausible to suggest, post-Daubert, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail." Nelson at 250, citing Weisgram v. Marley Co., 120 S.C. 1011, 528 U.S. 440 (2000).  See also Pride v. BIC Corp., 218 F.3d 566 (6th Cir. 2000) wherein the court upheld the trial court's refusal to re-open a Daubert hearing and admit new evidence to cure methodological deficiencies in the expert's report and testimony; and Nisus Corp. v. Perma-Chink Systems, Inc., 327 F.Supp.2d 844 (E.D. TN 2003) where the court denied leave to file a supplemental expert report after the expert was disqualified at the pre-trial stage for failure to meet Daubert standards.  In Nisus at 853-854, the court stated that the attempt to supplement the expert report was an "unabashed attempt to remedy deficiencies" in the expert's "opinions and testimony which the court will not allow at this juncture of the litigation."

In the instant case, the court's December 4 Order held that, in its current form, the Original PCM report failed to meet the standards set forth by Daubert and Rule 702.  In response to that ruling, RLI has performed and offered a new analysis in an attempt to cure methodological deficiencies pointed out by IRSD and to shore up its case.  While the December 4 Order did grant RLI leave to submit a corrected report, that leave was expressly limited to remedying the four defects identified by the court.  The December 4 Order certainly did not grant RLI leave to perform an entirely new analysis.  As the Supreme Court recognized in Weisgram, since Daubert, RLI is on notice of the exacting requirements of Rule 702 and "it is implausible to suggest, post-Daubert, that it should be allowed to initially present less than its best expert evidence in the expectation of a second chance should its first try fail."  In serving the supplemental analysis in the Revised PCM Report, six months after the expert report cut-off, RLI

is simple seeking a second chance at an expert analysis and opinion because it failed to comply with <u>Daubert</u> before expiration of the expert report cut-off.  For the aforementioned reasons, the Revised PCM Report must be stricken.

### <u>The Supplemental Analysis Violates Rules 26 and 16</u>

Rule 26 contains no provision allowing a party to file a supplement intended to strengthen an expert report once the expert report cut off has passes.  <u>Leviton Mfg. Co., Inc. v. Nicor, Inc</u>., 245 F.R.D. 524, 528 (D. NM 2007).  Rule 26(a)(2)(B) requires the report to be complete at the court imposed cut-off and to contain a complete statement of all opinions to be expressed and the basis and reasons therefore.  <u>Id</u>. To allow parties to supplement with new analysis and conclusions after the expert report cut off would create a system where

> …preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions already given.  This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the court's ability to set case management deadlines, because new reports and opinions would warrant a new round of consultation with one's own expert and virtually require new rounds of depositions.  That process would hinder rather than facilitate settlement and the final disposition of the case.

<u>Beller v. U.S</u>., 221 F.R.D. 696, 701-701 (D. NM 2003).

While the court may grant a party leave to file a supplemental report outside the time limits imposed by the case management order, it may do so only upon a showing of good cause. <u>F.R.C.P. 16 (b)(4)</u>; <u>Leviton</u> at 528.  The good cause standard does not focus on the bad faith of the party failing to comply with the deadline or on prejudice to the opposing party but rather it focuses on the diligence of the party seeking to modify the scheduling order.  <u>Id</u>. A court may modify the scheduling order on a showing of good case if the deadline cannot be met despite the diligence of the party seeking the extension.  <u>Id</u>. Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. <u>Id</u>.  Further, where a party proposes

amendments when dispositive motions are pending, a court should not allow an amendment if it is pertinent to an issue in the pending dispositive motion. Id.

RLI cannot meet the good cause standard. First, it sought no leave to file a supplemental report as required by Rule 16(c). Second, there is no reason RLI could not have performed a critical path analysis using the November 18, 2002 schedule as the baseline in its original report. That schedule information was provided to RLI during discovery. RLI's lack of diligence in failing to comply with Daubert standards is the sole reason RLI seeks to serve a supplemental report. Therefore RLI does not have good cause to file the supplement after the expiration of the expert report cutoff. More importantly, IRSD has a summary judgment motion pending with the court which seeks to dismiss RLI's claims/defenses relating to overpayment. Following submission of that motion, RLI now seeks to offer conclusions on the subject of overpayment. As noted by the cases cited above, RLI has not met the requirements to file a supplemental report at this stage of the litigation.

