# EXHIBIT E



DEPARTMENT OF THE ARMY
OFFICE OF THE CHIEF, ARMY RESERVE
2400 ARMY PENTAGON
WASHINGTON, DC 20310-2400

DAAR-ZA

20 December 2004

MEMORANDUM THRU Commander, United States Army Forces Command, 1777 Hardee Avenue SW, Fort McPherson, GA 30330-1062

FOR Chief of Staff, United States Army, 200 Army Pentagon, Washington, DC 20310-0200

SUBJECT: Readiness of the United States Army Reserve

1. The purpose of this memorandum is to inform you of the Army Reserve's inability—under current policies, procedures, and practices governing mobilization, training, and reserve component manpower management—to meet mission requirements associated with Operation Iraqi Freedom and Enduring Freedom and to reset and regenerate its forces for follow-on and future missions. Most importantly, I wish to advise you of my deepening concern over the effects of current policies and practices on the readiness of the Army Reserve as a capable military force. Current Army Reserve capabilities are limited severely by a successive series of restrictive mobilization policies and controls that have been incrementally enacted. Each has failed to encompass a longer range, strategic view of operational requirements and Army capabilities; all of which have not considered the second and third order effects on retention. These are discussed at enclosure 1. A more detailed update of "What's Left" is contained at enclosure 2. Care should be taken to note that the numbers provided are dynamic and change constantly, almost always downward, regarding residual capability. Further, gross numbers fail to explain capability, as they do not account for more than 5 digit personnel qualification, fail to account for grades, and do not have the benefit of daily updates in personnel availability (deployability).

2. Demands to use only "volunteers" from the Reserve Components threaten to distort the very nature of service in the Reserve Components. Use of RC Soldiers for wartime service is not an anomaly in our Nation's history. Arguments for less use or no use of the RC in this war fail to recognize the potential grave danger to future RC readiness and involuntary use policies, caused by a failure to modernize RC readiness and mobilization policies and procedures. Requirements to use other than involuntary mobilization authorities places the burden of responsibility for service on the Soldiers' back instead of the Army's back. While the Soldier is still protected under USERRA, the Soldier is seen as having a clear choice by his family and employer. Faced with this, the most likely "volunteers" are those who often enjoy lesser responsible positions in civilian life. While some have expressed surprise and indignation at being mobilized for this war, most have not. They have understood it to be inherent in their volunteer contract for service. Consequently, failure to use the inherent authorities of involuntary

DAAR-ZA
SUBJECT: Readiness of the United States Army Reserve

mobilization during this threatening period in our Nation's history will set a difficult, dynamic precedent for future involuntary use of the Nation's reserve components.

3. While ability to meet the current demands associated with OIF and OEF is of great importance, the Army Reserve is additionally in grave danger of being unable to meet other operational requirements including those in named OPLANS and CONUS emergencies, and is rapidly degenerating into a "broken" force. The requirement to leave substantial amounts of equipment for other service forces and contractors in theater; the policy inhibitors limiting demobilized Soldiers in their training; and the failure to act on numerous requests to change and modernize regulatory policies regarding retention and personnel management, are eroding daily our ability to reconstitute into an effective operational force.

4. I do not wish to sound alarmist. I do wish to send a clear, distinctive signal of deepening concern. Contrary to a perceived intention of "caring" for troops, the insistence on even more restrictive policies and practices governing mobilization, manpower management, and the insistence on incentivizing "volunteers" through the use of money, threatens to unhinge an already precariously balanced situation in which we are losing as many Soldiers through no use as we are through the fear of overuse. A more detailed discussion is at enclosure 3. Simply put, our Army Reserve Soldiers wish to serve; the issue for them is one we understand and are dealing with—how long and how often they should be deployed as opposed to how long and how often for the active component Soldier. There are in fact, capabilities in the Army Reserve, such as medical support and Civil Affairs, for which there is no alternative. Failure to address these in a balanced, forward thinking, and responsible manner will further damage the Army and Armed Services' capabilities now and in the future.

3 Encls

JAMES R. HELMLY
Lieutenant General, US Army
Chief, Army Reserve

2

<u>US Army Reserve Readiness Discussion</u>

<u>Past Dysfunctional Practices/Policies</u>

1. Continuance of Presidential Selected Reserve Call-up Authority (PSRC) after Partial Mobilization had been declared by the President including deploying Soldiers to Kuwait under PSRC as late as December 2002. PSRC carries a maximum limit of nine months call-up time whereas the Partial Mob authority was originally enacted using a 12-month limit.

2. Continuance of different deployment policies including nine months in Guantanamo Bay, six months for OEF, six months for Sinai, and, until recently, six months for the Balkans. The effect of using PSRC and differing deployment policies has been to provide multiples of mobilization and deployment combinations between them and CONUS mobilizations, often within the same unit. Requirements to then limit mobilization time based on these various combinations cause additional cross-leveling—a practice that weakens and ultimately breaks our units.