In addition, local Rule 16.4 provides that a party seeking to extend the deadline to perform an activity regulated by the case management order, must either obtain consent from the opposing party and file a stipulation with the court or file a motion with the court seeking an extension. While RLI has been granted leave to correct the specifically identified deficiencies in the Original PCM Report, it was not granted leave to perform an entirely new analysis and present new opinions and conclusions.

### THE REVISED PCM REPORT FAILS TO COMPLY WITH THE METHODOLOGICAL STANDARDS OF DAUBERT AND RULE 702

PCM's supplemental analysis fails to comply with Daubert and F.R.E. 702 because (1) it fails to contain the appropriate logic; (2) PCM's summary of its delay conclusions are not based on critical path delays, but on exceeded durations, and fails to consider or account for

McDaniel's exceeded durations; (3) fails to identify the critical path and fails to identify it at the time of the first delay; and (4) fails to use a consistent method to conduct the delay analysis.

The courts have identified several items a critical path analysis must contain in order to be reliable under Rule of Evidence 702.  PCM's supplemental analysis fails to include the following, among other things:

<u>**No Successor Activities**</u>

A scheduling analysis must demonstrate the interdependence of preceding and succeeding construction activities.  In the absence thereof, sufficient evidence of the critical path has not been established.  <u>Wilner v. U.S.</u>, 26 Cl. Ct. 260, 264 (1992).  Part of the understanding that an activity belongs on the critical path is an understanding of how that activity affects other activities.  <u>Southern Comfort Builders, Inc. v. U.S.</u>, 67 Fed. Cl. 124, 144 (2005).

The baseline schedule in the supplemental analysis upon which PCM calculated its critical path is woefully lacking in logic, or in other words, interdependence of activities.  PCM did provide IRSD with electronic data of its calculation of the purported critical path for the supplemental analysis (which it failed to do for the original analysis).  The electronic scheduling data shows the interdependence, or in this case the lack thereof, of the construction activities for the project.  The following are a few examples of why PCM's supplemental analysis lacks the required interdependence of activities to make it reliable.

Attached as Exhibit "2" to the Hughes Declaration is PCM's November 18, 2002 baseline schedule, showing the float bars.  Hughes Declaration ¶ 6.  The key at the bottom of the schedule shows that the green triangles on the schedule are float bars.  Hughes Declaration ¶ 15. An activity's available float reflects the amount of time that the activity can be delayed without delaying the project's completion date.  Hughes Declaration ¶ 16.  Total float is the difference

between an activity's early and late finish dates.  Hughes Declaration ¶ 17.  Once the early finish

date passes, and the activity is not complete, the float begins to be expended.  Hughes

Declaration ¶ 18.  If the late finish date is exceeded, the activity will begin to delay the project.

Hughes Declaration ¶ 16.   This date is set forth in the schedule in the second to last column from

the right.

There are 44 of the 162 work activities, according to this schedule, that may finish on

August 2, 2004 without delaying the project's planned completion date of August 2, 2004.  First,

it is nonsensical to have float extending out to August 2, 2004 on a project that is required to

achieve final completion no later than August 2, 2004.  Second, the reason that all of these

activities reflect so much float is because they are not logically tied to any other work activities.

Hughes Declaration ¶ 19.   They can complete on the last day of the Project without delaying the

project, according to this schedule, because this schedule does not reflect their interdependency

to other work activities. The following examples illustrate how activities must be linked and why

this baseline lacks the requirements to calculate even a reasonably reliable critical path.

According to Mr. Cassin's schedule analysis, interior CMU partitions in three buildings

(see activity numbers 95, 132 and 164) may complete on August 2, 2004 without delaying

project completion.  Interior CMU partitions are the interior masonry block walls of a building.

Common sense dictates that these walls are required to be in place before other activities can be

completed, such as interior doorways, ceilings, flooring, painting and electrical outlets just to

identify a few.  It is startlingly apparent that the interior masonry walls cannot complete on the

final completion date and not delay the project.