3. Over one half of mobilization taskings within the USAR since 9/11 have been for groups of six or fewer Soldiers to fill individual requirements, not identifiable as a "task organized" unit. Further, those taskings for units have more often been incrementally mobilized over a longer period of time, e.g., the Headquarters, 800th MP PW Brigade was mobilized in seven different increments over an approximate three-month period providing for even greater combinations of mobilization time.

4. Failure to extend RC Soldiers' orders to allow 12 months BOG in a timely manner, even after the 12 month BOG decision had been made, caused multiple last minute extensions and harmed Soldiers, families, and employers.

5. DOD issuance and enactment of a policy which precludes RC Soldiers from performing inactive duty training for 60 days and annual training for six months or the remainder of a training year after demobilization. This precludes use of AT for OES and NCOES and precludes timely initiation of resetting actions. Further it fails to renew the Soldiers' bond with his or her unit, thus harming retention.

6. Reluctance to issue mobilization orders in a timely manner caused initial mobilizations for OIF 1 to be delayed resulting in over 10,000 Soldiers receiving as little as 3-5 days notice. Further, insistence on demobilizing RC Soldiers before the situation in Iraq cleared caused the demobilization of over 8,000 Soldiers who then had to be remobilized within three months of demobilization.

7. Because of the demand for less than whole units and the Army Reserve's strength/structure imbalance, not only have we had to cross-level some 43,000 Soldiers out of an OIF 1 cohort strength of 71,000 but many units in the Army Reserve were "broken" just to provide individuals, not as "fillers" to other units.

Encl 1

8. As Soldiers are now returning from OIF and OEF, they are often returning to find that the unit from which they were drawn has now been mobilized.

9. In an effort to reduce short notice mobilization actions there is a requirement to obtain a "volunteer statement" from each Soldier who is receiving orders with less than 30 days notice. This masks the slowness of decision making in Army, FORSCOM, and DOD, places the "burden" of service on the Soldiers' back, and slows an already slow, burdened, and redundant process even more.

10. The most recent decision to include any PSRC time in computation of mobilization time and to regard all Soldiers who have been mobilized for any period of time since 9/11 the same, regardless of amount of cumulative time mobilized, has now exacerbated the situation to the breaking point, and will create second and third order negative affects of potentially immense proportions. I wish to register my strongest possible objection to the various courses of action under consideration to avoid "remobilization." My objections include:

   a. The potential "sociological" damage done to the all-volunteer force by trying to incentivize "volunteers" for remobilization by paying them $1,000 extra per month. We must consider the point at which we confuse "volunteer to become an American Soldier" with "mercenary." Use of pay to induce "volunteerism" will cause the expectation of always receiving such financial incentives in future conflicts.

   b. Use of other service forces and members is a worthy initiative which deserves additional effort. However, I strongly object to a proposal that would "cobble together" units comprised of "financially induced volunteers" from the various services to take the place of units that we might otherwise have to remobilize. This is dangerous and irresponsible with regard to placing combinations of various service members in groups to perform collective missions under dangerous, lethal, volatile conditions when they are incentivized solely by financial inducements and have not trained extensively together as a single team.

   c. Organization of provisional organizations to assume missions for which existing units have trained and prepared will serve as a disincentive for future recruitment and retention in career specialties for which members were originally recruited. Further, it will be perceived as a professional affront to the various communities affected. Example: An idea has been put forth to provisionally organize Civil Affairs units from the other services. The only other service with Civil Affairs structures are the USMC and most of that force is also in the USMCR and has been heavily mobilized. The Army Reserve created and has nurtured Civil Affairs since its inception. As DOD tabled the notion of "AC-RC balance" I argued that we should create additional Civil Affairs structure in the USAR to provide a rotational capability and additional depth; that has not been accepted, believing mistakenly, that somehow we can create an "easy" way out of relying on the RC. The Army Reserve will perceive it as a direct affront to its

2

existence if "provisional" civil affairs units are established to try to replace the experienced, highly-skilled professionals who inhabit that force today.

11. No military force in use was created on the spot. Similarly, the policies and procedures which govern the Army Reserve's very existence as a military force have evolved over time, all in the last century. These would be dysfunctional if there were no mobilization and war today; their dysfunction is made more acute and hurtful by the strain of wartime use on the USAR today. I have proposed changes, too numerous to recount here, to many current policies. With the sole exception of those which we have unilaterally violated Army policy (on promotion of mobilized Soldiers) or initiated through direct coordination with the Congress (recognition program for returning mobilized Soldiers), we have received no action or support. Continuance of a "business as usual mindset" when it pertains to even the slightest changes to Army policy is effectively precluding an energetic, focused, and robustly executed retention and recruiting effort in the Army Reserve, designed to mitigate against the harmful affects of the above mobilization policies.

3