Another easily understood example is the curtain wall (activity number 102) and the

aluminum windows ( activity number 103).  Mr. Cassin's analysis suggests that the curtain wall,

a large window wall on the exterior of the building, as well as all the building windows, can complete on August 2, 2004 without delaying the completion date.  Again, common sense dictates that finish work such as drywall, flooring, ceilings, painting etc. are not going to be completed and then left open to the elements until the last day of the project when the curtain wall and windows are installed.

A final example is Bldg E slab on metal deck (activity number 188), which is not required, according to this analysis, to finish until August 2, 2004.  The slab on metal deck is the concrete slab poured over the metal deck, which acts as the structural upper floor of this building. All construction on this level of the building will be built up from this floor. Obviously, the pouring of this floor is one of the earliest activities that must occur in order to *begin* construction in this area.  Yet, PCM's analysis shows that it can complete on the late finish date of August 2, 2004 and not delay the project's finish date.

These examples show how PCM's analysis fails to logically tie the identified activities to those interdependent upon them.  Many more examples of this lack of logic can be pointed out from this baseline schedule upon which PCM bases its supplemental critical path analysis but limitations on briefing do not allow IRSD to identify them all.  However, the court can see how not having these activities logically connected to dependent activities will result in an unreliable critical path calculation.

### Summary of Delay Analysis is Not a Critical Path Analysis

Mr. Cassin summarizes his conclusions at the bottom of page 107 of the Revised PCM Report.  He provides seven bar charts between pages 109 and 113, with a total of 67 work activities, all of which measure the difference between the planned duration and the actual time it took to complete the (1) foundation work; (2) slab on grade; (3) steel erection; (4) roofing; (5)

exterior framing and sheathing; (6) windows and curtainwall; and (7) metal framing and drywall. Mr. Cassin provides no analysis of how these differences in planned and actual duration affected the critical path. Hughes Declaration, ¶ 20. Only a few (5 of 67) of the activities charted on these pages were supposedly critical activities according to the rest of Mr. Cassin's report. In these charts, Mr. Cassin is merely measuring delay to non-critical path activities. Hughes Declaration ¶ 20.

It is not enough that a work activity is delayed. There must be a delay of work on the critical path in order for a delay to be compensable. An interruption in one aspect of the work does not always result in an increase in time for total performance. <u>Mega Construction</u> at 424. Bar charts and other similar charts showing only delay to construction activities for which it seeks compensation based upon delay, without showing the interdependence of activities in the critical path context will not be evidentiarily sufficient. <u>Wilner v. U.S</u>., 26 Cl. Ct. 260 263 (1992). Since PCM's delay conclusions are not based upon a critical path analysis they fail to meet the <u>Daubert</u> methodological standards.

In addition, if one were to take Mr. Cassin's own work product and make a similar chart showing McDaniel's work activities, one would see that McDaniel's actual performance, as recorded by Mr. Cassin, vastly exceed the durations allotted to McDaniel in Mr. Cassin's schedule. The chart attached as Exhibit "3" to the Hughes Declaration does just that. The bar chart shows McDaniel's work activities and that those activities were started before or at the time planned. Yet, the planned duration of those activities were greatly exceeded just like all the activities referenced in the delay summary on the Revised PCM Report. If PCM is going to argue that activities with excessive durations delayed the project, it must include McDaniel's

16

excessive durations in that analysis.  Its failure to do so renders the supplemental analysis unreliable.

## **<u>Identification of the Critical Path</u>**

The analysis must identify the critical path and must identify it prior to the time the first delay was experienced to show when the contractor intended to perform each phase of the work. <u>Mega Construction Co. v. U.S.</u>, 29 Fed. L. 396, 426-427 (1993).  Without an identification of the critical path prior to the first delay event, the court cannot exclude the possibility that the contractor caused delays or concurrent delays on the project.  <u>Wilner v. U.S.</u>, 26 Cl. Ct. 260, 274 (1992).

First, PCM has failed to identify the critical path in the Revised PCM Report.  PCM offers "the most critical path" calculated from this baseline schedule. See Revised PCM Report, p. 88.  There is one critical path for a project, not a "more" or "less" critical path.  <u>Mega Construction</u> at 427.  Since the supplemental analysis fails to identify a critical path it fails to meet the standards required by <u>Daubert</u> and F.R.E. 702.

The "most critical path" set forth in the Revised PCM Report is not identified until November 18, 2002, approximately four months after construction began.  PCM states in the report that its analysis "excuses" substantial delay which occurred prior to November 18, 2002. Revised PCM Report p. 89.  However, PCM may not simply "excuse" delay because it has failed to identify the critical path at the time that delay occurred.  PCM may not pick and choose the time periods it decides are relevant in determining the critical path and calculating delay. Without an identification of the critical path prior to the first delay, RLI cannot meet its burden of showing that McDaniel did not cause delay or concurrent delay during the period in which the

17

critical path was not identified.  Such a delay in the unidentified period would impact the events in the subsequent period where PCM chose to plot the critical path and calculate delay.

## Inconsistent Method of Calculating Delay

PCM did not use a consistent method in attempting to calculate delay.  In the November 18, 2002 baseline in the supplemental analysis, PCM uses an August 2, 2004 final completion date.  (See last page of PCM 11-18-02 baseline schedule (activity 278), attached as Exhibit "2" to the Hughes Declaration).  In the analysis, each day the project actually finishes after this August 2, 2004 date will be the number of days the project is delayed.  After producing the baseline, PCM measured actual progress on the project in periodic updates.  From that progress projected how long after that August 2, 2004 finish date the work would actually be completed. In Update 1, the progress is measured as of January 21, 2003 and PCM projects that the project will not complete until August 23, 2004, or *18 days* (-18 days of total float) after required completion.  However, in this update, delay is measured from a required completion date of July 28, 2004, not the August 2, 2004 date used in the baseline. (See activity number 278 on the last page of PCM's first update, attached to the Hughes Declaration as Exhibit "4.")  PCM again measures progress in Update 2, as of April 29, 2003, and projects that completion will be *104 days late*. (Revised PCM Report p. 92-94).  However, in this update, PCM measures delay from a finish date of *May 31, 2004* (see activity number 278, last page of PCM schedule Update 2, attached to the Hughes Declaration as Exhibit "5"), instead of the baseline August 2, 2004 date or the July 28, 2004 date used in Update 1. In the Update 3, where progress was measured on June 30, 2003, PCM projects that completion will now be only *23 days late* (see Revised PCM Report, P. 94-96), measuring again from the August 2, 2004 required completion date.[4] (See

---

[4] PCM credits the significant drop in delay to acceleration by the contractors rather than difference in the completion dates used in Updates 3 and 4.  See pages 92-94 of the Revised PCM Report.

18

activity 278, last page of PCM update 3, attached to the Hughes Declaration as Exhibit "6").

Since PCM does not even consistently measure delay from the same required completion date

throughout its analysis, it fails to apply the required methodology, rendering it unreliable.

For the reasons discussed above, the new analysis in PCM's Revised Report should be

stricken.  Once it is stricken, the Court is left only to consider whether the Revised Report

corrects the defects noted in the Court's December 4 Order.

### B.  PCM Failed to Correct the Defects in its Original Report, As Directed by the December 4 Order

The December 4 Order required RLI/PCM to correct four defects in the report to avoid

having it stricken:

- RLI was to provide Defendants with a straight forward statement of the data or other information considered by Mr. Cassin in forming his opinions, including generating a list of information RLI provided to Mr. Cassin to assist him in rendering his opinion.

- RLI was required to provide IRSD with any exhibits to be used as a summary of or in support of Mr. Cassin's opinions.

- RLI was to identify with greater clarity and precision the analysis methodology.

- RLI was to redact the McDaniel damage calculation from its report.

Of these four, only the last – redaction of the damages calculation – has been corrected.[5]

### Clarification of Methodology

In the December 4 Order, the court expressly required PCM / RLI to  "address the

report's substantive failings by…identifying with greater clarity and precision the analysis

methodology."  RLI and PCM have utterly failed to comply with this directive.  As discussed in

the first portion of this brief, the supplemental portion of the Revised report is a completely

different analysis, not a clarification of the original analysis.  The content of the Original PCM

---

[5]  In the body of the narrative, PCM still discusses financial impacts to McDaniel as a result of the alleged project delay but McDaniel has redacted the damage calculation originally contained in the report.

Report remains virtually unaltered in the Revised PCM Report with the exception of the correction of some typos and some stylistic changes, which are identified on the attached <u>Exhibit "A."</u>   No substantive changes have been made to the original analysis and nowhere in the Revised PCM Report does Mr. Cassin explain the methodological steps he employed in performing his original analysis.

The Revised PCM Report does include a new section titled "Critical Path Method" on page 2.  However, the explanation provided in this section is simply an explanation of what the critical path method is generally.  These generalizations do not explain the methodological steps Mr. Cassin employed in performing his analysis.  While Mr. Cassin does state on page 3 that he utilized Timelines for Windows and the Primavera Software System in performing his analyses there is no explanation of the methodology used in determining the data to input into the programs. As noted by a previous court, "while the court appreciates the value of computers in making complex tasks simpler, it must be remembered that a computer-generated analysis is no better than the data which is entered into the computer.  <u>Weaver-Bailey Contractors v. U.S.,</u> 19 Cl. Ct. 474, 480 (1990).  As a result, IRSD continues to have the same issues with the Original PCM Report as raised in its first motion to strike.

<strong><u>Information Considered By PCM and Exhibits</u></strong>

As the court noted in the December 4 Memorandum at page 8, "IRSD's expert is entitled to a straight forward accounting of what Mr. Cassin **did and (perhaps more importantly) did not consider** when he reached his conclusions…it is not terribly onerous for RLI to generate a list of the information and data **they provided to Mr. Cassin** to assist him in rendering his opinion.  Thus, the court concludes that RLI shall provide this information to the defendants" [emphasis added]. While IRSD agrees that PCM has added exhibit references to the report, this

20

activity alone does not comply with the court's directive. There is no identification of the information RLI provided to PCM for its analysis. Therefore, IRSD is still unable to determine what PCM considered and what it did not consider. While Mr. Cassin added a new section on page 3 of the Revised PCM Report titled "Materials Reviewed and Relied Upon," Mr. Cassin explains no more about what information was available for his consideration than he did in the Original PCM Report. He states only:

> In preparing this report, I have reviewed documents produced through discovery by the parties hereto on several occasions throughout the preparation of this report. The documents that I have relied upon in reaching my conclusions are attached as Exhibits to my report, an appendix of which accompanies the Exhibits.

Revised PCM Report, p. 3. As the narrative makes clear, IRSD was provided with no more information regarding the information PCM considered and did not consider in performing its analysis.

With respect to the exhibits supporting PCM's opinion, RLI has also failed to comply with the December 4 Order. The Revised PCM Report was due February 4, 2008, a date resulting from two extensions by IRSD. When the Revised PCM Report was served on February 4, 2008, the exhibits were not included. They were not served upon IRSD until February 13, 2008. When the exhibit packet did arrive, 9 days late, 112 of the 247 exhibits referenced in the PCM report were not included. Attached as Exhibit "E" is a spreadsheet prepared by IRSD identifying the missing exhibits. As of the filing of this motion, RLI has not provided IRSD with the outstanding exhibits, notwithstanding the December 4 Order.

## C.  IRSD IS ENTITLED TO RECOVER ITS FEES FROM RLI IN MOVING TO STRIKE THE PCM REPORT

The December 4 Order provided that if RLI failed to correct the deficiencies in its original analysis, IRSD was entitled to recover its fees and expenses in preparing a second

motion to strike.  <u>D.I. 119</u>, p. 16-17.  As a result, once the court enters an order striking PCM's reports IRSD should be permitted to submit its fees and expenses to the court for reimbursement by RLI.

**V.  <u>CONCLUSION</u>**

RLI's Revised PCM Report fails to remedy the deficiencies required by the court's December 4, 2007 Order. As a result, PCM's Revised Report should be stricken, Mr. Cassin precluded from testifying at trial, and IRSD should be awarded its attorneys fees and expenses in preparing this motion.

Respectfully Submitted,

**SEITZ, VAN OGTROP & GREEN, P.A.**

**<u>/s/ James S. Green</u>**
**JAMES S. GREEN, ESQ. (DE0481)**
**jgreen@svglaw.com**
**222 Delaware Ave., Suite 1500**
**P.O. Box 68**
**Wilmington, DE 19899**
**(302) 888-0600**
**Attorneys for Defendant**
**Indian River School District**

Of Counsel:

K. Gerard Amadio, Esq.
Venzie, Phillips & Warshawer
2032 Chancellor St.
Philadelphia, PA 19103
(215) 567-3322